# EXHIBIT G

The Honorable David G. Estudillo

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

GAVEN PICCIANO,

9              Plaintiff,

10    v.

11    CLARK COUNTY, CLARK COUNTY
      JAIL, WELLPATH, LLC, and
12    NAPHCARE, INC.,

13              Defendants.

NO. 3:20-cv-06106-DGE

DECLARATION OF MARY C. VARGAS

14

15        1.      I am one of the attorneys representing Gaven Picciano in this matter.

16        2.      I have attached as Exhibit 1 the relevant excerpts of NaphCare's responses to

17    Picciano's discovery requests.

18        3.      I have attached as Exhibit 2 the relevant excerpts of Wellpath's responses to

19    Picciano's discovery requests.

20

21

22

Declaration of Mary C. Vargas- 1
3:20-cv-06106-DGE

STEIN & VARGAS, LLP
10 G Street NE, Suite 600
Washington, DC 20002
(240)793-3185

**Correspondence with NaphCare's Counsel**

4.      On or about June 22, 2023, I sent counsel for NaphCare a letter identifying evidence Picciano had obtained demonstrating that it had failed to disclose responsive information and documents in its discovery production with respect to the issue of federal financial assistance.  In this letter, I pointed out instances where Picciano had obtained evidence of likely federal funding that NaphCare receives based on publicly available information.  This letter is attached as Exhibit 3.

5.      On or about June 30, 2023, NaphCare's counsel responded to my letter stating that NaphCare would not supplement its responses based on its interpretation of federal financial assistance.  NaphCare, however, reserved the right to supplement its answers and responses in its discretion.  NaphCare's counsel's letter is attached as Exhibit 4.

6.      On or about July 5, 2023, I sent NaphCare's counsel a letter responding to its arguments about the definition of federal financial assistance.  I explained the relevant statutory and regulatory provisions and provided case law explaining the scope of federal financial assistance in this case.  This letter is attached as Exhibit 5.

7.      On or about July 11, 2023, NaphCare's counsel replied in a letter asserting that these authorities that I provided were not point and that, based on its own definition of federal financial assistance, it had no additional discovery to produce.  Meanwhile, NaphCare again reserved the right to supplement its answers and responses in its discretion.  NaphCare's counsel's letter is attached as Exhibit 6.

8.      On or about July 24, 2023, I provided counsel for NaphCare with the results of a public records request from Lewis County, Washington showing that Lewis County had

Declaration of Mary C. Vargas- 2
3:20-cv-06106-DGE

STEIN & VARGAS, LLP
10 G Street NE, Suite 600
Washington, DC 20002
(240)793-3185

1  authorized that a portion of Medicaid grant funding be distributed to NaphCare for a medication-

2  assisted treatment program.

3      9.      Subsequent to this written correspondence, on or about July 24, 2023, NaphCare's

4  counsel David Perez and I had a telephonic meet and confer in which we were unable to resolve

5  this discovery dispute, as NaphCare would not change its position based on its narrow

6  interpretation of federal financial assistance.  During this call, I asked Mr. Perez if his client

7  would consent to a modification of the scheduling order to permit the filing of a motion to

8  compel discovery, as NaphCare's counsel had not objected during our written correspondence to

9  any motion being untimely.  When prompted on this issue, Mr. Perez stated that his client would

10  not consent to a modification of the scheduling order.

**Correspondence with Wellpath's Counsel**

11      10.     On or about June 22, 2023, I sent Wellpath's counsel a letter identifying

12  deficiencies in its discovery production that had come to light with respect to the issue of federal

13  financial assistance.  In this letter, I pointed out instances of likely federal funding that Wellpath

14  receives based on publicly available information.  This letter is attached as Exhibit 7.

15

16      11.     On or about July 6, 2023, after receiving no response to this letter, I sent a follow-

17  up email to Wellpath's counsel requesting a response.

18      12.     On or about July 7, 2023, Wellpath's counsel responded in a letter stating that

19  Wellpath had no additional relevant federal funding to identify because section 504 applies only

20  if the entity receives "general federal funding".  Wellpath's counsel stated, "If you want to bring

21  a motion on this issue, I invite you to do so."  Wellpath's counsel further stated that he did not

22  believe a meet and confer was necessary.  This letter is attached as Exhibit 8.

Declaration of Mary C. Vargas- 3
3:20-cv-06106-DGE

STEIN & VARGAS, LLP
10 G Street NE, Suite 600
Washington, DC 20002
(240)793-3185

13.     On or about July 25, 2023, I sent an email to Wellpath's counsel requesting that we do a telephonic meet and confer as required by Local Rules.  In response, Wellpath's counsel stated, "I believe our disagreement is legal in nature and not substantive.  The Court will need to decide it."  This email correspondence is attached as Exhibit 9.

14.     On or about July 26, 2023, Jerry Aiken, counsel for Wellpath, and I had a telephonic meet and confer, with follow-up email correspondence over the next few days in an unsuccessful attempt to resolve the discovery dispute.

15.     On or about August 3, 2023, when I asked Mr. Aiken if he would consent to a motion to amend the scheduling order to permit the motion to compel, he stated a preference for the Court to decide the motion for judgment on the pleadings first, but that he "most likely would have no objection to Plaintiff filing a motion to compel" if Plaintiff "felt the need to do so."  This email correspondence is attached as Exhibit 10.

DATED:   August 3, 2023

By ___/s/ Mary C. Vargas___
Mary C. Vargas, Admitted *Pro Hac Vice*
Stein & Vargas, LLP
10 G Street NE, Suite 600
Washington, DC 20002
(240)793-3185 telephone
(888)788-4620 facsimile

Declaration of Mary C. Vargas- 4
3:20-cv-06106-DGE

STEIN & VARGAS, LLP
10 G Street NE, Suite 600
Washington, DC 20002
(240)793-3185

EXHIBIT 1

1

2                    IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE
3

GAVEN PICCIANO,                          )
4                                        )
                    Plaintiff,           )
5                                        )     NO.  3:20-cv-06106-DGE
          vs.                            )
6                                        )
CLARK COUNTY, CLARK COUNTY JAIL,         )     **PLAINTIFF'S**
7   WELLPATH, LLC, and NAPHCARE, INC.    )     **INTERROGATORIES TO**
                                         )     **DEFENDANT NAPHCARE, INC.**
8                    Defendants.         )     **– SET ONE**
                                         )
9                                        )
_____  )
10

11        **TO:**        **Defendant Naphcare, Inc.**

12        **AND TO:**    **Defendant NaphCare, Inc.**
                         **Ketia Wick**
13                       **Fain Anderson VanDerhoef Rosendahl O'Halloran Spillane PLLC**
                         **701 Fifth Ave., Suite 4750**
14                       **Seattle, Washington 98104**
                         **T: 206-515-2151**
15                       **E:** [ketia@favros.com](mailto:ketia@favros.com)

16

17        You are hereby served with Plaintiffs' Interrogatories to Defendant NaphCare, Inc. – Set

18   One.

19        In accordance with FRCP 33 and 34, please answer each of the following interrogatories

20   separately, fully, in writing and under oath.  Each answer must be as complete and

21   straightforward as the information reasonably available to you permits after reasonable inquiry,

22   including the information possessed by your attorneys or agents.  If an interrogatory cannot be

23   answered completely, answer it to the extent possible.

1

2        **ANSWER:** Objection. This Interrogatory is overly broad and vague as to "all persons" as

3  NaphCare only provided care in Clark County Jail after Wellpath's contract ended. Subject to and

4  without waiving objection NaphCare only has knowledge of the care Plaintiff received after

5  NaphCare took over as the contracted medical provider at Clark County Jail. All NaphCare

   providers involved in Plaintiff's care are recorded in the medical record provided in response to

6  RFP No. 1.

7        **INTERROGATORY NO. 18:**  Please identify all sources and amounts of Federal or

8  State funding received by Defendant during the year of 2020.

9        **ANSWER:** Objection. This Interrogatory seeks information that is not relevant nor

10 reasonably calculated to lead to the discovery of admissible evidence.

11       **INTERROGATORY NO. 19:** Please explain all decisions regarding whether or not

12 Defendant was assigned a dietician and/or provided any dietary supplements to Plaintiff

13 while he was in NaphCare's care.

14       **ANSWER:** Objection. This Interrogatory is vague and confusing as to the language

15 "Defendant was assigned." Subject to and without waiving this objection, NaphCare did not, and

16 does not, employ a dietician at the Clark County Jail. Any onsite dietician would be employed by

17 another party or entity. NaphCare has no knowledge of who performed these duties during the

18 events referenced in this litigation. NaphCare has no input nor impact on medical diets and does

19 not sign off on such diets. NaphCare only inputs recommendations for medical diets that are

20 clinically indicated, and in accordance with the policies and procedures outlined in the documents

21 disclosed in response to RFP No. 2.

22

23

1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

7   GAVEN PICCIANO,

8                          Plaintiff,

9        vs.

10  CLARK COUNTY, CLARK COUNTY JAIL,
    and NAPHCARE, INC.,

11

12                         Defendants.

**NO.**  3:20-cv-06106-DGE

**PLAINTIFF GAVEN
PICCIANO'S REQUESTS FOR
PRODUCTION OF
DOCUMENTS TO DEFENDANT
NAPHCARE, INC.**

13
14
15
16

**TO:**        **Defendant NaphCare, Inc.
               c/o Ketia Wick, attorney of record for Defendant
               Fain Anderson VanDerhoef Rosendahl O'Halloran Spillane, PLLC
               701 Fifth Ave., Suite 4750
               Seattle, Washington 98104
               T: 206-515-2151
               E: ketia@favros.com**

17
18        Plaintiff requests that defendant produce the following documents to plaintiff's attorneys

19   pursuant to Rule 34 of the Federal Rules of Civil Procedure, on or before _____ ___, 2022, in

20   the form of PDF documents with searchable text.

21        Please take notice that you are under a continuing duty to amend and/or supplement your

22   responses upon discovery that any response is no longer correct or complete in whole or in part;

23   or that the response was incorrect or incomplete when made; or that the response though correct

PLAINTIFF'S REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT NAPHCARE, INC.
**Page 1 of 21**
Case No: 3:20-cv-06106-DGE

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3172

without specific search terms and identification of custodians to be searched. Without waiving and subject to objection, see response to RFP No. 2.

**Request for Production No. 12:**  Please produce all DOCUMENTS and COMMUNICATIONS policies, practices, and procedures relating to individuals experiencing dietary adverse events, including but not limited to allergic reactions, food poisoning, and/or gluten exposure, relating to their consumption of food served or inability to consume food at Clark County Jail.

**RESPONSE:** Objection. This Interrogatory is overly broad. Responsive communications on this topic, based on the broad and vague language used above, are too difficult to determine without specific search terms and identification of custodians to be searched. Without waiving and subject to objection, see attached response to RFP No. 2, and documents provided in response to RFP No. 1.

**Request for Production No. 13:**  Please produce every "assurance of compliance" with Section 504 of the Rehabilitation Act, 29 U.S.C. §794, signed by Defendant.

**RESPONSE:** Objection. This Interrogatory is overly broad and requests information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. The Court dismissed Plaintiff's Section 504 claim against all Defendants party to this suit in the Order On Defendant Wellpath, LLC's Motion to Dismiss the Second Amended Complaint, on May 23, 2022. This request is not properly limited by time or geography. Furthermore, the language used is non-specific and vague to the point that Defendant cannot answer without further explanation as to what information is being sought.

**Request for Production No. 14:**  Please produce all DOCUMENTS and COMMUNICATIONS relating to any funding of any kind Defendant received that originated

PLAINTIFF'S REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT NAPHCARE, INC.
**Page 16 of 21**
Case No: 3:20-cv-06106-DGE

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3172

from the United States and that NaphCare, Inc. has received or used between January 1, 2020, and the present, regardless of whether such funding first passed through other entities such as the State of Washington or the County of Clark.

**RESPONSE:** Objection. This Interrogatory seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Additionally, it is not properly limited in temporal scope.

**Request for Production No. 15:** Please produce all DOCUMENTS and COMMUNICATIONS related to any affirmative defense asserted by Defendant.

**RESPONSE:** Objection. This Interrogatory is overly broad and unduly burdensome as it is oppressive and virtually impossible to answer. *See Safeco of America v. Rawston*, 181 F.R.D. 441, 447 (C.D. Cal. 1998); *Lawrence v. First Kansas Bank & Trust Co.*, 169 F.R.D. 657, 633 (D. Kan. 1996). Moreover, Plaintiff may not force Defendant to put on a dress rehearsal for trial. *See Weber v. Biddle*, 72 Wn.2d 22, 29, 431 P.2d 705 (1967)

Subject to and without waiving such objections, discovery has just commenced and Defendant will supplement its answer as appropriate.

**Request for Production No. 16:** Please produce Defendant's complete personnel file for Melissa Songer.

**RESPONSE:** See attached, redacted personnel file for Melissa Songer at bates NC 000926-001046.

PLAINTIFF'S REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT NAPHCARE, INC.
**Page 17 of 21**
Case No: 3:20-cv-06106-DGE

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3172

# EXHIBIT 2

THE HONORABLE DAVID G. ESTUDILLO

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GAVEN PICCIANO,

               Plaintiff,

    v.

CLARK COUNTY, CLARK COUNTY
JAIL, WELLPATH, LLC, and
NAPHCARE, INC.,

               Defendants.

No. 3:20-cv-06106-DGE

**PLAINTIFF'S INTERROGATORIES TO
DEFENDANT WELLPATH, LLC, SET
ONE**

**[WITH SUPPLEMENTAL RESPONSES]**

**TO:**        **Defendant Wellpath, LLC**

**AND TO:**    **Jerome R. Aiken and Pardies Roohani, Counsel for Defendant
               Meyer, Fluegge & Tenney, P.S.
               230 South Second Street
               Yakima WA 98907-2680
               T: 509/575-8500
               F: 509/575-4676
               E: aiken@mftlaw.com
               E: roohani@mftlaw.com**

    You are hereby served with Plaintiffs' Interrogatories to Defendant Wellpath, LLC– Set

One.

    In accordance with the Federal Rules of Civil procedure 26 and 33, please answer each of

the following interrogatories separately, fully, in writing and under oath.  Each answer must be

Plaintiff's Interrogatories to Defendant Wellpath,
LLC., Set One - 1
Cause No.  3:20-cv-06106-DGE

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

**ANSWER:**

**Please see response to Interrogatory No. 10.**

**SUPPLEMENTAL ANSWER:  Please see supplemental response to Interrogatory No. 10.**

**INTERROGATORY NO. 12**: Please identify all individuals who were responsible or who had authority to ensure safe continuation of care for inmates at Clark County Jail during the transfer of medical contractors between Wellpath to NaphCare at Clark County Jail in 2020.

**ANSWER:**

**Based upon the information and records and deposition testimony to date, there was no change in the caregivers providing care to Mr. Picciano.  The majority of Wellpath caregivers continued to provide care to Mr. Picciano once NaphCare took over on February 1, 2020, and they became employees of NaphCare on that date, if not before.**

**SUPPLEMENTAL ANSWER:  All Wellpath employees at Clark County Jail were responsible for the safe continuation of care at Clark County Jail.**

**INTERROGATORY NO. 13:**  Please identify the individuals responsible for the determination of Plaintiff's need/request for a Special Diet and describe in detail the reasoning and information relied upon by those individuals in their determination.

**ANSWER:**

**Based upon the records and documents produced to date and the deposition testimony, no one at Wellpath was ever made aware that the Plaintiff made a request for a special diet.  It appears that Plaintiff's request for this did not occur until at the earliest February 1, 2020 after Wellpath ceased providing medical care at the Clark County Jail.**

**INTERROGATORY NO. 14:**  Please identify all sources and amounts of Federal or State funding received by Defendant during the year 2020.

**ANSWER:**

**Based upon information, Wellpath did not receive any such funding.**

Plaintiff's Interrogatories to Defendant Wellpath,
LLC., Set One - 15
Cause No.  3:20-cv-06106-DGE

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1  **SUPPLEMENTAL RESPONSE:  Object: This Interrogatory seeks information that is not
2  relevant under Rule 26 and is violative of the proportionality requirements of that rule.
   Without waiving this objection and subject to this objection, as it relates to Clark County
3  Jail, this Defendant is not aware of any federal or state funding directly received by the
   federal government or the state.  Wellpath may have received federal funding during 2020
4  for services provided at federal facilities under a specific contract with the federal
   government for the provision of services at that facility.**

5

6         **INTERROGATORY NO. 15:** Please explain Defendant's interactions with any

7  nutritionist and/or Registered Dietician to ensure the safety and nutrition of Medical Diets

8  for Jail Inmates.

9         **ANSWER:**

10        **This Defendant at this point is not aware of any such interactions that may have
   occurred.  This Defendant is continuing to research this and obtain information.  If any
11 additional information is provided on this, this response will be supplemented.**

12
   **SUPPLEMENTAL RESPONSE:  Under this Defendant's contract with Clark County Jail,
13 this Defendant had no obligation to provide any nutritionist or registered dietician services
   at the jail.  Based upon discovery that has occurred to date, there was no interaction
14 because Clark County at that time had not entered into any type of contract to provide
   nutritionist or registered dietician services.**
15

16        **INTERROGATORY NO. 16:** Please describe Defendant's policy or procedure for

17 provision of dietary/nutritional supplements or meal supplements such as Ensure or

18 Pedialyte to Jail Inmates.

19        **ANSWER:**

20
21        **At this time, this Defendant has not been able to locate any such policies that would
   have been in effect as of January 30 and January 31, 2020. This Defendant is continuing to
   review this and if any such policies are located, they will be immediately provided.**
22

23 **SUPPLEMENTAL ANSWER:  This Defendant had no specific policies responsive to this
   Interrogatory.**
24

25

26

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

**VERIFICATION**

STATE OF ~~WASHINGTON~~ UTAH )
                                                    ) ss.
County of _UTAH_                        )

CHRISTOPHER J. LAMB, being first duly sworn, on oath deposes and states:

That I am the representative for Defendant Wellpath named to answer the above Interrogatories and have given the answers set forth above; that I have read the within and foregoing Supplemental Answers to First Interrogatories Directed to Wellpath, LLC, the answers thereto, know the contents thereof, and believe the same to be true and correct.

_____
CHRISTOPHER J. LAMB

SUBSCRIBED AND SWORN TO (or affirmed) before me this _16_ day of
~~April~~ May, 2023.

_____
NOTARY PUBLIC
Residing at: _____
My Commission Expires: _____

**CERTIFICATION**

The undersigned attorney for Defendant has read the foregoing Supplemental Answers to First Interrogatories Directed to Defendant Wellath, LLC and the answers or objections made thereto and they are in compliance with CR 26(g).

**DATED** this _16_ day of May, 2023.

_____
JEROME R. AIKEN, WSBA #14647
Meyer, Fluegge & Tenney, P.S.
Attorneys for Defendant

Plaintiff's Interrogatories to Defendant Wellpath,
LLC., Set One - 21
Cause No. 3:20-cv-06106-DGE

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

EXHIBIT 3

# STEIN & VARGAS LLP

Overcoming Barriers | Ensuring Communication | Creating Access

June 22, 2023

**<u>VIA ELECTRONIC MAIL ONLY</u>**
David Perez
Zachary Davison
Michelle Maley
Mason Ji
Perkins Coie
1201 Third Avenue, Suite 4900
Seattle, WA 98101
dperez@perkinscoie.com
zdavison@perkinscoie.com
mmaley@perkinscoie.com
mji@perkinscoie.com

RE:     *NaphCare's Ongoing Discovery Deficiencies*

Dear Counsel,

This letter follows up with regard to federal funding that your client had failed to disclose during discovery.

Picciano's Request for Production of Documents No. 14 was as follows: "Please produce all DOCUMENTS and COMMUNICATIONS relating to any funding of any kind Defendant has received that originated from the United States and that NaphCare, Inc. has received or used between January 1, 2020 and the present, regardless of whether such funding first passed through other entities such as the State of Washington or the County of Clark."  Picciano's Request for Production of Documents No. 13 similarly sought documentation relevant to section 504 coverage.  Your client objected to these requests on the ground that they seek "information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence."[1]   Your client's refusal to produce responsive information on the ground that it was "irrelevant" is a waiver of the argument that your client does not receive federal financial assistance.

Picciano also propounded Interrogatory No. 18, which states: "Please identify all sources and amounts of Federal or State funding received by Defendant during the year of 2020."  Your client also objected on the ground that this interrogatory "seeks information that is not relevant

---

[1] Your client further objected to Interrogatory No. 14 on the ground that this document request was not limited in temporal scope.  This boilerplate objection is without merit as the request was limited to documents/communications related to federal funding received or used after January 1, 2020, when Picciano was detained later that same month.

nor reasonably calculated to lead to the discovery of admissible evidence." This is further waiver of the argument that your client does not receive federal financial assistance.

Given your client's recent motion for judgment on the pleadings that asserts in part that NaphCare is not a recipient of federal financial assistance, this information sought is obviously relevant. Given the arguments your client has advanced in open court in contravention to your client's previous representations in discovery, it is now incumbent on your client to respond fully to this discovery request.

Moreover, based on publicly available information, your client receives considerable federal funding.

- Numerous federal grants provide funding for the medication-assisted treatment that it promotes to treat opioid use disorder in correctional settings. See the attached NaphCare powerpoint presentation at slides 31 and 32 of 56. Slide 54 of 56 (a slide prepared by NaphCare) references recognition of a program that NaphCare partnered in to treat U.S. military veterans, a program that started in 2019 just before Picciano was detained, and which continued into the year 2020 and beyond. See also Veterans Resurgence Program at Hillsborough County jails: https://patch.com/florida/brandon/hillsborough-sheriff-opens-housing-inmates-who-are-veterans and https://www.naphcare.com/news/naphcare-partner-awarded-ncchc-program-of-the-year-for-veteran-focused-services.
- NaphCare's provision of medical and behavioral health services at the Hillsborough County, Florida jails has been funded in part by a grant of federal funds through the Substance Abuse and Mental Health Services Administration since prior to 2020. See https://www.usaspending.gov/award/ASST_NON_H79SM080608_7522.
- Delivery System Reform Incentive Payment Program (DSRIP) provides funding to enhance quality of care, including but not limited to delivery of medication-assisted programs to detainees and inmates.
  - For example, a public search shows that NaphCare was a partner on a project that received DSRIP funding for medication-assisted treatment for opioid use disorder in Lewis County in Washington State. See, for example, page 10 of the Washington State Medicaid Transformation report available at https://www.hca.wa.gov/assets/program/sar-4-findings-report.pdf.
- Medicaid/Medicare is an additional source of funding for health care in correctional settings that was not disclosed.
  - Further, while Medicaid/Medicare may limit payment for services for detainees, these programs do provide coverage in limited circumstances. For instance, Medicaid will cover services through the end of the day that a person is first detained and will also cover in-patient care for detainees/inmates. See for example the document at https://www.hca.wa.gov/assets/free-or-low-cost/suspension-101-training-module-1.pdf. Washington State law also explicitly authorizes Apple Health—Washington's Medicaid program—to pay jail health providers. *See* Wash. Rev. Code § 70.48.130(3) (stating that subsection (2) authorizes payment by Medicaid for confined persons).
  - Moreover, NaphCare employs individuals who deal with Medicaid/Medicare. For example, NaphCare has posted an opening for a position that deals with

3

"CMS edits" by Centers of Medicare & Medicaid Services (CMS) and requires a working knowledge of Medicaid/Medicare.  See attached job listing.

If your client does not intend to waive its arguments that it is not a recipient of federal financial assistance, Plaintiff kindly requests that your client search for all responsive information with respect to the above-mentioned sources of federal funding.  Your client should supplement its answers to describe the funding that it receives from these programs, and produce all documents related to the funding that your client receives from these programs, whether directly or through a third-party.  This should include description/documentation of federal funding described above, as well as any billing records/payment records from Medicaid/Medicare for the year 2020, and any other federal funding received.

I respectfully request a response to this letter by June 30, 2023.  I am available to do a meet and confer to ensure the issues raised in this letter are clear and that your client abides by its obligation to investigate and respond fully to discovery requests.  I can be reached at Mary.Vargas@steinvargas.com or at 240-793-3185 to discuss.

Thank you for your prompt attention to this matter.

Sincerely,

Mary Vargas

**UNIVERSITY of**
## SOUTH FLORIDA
**College of Behavioral & Community Sciences**
Criminal Justice, Mental Health, and
Substance Abuse Technical Assistance Center

# CJMHSA TAC Quarterly Conference Call (webinar)
# June 29, 2022 at 10:30 A.M.
# Agenda

- USF CJMHSA TAC Quarterly Webinar Introduction & TAC Updates

    Abby Shockley, MPH, Director, CJMHSA TAC

- "Jail-based Medication-Assisted Treatment (MAT): Best Practices, Lessons Learned from the Field, and a Florida Case Study"

    Sarah Wurzburg, MA, Deputy Division Director, Behavioral Health, Council of State Governments Justice Center

    Meghan Mahoum-Nassar, LMHC, CCPH, Corporate Mental Health Director - Eastern States, NaphCare, Inc.

- Questions and Answers



# Medication Assisted Treatment in Correctional Facilities

June 29, 2022| Sarah Wurzburg

# Presentation Outline

I.    Introductions

II.   Organization Overview

III.  Presentation

IV.   Discussion Period

V.    Resources



# Presenters

- Sarah Wurzburg, Deputy Division Director, Behavioral Health, CSG Justice Center

Medication Assisted Treatment in Correctional Facilities

CSG | Justice Center

# Presentation Outline

I.      Introductions

II.     Organization Overview

III.    Presentation

IV.    Discussion Period

V.     Resources



# The Council of State Governments Justice Center

We are a national nonprofit, nonpartisan organization that combines the power of a membership association, serving state officials in all three branches of government, with policy and research expertise to develop strategies that increase public safety and strengthen communities.



# Our Goals

## Break the cycle of incarceration
*We assist those working inside and outside of government to reduce both crime and incarceration among youth and adults in contact with the justice system.*

## Improve health, opportunity, and equity
*We work across systems to develop collaborative approaches to improve behavioral health, expand economic mobility, and advance racial equity for people and communities affected by the justice system.*

## Expand what works to improve safety
*We help leaders understand what works to improve public safety and assist them to develop strategies, adopt new approaches and align resources accordingly.*



# Second Chance Act

Supports state, local, and tribal governments and nonprofit organizations in their work to reduce recidivism and improve outcomes for people returning from incarceration. **The Second Chance Act has supported more than $500 million in reentry investments across the country.**



# The U.S. Department of Justice Bureau of Justice Assistance

**Mission**: BJA's mission is to provide leadership and services in grant administration and criminal justice policy development to support state, local, and tribal justice strategies to achieve safer communities. BJA works with communities, governments, and nonprofit organizations to reduce crime, recidivism, and unnecessary confinement, and promote a safe and fair criminal justice system.

 

Visit the BJA website to learn more.



# Presentation Outline

I.   Introductions

II.  Organization Overview

III. Presentation

IV.  Discussion Period

V.   Resources



# Substance Addiction in Prisons and Jails



**FIGURE 1**

Inmates and adult general population who met the criteria for drug dependence or abuse, 2007–2009

Bronson, J. Stroop, J. Zimmer, S. Berzofsky, M. *Drug Use, Dependence and Abuse Among State Prisoners and Jail Inmates, 2007-2009*.  Bureau of Justice Statistics (BJS): June 2017.



# Opioid Use and the CJ System



- Opioid use correlated with criminal justice (CJ) involvement

- Any level of opioid use was associated with involvement in the CJ system in the past year

- Involvement in the CJ system increased with intensity of opioid use

- People who report opioid use are more likely to report physical, mental health, and co-occurring substance use disorders

*Winkelman TN, Chang VW, Binswanger IA. Health, Polysubstance Use, and Criminal Justice Involvement Among Adults With Varying Levels of Opioid Use. *JAMA Network Open.* 2018;1(3):e180558. doi:10.1001/jamanetworkopen.2018.0558



# The Opioid Epidemic and the Criminal Justice System

- In Connecticut:
  - **52 %** of people who died from a drug overdose in 2016 had at some point been incarcerated in jail or prison. (Maurer 2018)
- In Rhode Island:
  - **15%** of those in DOC have a opioid use disorder
  - **60%** of fatal overdoses victims in 2014 had been incarcerated (Clark, Hurley, Martin, 2018)
- In Washington state:
  - opioids were detected in nearly **15%** of all deaths over a 10-year period among those released.
  - Within the first two weeks after release, the risk of death was **129 times** that of other state residents. (Binswanger et al 2013; Binswanger et al 2007)



# The Americans with Disabilities Act and the Opioid Crisis

- This effort focuses on combating discrimination against people in treatment or recovery

- Drug addiction is considered a physical or mental impairment under the ADA

- Example: A **jail** does not allow incoming inmates to continue taking MOUD prescribed before their detention. The jail's blanket policy prohibiting the use of MOUD would **violate** the ADA.

U.S. Department of Justice Civil Rights Division. The Americans with Disabilities Act and the Opioid Crisis: Combating Discrimination Against People in Treatment or Recovery.
https://www.ada.gov/opioid_guidance.pdf

# Corrections Priorities

- Safety, and security within the facility

- Meeting healthcare requirements

- Development of <u>collaborative</u> <u>comprehensive reentry plans</u>



# Reentry Best Practices

- Planning and Coordination

- Behavioral Health Treatment and Cognitive Interventions

- Probation and Parole

- Recovery Support Services, Housing, and Other Supports in the Community



# **What is Medication Assisted Treatment?**

- Medication Assisted Treatment (MAT) is the use of medications and behavioral therapy coupled with social supports to treat substance use disorders.

- It is used primarily to assist with opioid use disorders but can also benefit individuals with alcohol use disorders.

- It blocks the effects of alcohol and opioids, reducing physical cravings, and helps treat withdrawal symptoms.

CSG | Justice Center

# Medication Assisted Treatment





- MAT is approved by the Food and Drug Administration. Providers are driven clinically to meet individual needs.

- MAT is not recommended as a standalone treatment option.

CSG Justice Center

# The Shift to Medication Assisted Treatment

- Ongoing medication management has proven to increase family reunification, employment and housing stability, and sustained recovery.

- Providing MAT is an evidence-based practice and is recognized as the gold standard in treatment for opioid treatment.

- MAT is a valuable therapeutic benefit to attain a level of normalcy and break the cycle of opioid addiction.

Substance Abuses and Mental Health Services, "Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs," Treatment Improvement Protocol Series, no. 43(2005):12, https://www.ncbi.nlm.nih.gov/books/NBK64157/#A82732



# Poll Question

- Does your agency provide medication assisted treatment?
  - ➢ Yes
  - ➢ No
- If so, which medication assisted treatment is in use?
  - ➢ Methadone
  - ➢ Buprenorphine/Suboxone
  - ➢ Naltrexone/Vivitrol
  - ➢ All three

Medication Assisted Treatment in Correctional Facilities



# Types of Medication Assisted Treatment

Methadone

Buprenorphine

Naltrexone

Medication Assisted Treatment in Correctional Facilities



# Methadone

Long-acting opioid agonist that reduces opioid cravings and withdrawal and blocks the effects of opioids

- Taken daily orally
- Considered the treatment of choice for opioid use disorders in pregnant and breastfeeding women
- Administered by Opioid Treatment Programs (OTPs)
- Other medications may interact with methadone and can cause heart conditions
- Unintentional overdose is possible if not taken as prescribed

Medication Assisted Treatment in Correctional Facilities



# Buprenorphine (Suboxone)

An opioid partial agonist that produces effects such as euphoria or respiratory depression at low to moderate doses

 Also considered the treatment of choice for opioid use disorders in pregnant and breastfeeding women

Can be prescribed or dispensed in physician offices, significantly increasing access to treatment

Increase safety in cases of overdose

Lowers the potential for misuse

Medication Assisted Treatment in Correctional Facilities

CSG Justice Center

# Naltrexone (Vitriol)

Opioid antagonist that binds to opioid receptors in the brain and blocks the euphoric effects of opioids

Can also be used to treat alcohol use disorder

Not an opioid, is not addictive, and does not cause withdrawal symptoms when someone stops using it

Intramuscular extended-release injectable that lasts 30 days

Low potential for misuse

Can be prescribed by any health care provider that is licensed to prescribe medications



# Benefits of Medication Assisted Treatment

## Decreases
- Decreases risk for fatal and nonfatal overdoses

## Eliminates
- Eliminates opioid withdrawal syndrome (OWS)

## Decreases
- Decreases opioid cravings

## Increases
- Increases patient functionality

## Normalizes
- Normalizes brain anatomy and physiology

## Decreases
- Decreases transmission/acquisition of viral infections (Hepatitis B Virus, Hepatitis C Virus, HIV) and infection complications (abscesses, cellulitis, endocarditis)



# Benefits of Medication Assisted Treatment

**1** Improves patient survival

**2** Increases retention in treatment

**3** Decreases illicit opiate use and other criminal activity among people with substance use disorders

**4** Increases patients' ability to gain and maintain employment

**5** Improves birth outcomes among women who have substance use disorders and are pregnant



# Whole Person Approach

Treatment planning that focuses on treating every area of someone's life and understanding that addiction is only a symptom of a much larger problem

- Medical
- Psychological
- Social
- Vocational
- Legal issues

Medication Assisted Treatment in Correctional Facilities



# Elements of a Whole Person Approach

Cognitive Behavioral Therapy

Contingency Management

Detox

12 Step Programs

Alternative Therapies

Medication Assisted Treatment in Correctional Facilities



# Medication Assisted Treatment in Correctional Facilities



The National Commission on Correctional Healthcare, *Jail Based Medication Assisted Treatment Promising Practices, Guidelines, and Resources For The Field* (Illinois: The National Commission on Correctional Healthcare, 2018), https://www.ncchc.org/filebin/Resources/Jail-Based-MAT-PPG-web.pdf



# Benefits of Medication Assisted Treatment in Correctional Facilities

Less contraband coming into jails and prisons

Increased overall health of incarcerated individuals

Fewer safety and violence issues

Improvement in breaking the cycle of arrest, incarceration, and release normally associated with substance use disorders

Reduction in costs: comprehensive drug treatment programs in jails are associated with reduced system costs

"Medication- Assisted Treatment In The Criminal Justice System: Brief Guidance to the States," Substance Abuse and Mental Health Administration, 2022, https://store.samhsa.gov/sites/default/files/d7/priv/pep19-matbriefcjs_0.pdf



# Best Practices for Medication Assisted Treatment in Correctional Facilities

- Screening and assessing for substance use and mental health needs

- Providing appropriate medications

- Using MAT treatment approaches

- Offering therapeutic programming

- Partnering with community organizations

- Providing comprehensive reentry support

- Being culturally responsive

- Using data to make informed improvements

The National Commission on Correctional Healthcare, *Jail Based Medication Assisted Treatment Promising Practices, Guidelines, and Resources For The Field* (Illinois: The National Commission on Correctional Healthcare, 2018), https://www.ncchc.org/filebin/Resources/Jail-Based-MAT-PPG-web.pdf



# Sustainability and Program Resources: Funding

- SAMHSA: State Opioid Response grants, Medication Assisted Treatment Prescription Drug Opioid Addiction grants, Offender Reentry Grants

- Bureau of Justice Assistance: COSSAP grants, Second Chance Act grants, Justice and Mental Health Collaboration grants, Residential Substance Use Disorder Treatment Program for State Prisoners (RSAT)

- Municipal and state executive branch resources (e.g., Departments of Public Health)

- State legislatures

- Community partners and community foundations

- Post-release MAT can be funded through Medicaid for those eligible



# Sustainability and Program Resources: Implementation

- Comprehensive Opioid, Stimulant, and Substance Abuse Program (COSSAP) https://www.cossapresources.org/

- Jail-based MAT: Promising Practices, Guidelines, and Resources, *National Sheriffs Association,* https://www.sheriffs.org/jail-based-mat

- Medication-Assisted Treatment (MAT) for Opioid Use Disorder in Jails and Prisons: A Planning and Implementation Toolkit, *National Council for Mental Wellbeing*, https://www.thenationalcouncil.org/resources/medication-assisted-treatment-mat-for-opioid-use-disorder-in-jails-and-prisons-a-planning-and-implementation-toolkit/

- Medication Assisted Treatment (MAT) in Jails and Community-Based Settings**,** *The Council of State Governments Justice Center,* https://csgjusticecenter.org/wp-content/uploads/2018/04/7.6.16-MAT-Webinar.pdf

- Medication-Assisted Treatment (MAT) in the Criminal Justice System: Brief Guidance to the States, *Substance Abuse and Mental Health Administration,* https://store.samhsa.gov/sites/default/files/d7/priv/pep19-matbriefcjs_0.pdf

- Reentry Best Practices for People with Opioid Addiction,*The Council of State Governments Justice Center,* https://csgjusticecenter.org/publications/best-practices-for-successful-reentry-for-people-who-have-opioid-addictions/

Medication Assisted Treatment in Correctional Facilities



# Thank You!

Join our distribution list to receive updates and announcements:

https://csgjusticecenter.org/resources/newsletters/

For more information, please contact Sarah Wurzburg at
swurzburg@csg.org

*The presentation was developed by members of The Council of State Governments Justice Center staff. The statements made reflect the views of the authors, and should not be considered the official position of The Council of State Governments Justice Center, the members of The Council of State Governments, or the funding agency supporting the work.*

© 2022 The Council of State Governments Justice Center





# Medication Assisted Treatment in Correctional Facilities: A Florida Case Study

Meghan Mahoum-Nassar, LMHC CCHP
June 29th, 2022



# Introductions

Meghan Mahoum-Nassar, LMHC CCHP

Corporate Mental Health Director (Eastern States)

NaphCare, Inc.



# What is NaphCare?





- **Proactive Care**
- **Technology Solutions**
- **Dialysis Units**
- **Administrative Services**
- **Headquarters**

We partner with local, state, and federal government agencies across the country including

- 60 City/County Jail Facilities with Proactive Care Programs
- 115 TechCare® Operated Local State Facilities
- 25 Correctional Dialysis Units in Local and State Facilities
- 30 Federal Bureau of Prisons (BOP) Facilities Benefiting from Administrative Services

 Innovating to Improve Lives

Medication Assisted Treatment in Correctional Facilities | **4**

# The NaphCare Difference

An advanced technology-informed healthcare solution that improves patient outcomes and saves lives.



Proactive Care Model

TechCare®

Detox & MAT Protocols

NaphCare Rx Pharmacy

Utilization Management

Community Partnerships

Mental Health Stabilization & Restoration

STATCare 24/7 Telehealth

 **Innovating to Improve Lives**

**Medication Assisted Treatment in Correctional Facilities**



# Implementing MAT Programs in Correctional Facilities

# Jail-Based MAT

**National Sheriffs' Association Statement - 2018**

"Historically, it has not been the responsibility of the sheriffs and jail administrators to be primary providers of substance use disorder treatments. But with thousands of Americans dying every week from drug overdoses and those recently released from jail among the most defenseless, the situation has changed—sheriffs have taken on the challenge.

In 2017, the nation's sheriff s resolved to support the most current, evidence-based substance use disorder treatment within their jails to respond to the opioid and drug epidemic. Sheriffs have become this nation's pioneers in establishing medication-assisted treatment (MAT) programming, expanding jail MAT programs into 30 states at present."



> Jonathan F. Thompson
>
> Executive Director and CEO
>
> National Sheriffs' Association

# National Commission on Correctional Health Care (NCCHC)



Left untreated, opioid withdrawal may "result in needless suffering, interruption of life-sustaining medical treatment, and rarely, death," says the National Commission on Correctional Health Care (NCCHC). "National research shows significant gaps in quality of care for opioid withdrawal in correctional settings, including underuse of recommended protocols and low use of drugs approved for detoxification by the FDA [Food and Drug Administration]."

As a result, NCCHC set the following guidelines:

- All inmates should be screened for potential opioid withdrawal;
- All those who screen positive should be formally assessed within 24 hours;
- All those with significant withdrawal should be treated with effective medication; and
- All those who receive opioid withdrawal treatment should be educated and referred for treatment.

# Safely Managing Withdrawal

We are on a mission to improve the care of patients experiencing substance use withdrawal through our advanced detoxification protocols that safely manage symptoms and reduce negative outcomes



### Rise in Substance Abuse
Nationwide opioid and fentanyl epidemic impacting jails – increased deaths



### NaphCare's Proactive Care Model
Early identification of substance use through proactive intake screenings



### NaphCare's Advanced Detox Protocols
Evidence-based detox protocols, DEA X-licensed providers, buprenorphine administration onsite



### In-jail MAT Program
Offering continuation treatment with all FDA-approved medications and developing partnership with First Step to bring Vivitrol onsite



## OTP Models in Jails

Every program starts somewhere

1. Detox Only (Medication Assisted as Indicated)
2. Detox and MAT Continuation for Pregnant Patients
3. Detox & MAT Continuation for Patients with Verified Community MAT Provider Engagement
4. Detox, MAT Continuation, & New Inductions



# Detox Only Model

**All incoming patients are assessed for detox protocols**



- There are no exceptions – everyone is medically detoxed
  - COWS protocol for Opiates
  - CIWA protocol for Alcohol / Benzodiazepines

- Patients with active community enrollment in MAT are detoxed from Methadone / Buprenorphine

- The common philosophy is "this is a controlled environment, there's no need for MAT in jail"

- May offer comfort medications only, may use buprenorphine as part of the withdrawal protocol

## MAT and Pregnant Patients

- May continue pregnant patients with verified enrollment in a community provider for MAT
  - There may be stipulations regarding positive urine drug screen for other substances

- Pregnant patients without community MAT enrollment may still be medically detoxed

- MAT is almost always discontinued immediately after the patient gives birth (if the patient remains in custody)



# MAT – Perinatal Considerations

- MAT is recommended for pregnant women with Opioid Use Disorder (OUD)
  - Pregnant women on MAT are automatically considered to be High Risk
  - Methadone has been the standard treatment for opiate dependence in prenatal care for over 40 years
  - New research indicates buprenorphine is safe & effective during pregnancy

- Medication-assisted withdrawal is not recommended during pregnancy due to increased risks for the mother and fetal stress
  - Withdrawal can cause a loss of pregnancy
  - Increased relapse rates for the mother

- Patients with a history of OUD experience hypersensitivity to pain and poor pain tolerance. Managing pain during delivery and postpartum with opiates has not been linked to increased relapse potential.

- Breastfeeding is not negatively impacted by MAT treatment and is encouraged

| TABLE 2 | Methadone vs Buprenorphine in Pregnancy* | |
|---|---|---|
| | **Methadone** | **Buprenorphine** |
| Patient preference | Provided daily in licensed methadone clinics | Provided in office setting by licensed physician |
| Risk of overdose mortality | Higher | Lower (but not absent) |
| Risk of drug interaction | Higher | Lower (but not absent) |
| Risk of neonatal abstinence syndrome | Equal | Equal |
| Duration of neonatal abstinence syndrome | Longer | Shorter |
| Breastfeeding consideration | Safe (assuming no other contraindications) | Safe (assuming no other contraindications) |
| Neurodevelopmental outcome in exposed children | Favorable | Less long-term information |

*Adapted from: Mozurkewich EL et al. *Obstet Gynecol Clin North Am*. 2014 Jun; 41(2): 241-53
By Agatha S. Critchfield, MD and Wendy F. Hansen, MD



## Babies Born to Mothers on MAT Protocols

- Babies born to women addicted to opioids fare better when their mothers are treated with either the addiction medication buprenorphine or methadone than babies whose mothers are not treated at all.

- The National Institute on Drug Abuse (NIDA) has published research indicating buprenorphine may be superior to methadone in reducing withdrawal symptoms in newborns
  - Required less medication (1.1 versus 10.4 milligrams)
  - Less time spent in the hospital for the newborn (10 versus 17.5 days)



# Continuation with Verified Community Enrollment



**Limited In-Jail MAT Programming**

- Patient will be asked in booking about MAT involvement

- UDS performed to confirm presence of MAT medications
  - May be restrictions based on positive results for other substances

- Consent signed to confirm active enrollment in community MAT program

- In-Jail MAT program has to conform with Florida's 65D-30 standards including enrollment criteria & counseling

- Can be facilitated by the jail medical staff or in coordination with community organizations

## New Patient MAT Inductions

- Must have set criteria for who qualifies
  - Based on history of use
  - Detox scores
  - Ability to continue MAT in the community
- In-jail MAT program guidelines
  - NCCHC is optional but provides guidelines
  - OTP vs OBOT Models
  - Florida programs under 65D-30 license



## Discharge Planning

- Connection to community providers
- Transportation
- Employment
- Insurance
- Prosocial support



# Operational Challenges: In-Jail MAT Programs



- Housing considerations

- Attempts at medication diversion

- Staffing – Impacts on MAT
    - Patient movement
    - Transportation to outside appointments
    - Medication timeframes

- Jail clearance for community agency personnel

- Space and staff for counseling

- Accreditation is voluntary and many facilities choose not to pursue this

- Regulations for OTP

# Cultural Obstacles – Stigma & Common Misconceptions

- **"Buprenorphine is an opioid that inmates can get high on."** When used as directed, buprenorphine does not cause euphoria; it quells cravings. The "taper" method for managing withdrawal has been used for more than 20 years, and is FDA-approved for treating OUD.

- **"Sudden cessation may be uncomfortable, but not fatal."** For the young and healthy, this is usually true, but for those in poor health (common among jail detainees), the added physiological stress of withdrawal can be life-threatening.

- **"Opioid misuse is a consequence of moral failing, lack of willpower, or weak character."** Like other addictions, OUD is a chronic brain disease that has biological, psychological, and social components. Understanding the biology of opioid addiction helps explain the necessity of MAT, as well as the need to manage the condition as you would any other chronic, relapsing medical condition—with medication and lifestyle changes.

- **"MAT medications are too costly."** While administration of buprenorphine, naltrexone, and/or methadone does carry a cost, it usually isn't borne completely by the jail offering it as a treatment. NaphCare has worked with clients to obtain more than $1.5 million in grant funding and in-kind contributions to support MAT programs.

MAT programs can also reduce liability for local governments. Two courts have ruled that OUD meets the definition of a "disability" under the ADA, and that the continuation of MAT for OUD patients is a reasonable accommodation jails must provide. Other assumptions that give justice professionals pause about MAT programs —that they are ineffective, difficult to administer, or provide easily misused and diverted drugs— have little foundation. And while a handful of criminal justice officials feel that MAT "rewards" criminal activity or addiction, most admit that MAT is more effective than non-pharmacological treatment approaches.



# When Everyone Pulls Together







- In 2021 the Hillsborough County Jails became the first in the nation to achieve the Pinnacle Award
  - NCCHC – Medical Accreditation
  - NCCHC – Mental Health Accreditation
  - NCCHC – OTP Accreditation

"When I stepped into my role as Hillsborough County Sheriff, I knew that as a law enforcement agency, we could not arrest our way out of problems like drug addiction and mental health issues in our community," said Sheriff Chad Chronister. "We had to take a holistic approach in order to reduce recidivism, which is why we began offering and expanding our options for substance abuse treatment, mental health counseling, vocational training and connecting inmates with resources that will help get their lives back on the right path upon release. We are grateful for our partnership with NaphCare, whose medical staff helps make these services possible, and we are humbled by NCCHC recognizing our continued efforts."

## Resources

- Florida Administrative Code: 65D-30 : SUBSTANCE ABUSE SERVICES OFFICE - Florida Administrative Rules, Law, Code, Register - FAC, FAR, eRulemaking (flrules.org)

- Harm Reduction Coalition: https://harmreduction.org/about-us/principles-of-harm-reduction/

- NaphCare: The Value of Detox – The Value Of Detox in Correctional Healthcare | NaphCare

- NASADAD: USE OF State Targeted Response to the Opioid Crisis (STR) and State Opioid Response (SOR) GRANT FUNDS TO ADDRESS THE OPIOID CRISIS: https://nasadad.org/wp-content/uploads/2019/09/FINAL-FL-Profile.pdf

- NCCHC Jail-Based Medication-Assisted Treatment: Promising Practices, Guidelines, and Resources for the Field: Promising Practice Guidelines for Jail-Based Medication-Assisted Treatment NEW.indd (ncchc.org)

- Stanford Children's Hospital: Neonatal Abstinence Syndrome: https://www.stanfordchildrens.org/en/topic/default?id=neonatal-abstinence-syndrome-90-P02387



# Thank You

Meghan Mahoum-Nassar, LMHC CCHP
Email: meghan.nassar@naphcare.com

*The statements made within this presentation reflect the views of the author and should not be considered the official position of NaphCare or the partnerships with local and federal entities.*



22



Local Government   State Government
Federal Government   Claims

About Us   Our Services ▾   Careers
Newsroom   Contact

New Search
Login Page
Position Description
☐
**Senior Claims Adjudicator**
Work Location **Corporate Headquarters**
State/Territory **US-AL**
City **Birmingham**
Apply Now
Status:
**Full-Time**
Shift:
**1st**

**NaphCare, Inc.** has an excellent opportunity for a **Sr. Claims Adjudicator (Claims Examiner Tier II, Claims Analyst Tier II)** to join our team at the **Corporate Headquarters** in **Birmingham, Alabama**. The Sr. Claims Adjudicator will be responsible for reviewing medical claims for accuracy and completeness, analyzing complex CCI and CMS edits, making determinations on claims based on established policies and procedures and processing claims for payment. The ideal candidate will have strong knowledge and experience in processing multiple claim types, including professional, institutional and dental claims.

**Position Responsibilities:**
Utilize claims processing experience and working knowledge of Medicare and Medicaid to effectively and efficiently process claims for payment while adhering to internal deadlines.
Demonstrate ability to handle daily workload with speed and accuracy.
Demonstrate a high comfort level in working with large volumes of data.
Demonstrate the ability to act as a mentor for others within team.
Demonstrate a strong attention to detail and a commitment to customer service throughout the claims process.
Additional duties and specific projects as assigned.

**Position Requirements:**
Associate Degree or higher or equivalent work experience.
Minimum five years of recent adjudication experience required.
An ability to define and calculate Medicare and Medicaid is critical.
Working knowledge of medical terminology, billing standards, and Medicare and Medicaid methodologies.
Proficiency in Microsoft Office Suite and strong written and verbal communication skills are also required.
CPC, COC, CIC, or Specialty Medical Coding Certification preferred.

*__The Sr. Claims Adjudication positions will be remote/work from home after initial training is completed and processes are proficiently demonstrated (candidates outside of the greater Birmingham area may not be considered).*

Equal Opportunity Employer: disability/veteran

**Outstanding Benefits Package:**
NaphCare offers competitive benefits, including health, prescription, dental, Employment Assistance Program (EAP) services, vision and 401(k). NaphCare offers term life insurance at no cost to the employee and provides PTO, paid holidays and an array of voluntary benefits.

Employees enrolled in our health insurance program receive prescriptions _**free of charge**_ when filled at our in-house pharmacy or mail order program.

The above statements are intended to describe the general nature and level of work being performed by people assigned to this job. They are not intended to be an exhaustive list of all responsibilities, skills, efforts or working conditions associated with a job

Back   Share   Apply Now

2090 Columbiana Rd. Ste 4000
Birmingham, AL 35216
Toll Free: 800.834.2420
Phone: 205.536.8400

   

About Us
Careers
Newsroom
Contact

Our Services
Healthcare Services
Technology Solutions
Administrative Services

NaphCare Charitable Foundation
Employee Access
Claims
Provider Portal

# EXHIBIT 4

# PERKINS**COIE**

1201 Third Avenue          +1.206.359.8000
Suite 4900                +1.206.359.9000
Seattle, WA 98101-3099    PerkinsCoie.com

June 30, 2023

David A. Perez
DPerez@perkinscoie.com
D.  +1.206.359.6767
F.  +1.206.359.7767

**VIA EMAIL**

Marielle Maxwell
Conrad Reynoldson
Washington Civil and Disability Advocate
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
Marielle@wacda.com
Conrad@wacda.com

Charles Weiner
Law Office of Charles Weiner
99 Lantern Drive, Suite 202
Doylestown, PA 18901
charles@charlesweinerlaw.com

Mary C. Vargas
Stein & Vargas LLP
10 G Street NE, Suite 600
Washington, DC 20002
mary.vargas@steinvargas.com

**Re:**    ***Picciano v. Clark County et al.*, Case No. 3:20-cv-06106-DGE**
       **Response to Plaintiff's Deficiency Letter**

Counsel,

We write to respond to your June 22, 2023 letter regarding NaphCare, Inc.'s ("NaphCare") answers to Plaintiff's Interrogatories - Set One and responses to Plaintiff's Requests for Discovery - Set One (collectively, the "Discovery Responses"). Your letter purports to identify deficiencies in NaphCare's discovery responses and attempts to argue that NaphCare waived its argument that NaphCare does not receive federal financial assistance.

NaphCare stands by its position that Interrogatory No. 18 seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. NaphCare will further not be supplementing its production to Request for Production No. 13, as it seeks documents not relevant to the claims in this litigation, and because NaphCare's response is complete.

Marielle Maxwell
Conrad Reynoldson
Charles Weiner
Mary C. Vargas
June 30, 2023
Page 2

As articulated in NaphCare's Motion for Partial Judgment on the Pleadings, the only source of federal funds relevant to Plaintiff's claims is federal *subsidies*, not compensation or assistance for services rendered under federal contracts.  *See* NaphCare's Motion for Partial Judgment on the Pleadings, at 18.

To be clear: NaphCare did not receive any federal subsidies for providing medical services at Clark County Jail.  The categories of federal funding that Plaintiff names in his letter are not federal subsidies nor are they related to NaphCare's provision of services at Clark County Jail.  Accordingly, there are no <u>relevant</u> documents to produce because NaphCare does not receive any federal funding <u>relevant to this case</u>.  NaphCare also accordingly disagrees that it has waived any arguments related to federal funding.

We trust that the above discussion resolves the issues addressed in your June 22, 2023 letter.  Please let us know if you have any further questions.  This letter is without waiver and NaphCare reserves the right to supplement its answers and responses.

Sincerely,


David A. Perez

# EXHIBIT 5

# STEIN & VARGAS LLP

Overcoming Barriers | Ensuring Communication | Creating Access

July 5, 2023

**<u>VIA ELECTRONIC MAIL ONLY</u>**
David Perez
Zachary Davison
Michelle Maley
Mason Ji
Perkins Coie
1201 Third Avenue, Suite 4900
Seattle, WA 98101
dperez@perkinscoie.com
zdavison@perkinscoie.com
mmaley@perkinscoie.com
mji@perkinscoie.com

RE:     *NaphCare's Ongoing Discovery Deficiencies*

Dear David,

This letter follows up on your letter dated June 30, 2023, with respect to federal financial assistance.

NaphCare has taken the position that it is not a recipient of federal financial assistance based on its say so.  In the analogous situation when defendants have proffered self-serving affidavits stating that they do not receive federal financial assistance, courts have rejected such affidavits as obviously self-serving and have ordered discovery.  *See, e.g.*, *Nat'l Ass'n of the Deaf v. State of Fla.*, 980 F.3d 763, 775-76 (11th Cir. 2020) (11th Cir. 2020) (affirming ruling that "dismissal was not warranted on the basis of a single 'self-serving' affidavit"); *T.W. v. N.Y. State Bd. of Law Exam'rs*, Case No. 16-cv-3029, 2017 U.S. Dist. LEXIS 158060, at *9-10 (E.D.N.Y. Sept. 25, 2017) (ordering discovery on federal financial assistance because whether the defendant was a recipient of federal financial assistance was "a fact peculiarly within [its] possession and control"); *Staley v. Nat'l Capital Area Council*, Case No. RWT 10cv2768, 2011 U.S. Dist. LEXIS 61986, at *34-35 (D. Md. June 9, 2011) (ordering discovery on federal financial assistance because "the financial workings of [defendant] are completely unknown to Plaintiffs").  These cases make pellucidly clear that an entity cannot shield itself from discovery simply by denying that it receives federal financial assistance.

Moreover, you appear to have taken the position that section 504 has a "magic words" test in which the word "subsidy" must be used in order for the statute to come into play.  The term "federal financial assistance" is well-defined by the regulations.  *See, e.g.*, 28 C.F.R.

§ 42.540(f) (Department of Justice regulatory definition of federal financial assistance). As even a cursory review of the DOJ regulation makes clear, the word "subsidy" is not used. For example, a "contract under a grant" constitutes federal financial assistance. *Id.* Thus, for instance, if a state or local jail received a grant for medication-assisted treatment (MAT), and then directed a portion of that funding to NaphCare, that is enough to establish federal financial assistance.

Similarly, it has been long established that receipt of Medicaid or Medicare payments is sufficient to establish federal financial assistance. *E.g.*, *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1042 (5th Cir. 1984) (stating in no uncertain terms, "We hold that Medicare and Medicaid are federal financial assistance for the purpose of Section 504"); *see also, e.g.*, *Alexander v. Kujok*, 158 F. Supp. 3d 1012, 1022 (E.D. Cal 2016) ("Medicare and Medicaid payments have been widely interpreted as federal financial assistance when raised in the context of Section 504 litigation.").

Finally, you appeared to assert that any federal financial assistance must be related to Clark County Jail. Your client has provided no authority for this position. To the contrary, a single dollar of federal financial assistance received *anywhere* during the relevant time period is sufficient to subject NaphCare to section 504 coverage. This is clear in the statute itself, which subjects to coverage the *entirety* of a "corporation, partnership, or other private organization" which is "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." 29 U.S.C. § 794(b)(3)(A). NaphCare cannot dispute that it is "principally engaged" in providing health care. Consequently, any federal financial assistance received anywhere in the country during the relevant time period is sufficient to establish section 504 coverage in this case.

Your client cannot have it both ways, claiming that whether it receives federal financial assistance is irrelevant while also claiming that it is not subject to section 504. Either your client must concede that it receives federal financial assistance, or it must comply in full with the discovery requests on this issue. Please advise if your client will choose either of these two courses of action.

If your client persists in refusing either option, I am available for a meet and confer on July 6, 2023 between 2-4 Eastern/11-2 Pacific or July 12, 2023, between 2-4 Eastern/11-2 Pacific, in a final attempt to avoid having to file a motion to compel discovery.

Thank you for your prompt attention to this matter.

Sincerely,

Mary Vargas

# EXHIBIT 6

# PERKINSCOie

1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099

T +1.206.359.8000
F +1.206.359.9000
PerkinsCoie.com

July 11, 2023

David A. Perez
DPerez@perkinscoie.com
D.  +1.206.359.6767
F.  +1.206.359.7767

**VIA EMAIL**

Marielle Maxwell
Conrad Reynoldson
Washington Civil and Disability Advocate
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
Marielle@wacda.com
Conrad@wacda.com

Charles Weiner
Law Office of Charles Weiner
99 Lantern Drive, Suite 202
Doylestown, PA 18901
charles@charlesweinerlaw.com

Mary C. Vargas
Stein & Vargas LLP
10 G Street NE, Suite 600
Washington, DC 20002
mary.vargas@steinvargas.com

Re:     ***Picciano v. Clark County et al.*, Case No. 3:20-cv-06106-DGE**
        **Response to Plaintiff's Deficiency Letter**

Counsel,

        We write to respond to your July 5, 2023, letter regarding NaphCare, Inc.'s ("NaphCare")
answers to Plaintiff's Interrogatories - Set One and responses to Plaintiff's Requests for Discovery
- Set One (collectively, the "Discovery Responses").  Your letter purports to identify deficiencies
in NaphCare's discovery responses regarding the federal financial assistance it receives.  Your
letter argues that your client is entitled to discovery on all federal funds that NaphCare received
for any facility for 2020.

        NaphCare respectfully disagrees for the following two reasons.

        **First,** Plaintiff assumes an overbroad notion of relevance for federal financial assistance
pertaining to his Section 504 claim.  As NaphCare has already repeatedly articulated, in its Motion

Marielle Maxwell
Conrad Reynoldson
Charles Weiner
Mary C. Vargas
July 11, 2023
Page 2

for Partial Judgment on the Pleadings and in its June 30, 2023, response letter, the only type of federal financial assistance that can give rise to a Section 504 claim is federal *subsidies*.  Plaintiff has not sufficiently addressed this argument.  Instead, Plaintiff cites to the Department of Justice's regulatory definition of federal financial assistance and Medicaid/Medicare payments.  Those definitions are not relevant to this litigation, as this is not a criminal matter nor are Medicaid or Medicare payments the subject of this litigation.

By contrast, federal case law clearly and consistently holds that only federal subsidies can give rise to a Section 504 claim, not federal compensation.  *See, e.g.*, *Lee v. Corr. Corp. of Am./Corr. Treatment Facility*, 61 F. Supp. 3d 139, 144 (D.D.C. 2014) ("Courts interpreting § 504 of the Rehabilitation Act have consistently construed 'Federal financial assistance' to mean the federal government's provision of a subsidy to an entity, not the federal government's compensation of an entity for services provided"); *McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp. 3d 424, 440 (E.D. Penn. 2020) (same); *Gross v. Landry*, 2019 WL 1270922, at *9 (D. Maine March 19, 2019) (same). We are aware of no contrary authority, and you certainly have not provided any.

**Second,** Plaintiff is incorrect that he is entitled to discovery on "any federal financial assistance received anywhere in the country during the relevant time period."  In a word, that's absurd.

The courts have consistently held that federal subsidies giving rise to a Section 504 claim must be tethered to the activity and facility at issue.  *See Mullen v. Commissioners for Adams County, Colorado*, 2022 WL 126618, at *5 (D. Colo Apr. 28, 2022) (quoting *Arbogast v. Kansas, Dept. of Lab.*, 789 F.3d 1174, 1184 (10th Cir. 2015))  (noting that "the definition of 'program or activity' under the Rehabilitation Act is 'not intended to sweep in the whole state or local government'" only the facility or subdivision at issue); *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002) (the phrase "program or activity" in the Rehabilitation Act "only covers all the activities of the department or the agency receiving federal funds"); *Sharer v. Oregon*, 581 F.3d 1176, 1178 (9th Cir. 2009) (limiting federal funds consideration for Rehabilitation Act claim to particular subunit of state government receiving that assistance).

In short, Plaintiff is only entitled to relevant discovery for federal subsidies that NaphCare received for its medical services *at Clark County Jail*, the facility/subdivision at issue, for 2020. **As no such federal subsidy exists, NaphCare does not have any additional discovery to supplement**.  Let me say that again: there is nothing to supplement, and therefore no basis for a motion to compel.

Marielle Maxwell
Conrad Reynoldson
Charles Weiner
Mary C. Vargas
July 11, 2023
Page 3

If that Plaintiff is arguing that NaphCare must somehow affirmatively prove that it does not receive federal subsidies at the Clark County Jail facility beyond responding to Plaintiff's interrogatories and requests for production, NaphCare is not required to do so under the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 33. After all, we are not required to prove a negative.

**To reiterate:** NaphCare did not receive any federal subsidies for providing medical services at Clark County Jail.  The categories of federal funding that Plaintiff names in his letter are not federal subsidies nor are they related to NaphCare's provision of services at Clark County Jail.  Accordingly, there are no <u>relevant</u> documents to produce because NaphCare does not receive any federal funding <u>relevant to this case</u>.

We trust that the above discussion resolves the issues addressed in your July 5, 2023 letter.  Please let us know if you have any further questions.  This letter is without waiver and NaphCare reserves the right to supplement its answers and responses.

Sincerely,

David A. Perez

# EXHIBIT 7

# STEIN & VARGAS LLP

Overcoming Barriers | Ensuring Communication | Creating Access

June 22, 2023

**VIA ELECTRONIC MAIL ONLY**
Jerome R. Aiken
Meyer, Fluegge & Tenney, P.S.
230 South Second Street
P.O. Box 22680
Yakima, WA 98907-2680
aiken@mftlaw.com

RE:    *Wellpath's Ongoing Discovery Deficiencies*

Dear Jerry,

This letter follows up on our email correspondence in which I identified sources of federal financial assistance for Wellpath that your client had failed to disclose during discovery. This letter follows up formally to request that your client supplement its discovery responses.

Picciano's Interrogatory No. 14 to Wellpath asked Wellpath to "identify all sources and amounts of Federal or State funding received by Defendant during the year 2020." Your client answered, "Based upon information, Wellpath did not receive any such funding." Your client stated that its answer was "[b]ased upon information" and does not appear to reflect any actual search for responsive information. Based on publicly available information, your client receives considerable federal funding.

- During the fiscal years 2019-2020, Wellpath was a subrecipient of at least eight federal grants, none of which were disclosed in your client's discovery responses. See attached Ex. A.
  - For example, the Maine Department of Corrections received a federal grant to partner with Wellpath and a nonprofit organization in piloting the use of medication-assisted treatment (MAT) to treat detainees/inmates with opioid use disorder. This grant covered the period 2019-2020. See for example page 2 of the document attached Ex. B (describing the pilot project which was underway at the same time that Picciano was detained).

10 G Street NE, Suite 600 • Washington, DC 20002
Tel: (240) 793-3185 • Fax: (888) 778-4620
mary.vargas@steinvargas.com

- Numerous federal grants provide funding for MAT to treat opioid use disorder in correctional settings, none of which were disclosed in your client's discovery responses:
    - U.S. Department of Health's Substance Abuse and Mental Health Services Administration (SAMHSA): State Opioid Response grants; Medication Assisted Treatment Prescription Drug Opioid Addiction grants; Offender Reentry grants.
    - U.S. Department of Justice's Bureau of Justice Assistance: COSSAP grants, Second Chance Act grants, Justice and Mental Health Collaboration grants, Residential Substance Use Disorder Treatment Program for State Prisoners (RSAT).

- Medicaid or Medicare can be an additional source of funding for health care in correctional settings that was not disclosed.
    - Delivery System Reform Incentive Payment Program (DSRIP) provides funding to enhance quality of care, including but not limited to delivery of medication-assisted programs to detainees and inmates.
    - Further, while Medicaid/Medicare may limit payment for services for detainees, these programs do provide coverage in limited circumstances. For instance, Medicaid will cover services through the end of the day that a person is first detained and will also cover in-patient care for detainees/inmates. See for example the document at https://www.hca.wa.gov/assets/free-or-low-cost/suspension-101-training-module-1.pdf. Washington State law also explicitly authorizes Apple Health—Washington's Medicaid program—to pay jail health providers. *See* Wash. Rev. Code § 70.48.130(3) (stating that subsection (2) authorizes payment by Medicaid for confined persons).
    - Additionally, Wellpath has employees dealing with Medicaid/Medicare, as the attached document from LinkedIn shows. See attached Ex. C.

Plaintiff kindly requests that your client search for all responsive information with respect to the above-mentioned sources of federal funding. Your client should supplement its answers to describe the funding that it receives from these programs, and produce all documents related to the funding that your client receives from these programs, whether directly or through a third-party. This should include description/documentation of federal funding described above, as well as any billing records/payment records from Medicaid/Medicare for the year 2020, and any other federal financial assistance received.

In addition, we have yet to receive the policies and practices specific to Clark County Jail about which we sent you an email on May 19, 2023.

I respectfully request a response to this letter by June 30, 2023. I am available to do a meet and confer to ensure the issues raised in this letter are clear and that your client abides by its obligation to investigate and respond fully to discovery requests. I can be reached at Mary.Vargas@steinvargas.com or at 240-793-3185 to discuss.

Thank you for your prompt attention to this matter.

Sincerely,

Mary Vargas

# EXHIBIT A

# Advanced Search

Share    Download

Submit Search

Add or update a filter to submit.

Reset search

## ∨ Keyword ⓘ

Search by Keyword    🔍

wellpath ✕

## ∨ Time Period ⓘ

| Fiscal Year | Date Range |

☐ All Fiscal Years

☐ FY 2023    ☐ FY 2015
☐ FY 2022    ☐ FY 2014
☐ FY 2021    ☐ FY 2013
☑ FY 2020    ☐ FY 2012
☑ FY 2019    ☐ FY 2011
☐ FY 2018    ☐ FY 2010
☐ FY 2017    ☐ FY 2009
☐ FY 2016    ☐ FY 2008

## ∨ Award Type

## ∨ Agency

## ∨ Treasury Account Symbol

# Spending by Sub-Award

## What's included in this view of the data?

View a list of sub-award transactions based on your selected filters. Click the Sub-Award ID or Prime Award ID for additional details on the prime award. You can also learn more about the prime award's recipient by clicking the Prime Recipient Name.

**read more**

| Sub-Contracts 0 | Sub-Grants 8 |

| Sub-Award ID ⇅ | Sub-Awardee Name ⇅ | Action Date ⇅ | Sub-Award Amount ⇅ |
|---|---|---|---|
| OSA-20-739 | WELLPATH LLC | 7/18/2019 | $457,466 |
| OSA-20-739 | WELLPATH LLC | 7/18/2019 | $381,205 |
| OSA-20-739 | WELLPATH LLC | 7/18/2019 | $380,161 |
| OSA-20-739 | WELLPATH LLC | 7/18/2019 | $284,583 |
| OSA-20-739 | WELLPATH LLC | 7/18/2019 | $76,241 |
| RS-01-19 | MAINE DEPARTMENT OF CORRECTIONS | 1/1/2020 | $70,084 |
| RS-01-19 | MAINE DEPARTMENT OF CORRECTIONS | 1/1/2020 | $42,583 |
| OSA-20-739 | WELLPATH LLC | 7/18/2019 | -$380,161 |

Feedback

# EXHIBIT B

# Maine Department of Corrections

# Medication Assisted Treatment Services First Year Review



This report is a review of the pilot year of medication assisted treatment for opioid use disorder in MDOC adult correctional facilities.

Randall Liberty, Commissioner
Ryan Thornell, Deputy Commissioner
Maine Department of Corrections
Correctional Programming Division
25 Tyson Drive
State House Station 111
Augusta Maine 04333-0111
207-287-2711



**Maine Department of Corrections**                                    **December 2020**
## Correctional Programming Division

### Medication Assisted Treatment

On July 1, 2019, in response to the current opioid epidemic in Maine and in accordance with Governor Mills' Executive Order, the Maine Department of Corrections (MDOC) launched a pilot for residents in MDOC adult correctional facilities diagnosed with opioid use disorder (OUD). MDOC's medication assisted addiction treatment (MAT) services were implemented in collaboration with Wellpath (MDOC's comprehensive medical care provider) and Groups Recover Together (a community agency serving those with OUD). Pilot year funding for the program in FY20 totaled $1.2 million, including $450,000 from Maine's Office of Behavioral Health (OBH). Funding for FY21 totals $1.7 million of which $830,000 is from Maine OBH.

MAT is considered one of the highest standards of care for individuals diagnosed with OUD, and the purpose of addressing addictions with medication is to reduce cravings for opiates which helps individuals more effectively manage personal triggers and engage in prosocial activity, including counseling/treatment. MDOC's MAT treatment services utilize buprenorphine and naltrexone as the primary medications prescribed by medical providers.

In July, MAT was initiated at Maine Correctional Center (men and women), Southern Maine Women's Reentry Center, and Bolduc Correctional Facility. The pilot treatment served both male and female residents who were within three months of discharge from MDOC custody and determined to be clinically eligible by a medical provider. Participation in MAT was and is strictly voluntary and requires informed consent and acknowledgment of the risks and benefits of treatment. Treatment started in the facility, and continuity of care upon discharge was assured with MDOC's community partner, Groups Recover Together.

After an effective launch and early successes, MAT was initiated at Mountain View Correctional Center (in partnership with Day One) on November 4, 2019, and at Maine State Prison, in February 2020 and is now available throughout our adult correctional facilities. Also, in February 2020, the timeframe to start treatment increased from three months of discharge to six months of discharge. At that same point in time, the program was expanded to include all those newly admitted to MDOC who were receiving MAT prior to entry, thus providing continuity of care regardless of sentencing. Beginning in February 2020, all residents admitted to MDOC on new charges from a county jail or as a probation return who were receiving MAT upon admission, were provided with continuity of care. This accounted for 16 residents during the pilot year.

Prior to discharge from MDOC custody MAT residents are provided with comprehensive discharge planning including linkages to community-based continuity of care services. Groups Recover Together and Day One assist MDOC with securing post-release services and linking residents with MAT providers in local communities, and when appropriate, by making connections to out of state providers as well. At discharge, along with a copy of their release plan and MAT bridge prescription, residents receive a naloxone (Narcan) kit and hands on teaching for responding to an overdose. The kit also contains an education resource on overdose response for family and friends.



## MaineCare Upon Release

Through a collaborative effort between MDOC and Maine Department of Health and Human Services (DHHS), all residents who qualify for MaineCare insurance have an active account in place upon release. Prior to this collaboration, it could take weeks for MaineCare benefits to begin post discharge. With the new process, discharged residents are assured continuity of care for MAT and other vital services covered by this insurance.

## Numbers Served During Pilot Year

The following information, charts and tables show breakdowns of the numbers served throughout the first year of MAT, categorized by various demographics.

- 333- Total residents who started MAT and continued treatment through discharge
  - Men 264
  - Women 69
- 86- Total determined appropriate for MAT by clinical staff, but did not complete treatment, or never started due to patient choice or issues such as early release prior to entering the induction timeframe
  - Men 67
  - Women 19

## Residents on MAT at Admission

Beginning in February 2020, residents admitted to MDOC on new charges from a county jail or as a probation return who were receiving MAT upon admission, were provided with continuity of care. This accounted for 16 residents during the first year.

## First Year Inductees by Month

The following table indicates the total number of newly inducted participants for each month during the pilot year (n=621) compared to the total number of participants during each month. These numbers include all who started, continued, or were terminated during a month, regardless of outcome. At the end of the pilot year (end of June 2020) there were 202 continuing in treatment.



**Maine Department of Corrections**                    **December 2020**
# Correctional Programming Division

## Demographics of Transitioned Participants

Transitioned Participants (n=333) are defined as those who started treatment while in a facility and were discharged to the care of a community provider for continued medication assisted treatment.

**Race and Age**  Although minority groups seem disproportionally represented in the breakdown below, treatment was offered based on the following requirements: resident request, clinical assessment, and applicable diagnostic criteria, in addition to timeframe to discharge.  Upon a review of the eligibility requirements those who requested to participate in treatment and met all criteria had equitable access to the program.

| Race | Men | Women |
|---|---|---|
| Asian | 1% | 0% |
| Black or African American | 1% | 0% |
| Native American | 1% | 6% |
| Two or More Races | <1% | 1% |
| Unknown | <1% | 0% |
| White | 96% | 93% |
| **Total** | **100%** | **100%** |

| Age Group | Men | Women |
|---|---|---|
| 20's | 20% | 14% |
| 30's | 50% | 55% |
| 40's | 23% | 28% |
| 50's | 6% | 4% |
| 60's | 1% | 0% |
| **Total** | **100%** | **100%** |

## Most Recent Education Level known to MDOC

According to education data tracked by MDOC, greater than 50% of those transitioned to community MAT are high school graduates.

| Most Recent Edu level | Men | Women |
|---|---|---|
| Unknown | 12% | 13% |
| 0-5th | 0% | 0% |
| 6-8th | 6% | 10% |
| 9th-11th | 24% | 23% |
| GED/HiSET | 57% | 51% |
| Associate | 1% | 1% |
| Bachelor | 0% | 1% |
| Technical/Trade | 1% | 0% |
| **Total** | **100%** | **100%** |

## Risk Rating by Assessment Tool- Men's tool- Level of Service Indicated-Revised (LSI-R) Women's tool- Service Planning Instrument for Women (SPIn-W)

The charts show transitioned participants by assessed risk scores. When combining high and maximum ratings, the tables demonstrate the appropriate focus on higher risk residents, accounting for 59% of men and 50% of women. Lower risk participants only account for 10% or less.

| Men's LSI Rating | % |
|---|---|
| Low/Administrative | 10% |
| Moderate | 31% |
| High | 48% |
| Maximum | 11% |
| **Total** | **100%** |

| Women's SPIn-W Rating | % |
|---|---|
| Low | 7% |
| Moderate | 43% |
| High | 41% |
| Maximum | 9% |
| **Total** | **100%** |

**Maine Department of Corrections**                    **December 2020**
# Correctional Programming Division

## Transitioned Participants by Controlling Offense Group

| Controlling Offense- Men | % |
|---|---|
| Assault | 9% |
| Burglary/Theft/Robbery | 36% |
| Drugs | 22% |
| Domestic Violence | 8% |
| Forgery | 2% |
| Sex Offenses | 2% |
| OUI/Vehicular Offenses | 9% |
| Violation of Release/Tampering with Witness | 3% |
| All Other Misc. Charges | 8% |
| **Total** | **100%** |

A controlling offense is the most serious crime committed carrying the greatest amount of sentencing. When looking at controlling sentences of "Drugs" between men and women, women with substance use disorder are nearly twice as likely (men 22%, women 43%) to be incarcerated on these charges. When adding charges sometimes associated with supplying a means to support drug addiction (Burglary/ Theft/Robbery) the number for men increases to 58% and women to 79%.

| Controlling Offense- Women | % |
|---|---|
| Assault | 3% |
| Burglary/Theft/Robbery | 36% |
| Drugs | 43% |
| Forgery | 3% |
| OUI/Vehicular Offenses | 3% |
| Violation of Release | 4% |
| All Other Misc. Charges | 7% |
| **Total** | **100%** |

## Transitioned Participants and Return to Custody Rate

First year pilot participants who transitioned to community services (n=333) returned to DOC custody in 6% of cases. They had been in the community between 6 to 18 months as of December 2020. The 6% represents 21 who returned to custody. 15 returned from probation (14 men/1 woman) and 6 returned from straight release (5 men and 1 woman). One-year return to custody rate for all DOC releases for calendar year 2018 was 8.3%. Considering pilot participants transitioned are assessed mostly high-risk residents, 6% is a positive outcome. A more accurate comparison can be made when all pilot participants can be measured at 1-year post discharge in July 2021.

## Overdose deaths in Maine

During the first six months of 2020 (Jan 1st-June 30th) there were 237 overdose deaths in the State of Maine. In the same timeframe a year previous (2019) there were 178. This is an increase of 59 deaths (33%) for the same timeframe from one year to the next. None of those deaths included any of the first year MAT pilot program participants.

MDOC cross-referenced the list of those deceased with its Correctional Information System to understand any relationship they may have had to our Department. In the cohort from 2019, we identified 80 (45%) who had some relationship to MDOC, and in the 2020 cohort, 110 (46%).

The following charts display demographic characteristics for 2019 and 2020 cohorts identified as having


**Maine Department of Corrections**                    **December 2020**
# Correctional Programming Division

some relationship to MDOC. The totals represent the full count of those identified in our Correctional Information System for each year, except for "Months from Discharge to Death" and "County of Primary Address" which are both missing between 4-7 members from the total.

*Overdose deaths in Maine, continued.*

| Age at Death | 2019 | | 2020 | |
|---|---|---|---|---|
| Under 20 | 2 | 3% | 0 | 0% |
| 20-29 | 10 | 13% | 15 | 14% |
| 30-39 | 30 | 38% | 39 | 35% |
| 40-49 | 22 | 28% | 25 | 23% |
| 50-59 | 14 | 18% | 28 | 25% |
| >59 | 2 | 3% | 3 | 3% |

| Months from D/C to Death | 2019 | | 2020 | |
|---|---|---|---|---|
| Active on Day of Death | 23 | 32% | 11 | 11% |
| 1-6 months | 4 | 6% | 4 | 4% |
| 7-12 months | 8 | 11% | 4 | 4% |
| 13-24 months | 2 | 3% | 6 | 6% |
| 25-36 MONTHS | 3 | 4% | 3 | 3% |
| 37-48 Months | 5 | 7% | 9 | 9% |
| 49-60 months | 2 | 3% | 4 | 4% |
| > 60 months | 24 | 34% | 62 | 60% |

| | Race | 2019 | | 2020 | |
|---|---|---|---|---|---|
| **Male** | Black or African American | 1 | 2% | 3 | 4% |
| | Native American | 1 | 2% | 1 | 1% |
| | Two or More Races | 1 | 2% | 0 | 0% |
| | Unknown | 0 | 0% | 10 | 12% |
| | White | 59 | 95% | 70 | 83% |
| | **Total Males** | **62** | **100%** | **84** | **100%** |
| **Female** | Native American | 1 | 6% | 2 | 8% |
| | Unknown | 0 | 0% | 1 | 4% |
| | White | 17 | 94% | 23 | 88% |
| | **Total Females** | **18** | **100%** | **26** | **100%** |



Maine Department of Corrections                December 2020
## Correctional Programming Division

*Overdose deaths in Maine, continued.*

| Controlling Sentence | 2019 | | 2020 | |
|---|---|---|---|---|
| Arson | 1 | 1% | 0 | 0% |
| Assault/Threaten | 6 | 8% | 18 | 16% |
| Bail | 0 | 0% | 1 | 1% |
| Burglary | 4 | 5% | 8 | 7% |
| Civil/Human Rights | 0 | 0% | 1 | 1% |
| Conspiracy | 0 | 0% | 1 | 1% |
| Drugs | 21 | 26% | 26 | 24% |
| Forgery | 0 | 0% | 1 | 1% |
| Liquor | 2 | 3% | 0 | 0% |
| Manslaughter | 1 | 1% | 0 | 0% |
| None | 7 | 9% | 8 | 7% |
| OUI | 5 | 6% | 8 | 7% |
| Property Damage | 3 | 4% | 2 | 2% |
| Public Admin | 3 | 4% | 2 | 2% |
| Public Order | 0 | 0% | 1 | 1% |
| Robbery | 3 | 4% | 2 | 2% |
| Sex Offenses | 0 | 0% | 5 | 5% |
| Stalking/Terrorize | 1 | 1% | 1 | 1% |
| Theft | 12 | 15% | 17 | 15% |
| Traffic Criminal | 9 | 11% | 5 | 5% |
| Traffic Infraction | 0 | 0% | 1 | 1% |
| Trespass | 1 | 1% | 2 | 2% |
| Weapons | 1 | 1% | 0 | 0% |

| County of Address | 2019 | | 2020 | |
|---|---|---|---|---|
| Androscoggin | 7 | 9% | 8 | 8% |
| Aroostook | 1 | 1% | 7 | 7% |
| Cumberland | 23 | 30% | 17 | 17% |
| Franklin | 1 | 1% | 3 | 3% |
| Hancock | 2 | 3% | 3 | 3% |
| Kennebec | 6 | 8% | 9 | 9% |
| Knox | 1 | 1% | 6 | 6% |
| Lincoln | 1 | 1% | 2 | 2% |
| Oxford | 1 | 1% | 0 | 0% |
| Penobscot | 12 | 16% | 22 | 21% |
| Piscataquis | 1 | 1% | 2 | 2% |
| Sagadahoc | 2 | 3% | 1 | 1% |
| Somerset | 3 | 4% | 4 | 4% |
| Waldo | 1 | 1% | 2 | 2% |
| Washington | 5 | 7% | 5 | 5% |
| York | 9 | 12% | 12 | 12% |

## Facility Disciplinary Data

This chart shows the number of disciplinary violations related to medication, and drug possession/use, and/or trafficking for the six months prior to MAT rollout through the end of the pilot year. The timeline shows when each adult facility began administration of MAT.  In comparing the six months prior to MAT implementation to the pilot year, there does not appear to be sustained negative impact in these violations. Comparing additional data in the future will provide further insight.



## Community Partners and Continuity of Care

Since initial rollout **Groups Recover Together** has been involved with providing transition services to residents during incarceration through discharge by connecting participants to post-release Groups providers or other community-based MAT providers.

Of the 333 treated and discharged to community care:
- 74% made it to the first community follow up appointment (Groups cohort only)
  - Groups received and handled 70% of discharged resident referrals, and connected the remaining 30% to other community providers
- In addition to those listed above, Groups also coordinated aftercare for 34 residents who chose not to initiate services but did want connection to a community provider after their release.

**Day One**, MDOC's substance use disorder service provider serving the population at Mountain View Correctional Facility started continuity of care referrals in November 2019.  They do not provide MAT services in the community, but rather assist residents to connect with community service providers at the time of discharge. Since November and throughout the pilot year, Day One provided 64 continuity of care referrals for facility MAT participants desiring to receive services upon release. Connections were made to 30 different community providers statewide.

## Pilot Year Conclusions

MDOC's initial goal with providing MAT treatment was to serve up to 100 residents from 3 pilot sites who would discharge to community aftercare.  This goal was exceeded threefold, as 333 residents were served and transitioned with community MAT services in place.  In addition, due to efficiencies identified during implementation and operation, the pilot year came in well below budget:  Less than half ($482,000) the budgeted amount ($1.2 million) was expended.

Other successful milestones included the expansion from three to five adult correctional facilities within the first six months; an early expansion of the induction window from three months to discharge to 6 months; and beginning in February 2020 extending treatment to include all new admissions who came in on MAT regardless of their sentencing. Although there was a 33% spike in overdose deaths in Maine in the first six months of 2020 compared to the same timeframe in 2019, none of the 333 who transitioned to community care were among the deceased.

The introduction of MAT to MDOCs adult facilities also brought some challenges. These were all met or mitigated with well-planned strategies including sending teams of administrators and correctional staff to visit and study another state's program (Rhode Island); forming interdisciplinary facility planning teams; providing intensive staff training and team building to create buy in; and the use of dry-runs prior to rollout.

MAT is considered one of the highest standards of care for individuals diagnosed with OUD. MDOC is on the cutting edge of using this treatment to provide corrections involved individuals an opportunity to begin addressing their addiction before transitioning back into the community. Furthermore, offering MAT treatment in a correctional setting, including the use of medications to address addiction triggers combined with comprehensive discharge planning and the provision of Narcan kits and education may serve as a community overdose mitigation strategy.

# EXHIBIT C



G  Sign in to LinkedIn with Google                    ✕

M   Marielle Maxwell
    marielle@wacda.com

              Continue as Marielle

To create your account, Google will share your name,
email address, and profile picture with LinkedIn. See
LinkedIn's privacy policy and terms of service.



**Tara Craig, MPA**
Saving the world, one analysis at a time....
Farragut, Tennessee, United States
515 followers · 500+ connections

Wellpath

Grand Canyon University

[ Join to view profile ]

## About

Experienced leader in the public health space (Medicaid & Medicare) with extensive history in Medical
Economics, Informatics, Actuarial and Underwriting departments.

## Activity



You may not see it, but these days AI is everywhere
Liked by Tara Craig, MPA



I'm please to announce that Ryan Mead has joined Beacon
as our new Director of Reimbursement. Ryan comes to us
with several years of experience in...
Liked by Tara Craig, MPA



The Alameda, CA team thanks Wellpath CEO, Jorge
Dominicis and Wellpath President, Kip Hallman for a great
visit! #wearewellpath
Liked by Tara Craig, MPA

[ Join now to see all activity ]

**You're signed out** ✕

Sign in for the full experience.

[ Sign in ]

[ G  Continue with Google ]

or

[ Join now ]

## Experience



**Director of Medical Economics**
Wellpath
Jun 2021 - Present · 2 years 1 month

Linked in

Join now    Sign in

**Director, Medical Economics, Medicaid and Medicare**
Mar 2020 - Jun 2021 · 1 year 4 months
Phoenix, AZ

**Manager, Medical Economics, Medicaid and Medicare**
Feb 2017 - Mar 2020 · 3 years 2 months
Phoenix, Arizona

**Senior Medical Economics Consultant, Medicaid and Medicare**
May 2012 - Jan 2017 · 4 years 9 months
Phoenix, AZ

**Informatics Consultant, Medicaid and Medicare**
Feb 2011 - May 2012 · 1 year 4 months
Phoenix, AZ
- Perform data analysis, manipulate complex data sets, and design and produce reports.
- Perform research and custom analysis of complex healthcare claims that include medical, pharmacy and behavioral health data.
- Create new and make changes to existing SQL stored procedures as part of report automation.
- Create dynamic Excel templates which incorporate SQL logic, tables created via dynamic stored procedures and Visual Basic log to automate reports and enable the end user to access...

Show more

**Actuarial Consultant, Medicaid and Medicare**
Nov 2006 - Feb 2011 · 4 years 4 months
Phoenix, AZ
- Conduct monthly reserve modeling, analysis and reporting for MCP, CT and FL.
- Provide actuarial and technical support for reserving, planning, forecasting, rate-setting and reporting process.
- Compile and analyze data, prepare and submit necessary exhibits for regulatory filings.
- Use SQL programming and actuarial tools and systems to obtain, organize and analyze information. Apply financial principles, analytical skills, management skills and interpersonal communication to...

Show more

**Underwriting Analyst**
CVS Caremark Corporation
Jul 2005 - Oct 2006 · 1 year 4 months
Scottsdale, AZ
- Analyzed large data sets to underwrite new and renewal PBM contracts for Employers, Health Plans and TPAs.
- Reviewed RFPs to assess requirements with various financial implications into the pricing analysis; actively participated in management discussions concerning each case.
- Conducted risk assessment, cost/savings projections and ad-hoc reporting.
- Developed and maintained modeling processes, participated in updates to business assumptions and conducted project management for...

Show more

**Manager of Evaluation and Pricing**
Peak-Ryzex
Jun 2004 - Jun 2005 · 1 year 1 month
Phoenix, AZ
- Managed daily operations of the Evaluation Department, created and maintained all pricing and policies of the division, authored monthly company-wide service newsletters and policy guides.
- Utilized data systems to compile, organize and analyze information to underwrite customized service contracts.



You're signed out

Sign in for the full experience.

Sign in

or

Join now

Linked in

Join now    Sign in

Show more

**Senior Service Consultant**
Danka Office Imaging
Sep 2002 - Mar 2004 · 1 year 7 months

Tempe, AZ

- Conducted trend, revenue, billing, payment history and other account related analyses and reporting.
- Queried various systems to perform account audits and manage all service orders prior to being billed through Oracle.
- Participated in projects to assess Oracle data, assisted in correcting customer accounts and contracts.
- Averaged over $100K in monthly recovered revenue via opportunity analyses using various data sources.
- Reconciled and resolved a key customer's account;...

Show more

**NCS Pearson**
3 years 9 months

**Manager of Pricing Analytics**
Mar 2000 - Apr 2002 · 2 years 2 months
Mesa, AZ and Tucson, AZ
- Conducted, budgeting, forecasting, ad-hoc analyses; provided assistance, support and training to Pricing Analysts.
- Developed metrics reporting using various data sources (Oracle, Excel, Access, Crystal Reports, Vantive, Data Warehouse reports) and suggested improvements.
- Authored SOP manual detailing the role and responsibilities of the Pricing Analytics Supervisor and the supervised employees.
- Programmed, implemented and maintained pricing model and process used to analyze...

Show more

**Pricing Analyst**
Aug 1998 - Mar 2000 · 1 year 8 months
Mesa, AZ
Pricing Analyst (Aug 1998 – Mar 2000)
- Used various systems to compile, analyze and report pending revenue.
- Developed and maintained database that provided visibility and reporting capabilities for order status and revenue.
- Provided technical and reporting assistance to accounting; developed early warning system to identify potential revenue recognition concerns.
- Liaison to all internal departments and with customers to quickly identify and resolve any problems related to...

Show more

## Education

You're signed out

Sign in for the full experience.

Sign in

or

Join now

Linkedin

Join now    Sign in

Administration/Management • GPA: 3.97, All A's, everydays!

2016 - 2019

**Arizona State University, W. P. Carey School of Business**
Finance

1998 - 2000

**North High School**
International Baccalaureate (Honors) Diploma Recipient • Top 5%

1992 - 1996

Activities and Societies: National Honor Society Varsity Softball Varsity Basketball Spanish Club (1995 trip to Spain) French Club Chess Club (Travelling) Yearbook Newspaper Reporting/Writing/Art/Photography/Editorials

**Usa Martial Arts**
Taekwondo

2011 - Present

Activities and Societies: Coach of Little Tigers Program

## Volunteer Experience

**Fundraising Coordinator**
Phoenix Boys Choir

Jan 2018 - Present • 5 years 6 months

Education

**Instructor of Financial Literacy to Elementary Students**
Junior Achievement of Arizona

Education

**Frequent Volunteer**
Feed My Starving Children

Children

**Tae Kwon Do Coach, Little Tigers Program**
USA Martial Arts

Sep 2013 - Sep 2016 • 3 years 1 month

Children



You're signed out

Sign in for the full experience.

Sign in

or

Join now

Linked in                                                          Join now    Sign in

Brownie Troop Volunteer, Thin Mint Connoisseur
Girl Scouts of the USA

Children

---

## Licenses & Certifications

**American Society of Health Economists**
American Society of Health Economists
Issued Jan 2019

**Fellow of the Healthcare Financial Management Association (FHFMA)**
Healthcare Financial Management Association (FHFMA)
Issued Jan 2019

**Six Sigma Yellow Belt**
Lean Six Sigma Institute LLC
Issued Apr 2018

**Series 6**
FINRA (Financial Industry Regulatory Authority)

**Series 63**
FINRA (Financial Industry Regulatory Authority)

---

## More activity by Tara

Ribbon Cutting for South Correctional Entity (SCORE) in
Des Moines, WA! Congrats Team!
Liked by Tara Craig, MPA

The Anthem, Inc. family extends a warm welcome to Glenn
MacFarlane, who was named president of Beacon Health
Options just this week. Glenn has...
Liked by Tara Craig, MPA

View my verified achievement from University of Dallas.
Liked by Tara Craig, MPA

10 days of classes left until I graduate with my Bachelor of
Science in Health Sciences! Summa Cum Laude with
highest honors, top 1% of my class...
Liked by Tara Craig, MPA

**You're signed out**
Sign in for the full experience.

Sign in

or

Join now

**Linked**in                                                    Join now    Sign in

See who you know in common

Get introduced

Contact Tara directly

Join to view full profile

## People also viewed

 **Zachary O'Connor**
Vice President - Enterprise Analytics at Wellpath
New York, NY

 **Joshua Eads**
Director of Operational Reporting & Analytics
Nashville Metropolitan Area

 **Lynne Busby**
Arizona Regional Office Manager Toshiba
Tempe, AZ

 **David Doherty**
Informatics Consultant at Aetna, a CVS Health Company at Aetna, a CVS Health Company
Phoenix, AZ

 **Monica Boyce, Ed.D**
Senior Project Manager at ChristianaCare
Greater Philadelphia

 **Lisa Danka**
Transportation Programming Manager and Co-author of "Soup Bone Holler, Indiana"
Greater Phoenix Area

 **Sara K**
Application Developer
Bear, DE

 **Mark Gale**
Corporate Controller at Clear Captions, Inc.
Sacramento, CA

 **Kimberly N. Velasco, BSIT**
Health Informatics Specialist at The Family Practice & Counseling Network
Greater Philadelphia

 **Dora Herrera**
IntegraNet Health
Greater Houston

Show more profiles ⌄

---

 **Explore collaborative articles**

We're unlocking community knowledge in a new way. Experts add insights directly into each article, started with the help of AI.

Explore More

## Add new skills with these courses

 Excel Business Intelligence: Data Modeling 101

 The Essential Elements of Predictive Analytics and Data Mining

**You're signed out**
Sign in for the full experience.

Sign in

or

Join now

 

Join now    Sign in

See all courses

## Tara's public profile badge

Include this LinkedIn profile on other websites



**Tara Craig, MFA**
Saving the world, one analysis at a time....

Director of Medical Economics at Wellpath

Grand Canyon University

View profile

View profile badges

© 2023

Accessibility

Privacy Policy

Cookie Policy

Brand Policy

Community Guidelines

About

User Agreement

Your California Privacy Choices

Copyright Policy

Guest Controls

Language



### You're signed out
Sign in for the full experience.

Sign in

or

Join now

# EXHIBIT 8

# MEYER, FLUEGGE & TENNEY, P.S.

ROBERT C. TENNEY
MARK D. WATSON*
JEROME R. AIKEN*
JOHN A. MAXWELL, JR.
PETER M. RITCHIE**
JAMES C. CARMODY

ATTORNEYS & COUNSELORS
230 SOUTH SECOND STREET, SUITE 101
P.O. BOX 22680
YAKIMA, WASHINGTON 98907-2680

JACOB A. LARA
ROBERT S. URLOCKER
PARDIES ROOHANI
HARLEY A. MONTOYA

_____

*Also admitted in Oregon
**Also admitted in Oregon & Virginia

*OF COUNSEL*

GARY E. LOFLAND

July 7, 2023                    **VIA EMAIL ONLY**

Ms. Mary C. Vargas
Stein & Vargas, LLP
10 G Street NE, Suite 600
Washington, DC  20002

Re:    Gaven Picciano v. Clark County, Jail, Wellpath
       Our File No. 23897

Dear Mary:

Thank you for your email of July 6, 2023.  It is our position that Wellpath does not have any
discovery deficiencies at this time.  I will address the two issues you raise.

You have requested Wellpath's site-specific policies for the Clark County Jail that would be in
place in 2020.  In an email to you dated May 19, 2023, I responded to that issue.  I informed you
that I had requested those policies, but they could not be located.  As I stated in that email, I
once again requested this information.  The information that has been provided to me is that
there are no site-specific policies.  Most likely this is because none ever existed at Clark County
Jail.  Apparently, Wellpath utilizes its global policies at some of the correctional facilities with
which it has a contract.

I forwarded to my client all of the information you sent alleging Wellpath's receipt of federal
funds.  Wellpath's response to this remains the same and our latest supplemental discovery
responses covered this.  NaphCare's Reply Memorandum related to its Partial Summary
Judgment Motion addresses this issue.  For those federal statutes to apply, an entity must receive
general federal funding.  As NathCare states in its reply brief, it is essentially a subsidy that
must be received.  According to my client, Wellpath receives no such funding.

As the website you have located and the information you provided demonstrate, Wellpath does
have specific contracts with the federal government for the provisions of specific services.
However, it does not receive a subsidy.

Moreover, in regards to its operations at Clark County Jail, it did not receive federal funding.
As you know, Wellpath had a specific contract with Clark County Jail and the payments

Ms. Mary C. Vargas
July 7, 2023
Page 2


Wellpath received were under the terms of that contract.  Accordingly, Wellpath believes the responses provided are completely accurate.

If you want to bring a motion on this issue, I invite you to do so.  I do not believe it is necessary at this point to have a meet and confer to discuss this further.  I would be happy to do so if you believe it is necessary, but I believe this letter responds to your specific issues.

Thank you for your time and attention.  Please do not hesitate to contact me if would like to discuss this in more detail.

Respectfully yours,

Jerome R. Aiken

JRA/saj
cc:     Mr. Michael S. Stein
        Mr. Conrad Reynoldson
        Ms. Marielle Maxwell
        Mr. Charles Weiner

# EXHIBIT 9

**Subject:** Re: Meet and Confer
**Date:** Tuesday, July 25, 2023 at 10:54:30 AM Eastern Daylight Time
**From:** Jerry Aiken
**To:** Mary Vargas
**CC:** Pardies Roohani, Sheri Jones, Leslie Van Guse

Mary:

I believe our disagreement is legal in nature and not substantive. The Court will need to decide it. We do not disagree that Wellpath receives specific funds from the Government for specific contracts with the Government. We agree with Naphcare that is not sufficient to trigger the Federal statutes. Wellpath would need to receive general funding to assist Wellpath's overall operations. Again, akin to a subsidy. I reviewed our discovery answers and believe they state as such.

I am out of town in depositions all day. Potentially could have a call tomorrow at noon my time if you believe it is necessary.

Respectfully yours,

Jerry

Sent from my iPhone

> On Jul 25, 2023, at 7:38 AM, Mary Vargas <mary.vargas@steinvargas.com> wrote:
>
>
> Jerry,
>
> I understand that you do not think a meet and confer is necessary before we file a motion to compel Wellpath's production on federal financial assistance. However, I do think it is important that we honor the local rules which require us to meet and confer in an effort to resolve the dispute. I am available today between 3-6 pm eastern/12-3 pacific or tomorrow between 3-6 pm eastern/12-3 pacific. Please advise.
>
> Mary

# EXHIBIT 10

**Subject:** RE: Picciano - Response Needed
**Date:** Thursday, August 3, 2023 at 1:44:08 PM Eastern Daylight Time
**From:** Jerry Aiken
**To:** Mary Vargas
**CC:** Pardies Roohani, Sheri Jones, Leslie Van Guse

Mary:

My preference would be not to go to the time and expense of this at this time.  I believe there is a chance that this may become moot.  As I stated to you in a conversation, in my opinion Naphcare's pending motion may resolve this issue.  Moreover, the pending motions on experts may resolve this.  I think we should let these matters play out and then revisit.

Since there is no trial date, and by the time we obtain one if needed, the trial most likely will be months in the future.  Thus, I most likely would have no objection to Plaintiff filing a motion to compel if you felt the need to do so.  However, according to my numerous conversations with my client, there would be nothing from them to compel production.  They receive no direct federal funding.  Potentially, some of the entities with whom they contract may receive federal funding, but you would need to obtain that information from the other party to the contract.

Please call me if you would like to discuss in more detail.

Respectfully yours,

Jerry

Jerome R. Aiken
Meyer, Fluegge & Tenney, P.S.
P.O. Box 22680
Yakima, WA 98907-2680
509/575-8500   Fax: 509/575-4676
aiken@mftlaw.com

This e-mail transmission may contain information which is protected by the attorney-client, work-product and/or other privileges. If you are not the intended recipient, you are hereby notified that any disclosure or taking of any action in reliance on the contents is strictly prohibited. If you have received this transmission in error, please contact us immediately and return any e-mail to us by choosing Reply (or the corresponding function on your e-mail system) and then deleting the e-mail.

**From:** Mary Vargas <mary.vargas@steinvargas.com>
**Sent:** Thursday, August 3, 2023 10:28 AM
**To:** Jerry Aiken <aiken@mftlaw.com>
**Cc:** Pardies Roohani <roohani@mftlaw.com>; Sheri Jones <jones@mftlaw.com>; Leslie Van Guse <VanGuse@mftlaw.com>
**Subject:** Picciano - Response Needed

Jerry,

Please let me know by 12 pacific today whether your client will consent to our motion to modify the scheduling order for the limited purpose of filing a motion to compel discovery on the federal financial assistance issue.

Mary