1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

GAVEN PICCIANO,

CASE NO. 3:20-cv-06106-DGE

8

Plaintiff,

v.

ORDER ON MOTIONS TO
EXCLUDE EXPERT TESTIMONY
(DKT. NOS. 88, 91, 93, 94, 95)

9
10

CLARK COUNTY, CLARK COUNTY
JAIL, WELLPATH, LLC, and
NAPHCARE, INC.,

11

Defendants.

12
13

## I      INTRODUCTION

14      Before the Court are five motions to exclude expert testimony.  Defendants NaphCare

15 (Dkt. No. 88) and Wellpath (Dkt. No. 91) move to exclude testimony of Plaintiff Gaven

16 Picciano's experts.  Plaintiff moves to exclude expert testimony of Defendants NaphCare (Dkt.

17 No. 94), Wellpath (Dkt. No. 93) and Clark County[1] (Dkt. No. 95).  The Court assumes

18 familiarity with the facts of this case.  (*See* Dkt. Nos. 60 at 2–3; 131 at 2–3.)

19

## II      LEGAL STANDARD

20      Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert . . .

21 may testify in the form of an opinion or otherwise if the proponent demonstrates to the court," on

22
23

---

[1] The Court refers to Defendants Clark County and the Clark County Jail collectively as "Clark
County" or "the County."

24

a "more likely than not" basis, that the expert's qualifications "will help the trier of fact to understand the evidence or to determine a fact in issue," the expert's testimony "is based on sufficient facts or data" and "is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

The Court's role is to act as a gatekeeper, "ensur[ing] the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) ("judges are entitled to broad discretion when discharging their gatekeeping function").  And while "[s]haky but admissible evidence is to be attacked by cross examination" rather than exclusion, *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), courts need not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Put differently, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

### III    DISCUSSION

**A.    Defendants' Motions to Exclude Testimony of Plaintiff's Experts (Dkt. Nos. 88, 91)**

NaphCare moves to exclude opinions of Isabel Hujoel ("Dr. Hujoel").  (Dkt. No. 88 at 10–13.)  NaphCare and Wellpath move to exclude opinions of Mitchel Holliday ("Dr. Holliday").  (*Id.* at 13–17; Dkt. No. 91 at 8–12.)

1.    Dr. Hujoel's Opinions

a.    *Qualifications*

NaphCare argues Dr. Hujoel is not qualified to opine that Plaintiff (1) has celiac disease (Dkt. No. 88 at 5) and (2) suffered damages (*id.* at 10).

1

(1)     Celiac Disease

2

NaphCare asserts Dr. Hujoel is not qualified to opine that Plaintiff has celiac disease

3

because she "has limited expertise in the field of medicine" and "only recently became a resident

4

physician at the University of Washington."  (*Id.*)  Plaintiff responds that as "a gastroenterologist

5

who specializes in celiac disease, [Dr. Hujoel] is well qualified to offer expert opinions on

6

whether Picciano has celiac disease."  (Dkt. No. 106 at 8.)

7

The Court agrees with Plaintiff.  Dr. Hujoel is a physician licensed in gastroenterology

8

and internal medicine with a clinical and academic focus in celiac disease.  (Dkt. No. 89-16 at 3.)

9

She has authored numerous peer-reviewed articles and book chapters on celiac disease; several

10

of her publications relate to diagnosis of celiac disease.  (*Id.* at 18–20.)  In her outpatient

11

practice, she has handled "both new diagnoses and ongoing management" of celiac disease.  (*Id.*

12

at 3.)  The question of whether an individual has celiac disease falls squarely in Dr. Hujoel's

13

expertise.  Challenges as to the extensiveness or recency of Dr. Hujoel's credentials go to the

14

weight, but not the admissibility, of her opinion.  *See Kennedy v. Collagen Corp.*, 161 F.3d 1226,

15

1231 (9th Cir. 1998).

16

(2)     Damages

17

NaphCare argues Dr. Hujoel "is not qualified to render an opinion that Picciano suffered

18

damages."  (Dkt. No. 88 at 10.)  As NaphCare maintains, "Dr. Hujoel stretches far beyond her

19

limited expertise as a gastroenterologist" because "[h]er opinions concern the damages Picciano

20

claims to have suffered while housed at the Clark County Jail," and Dr. Hujoel is not "an

21

economist or an accountant."  (*Id.* at 11.)  NaphCare further asks that Dr. Hujoel's "damages"

22

opinion be excluded because it is based "on NaphCare's emergency response to Picciano's

23

'controlled fall'" despite Dr. Hujoel having "no experience in emergency department care or in a

24

correctional setting."  (*Id.*)

1          Dr. Hujoel's report assigns no monetary value to Plaintiff's injuries and does not

2  reference economic damages.  (*See generally* Dkt. No. 89-16.)  Rather, a review of NaphCare's

3  motion reveals that the "'damages' opinion[]" to which NaphCare refers (Dkt. No. 88 at 11) is

4  Dr. Hujoel's opinion that Plaintiff suffered "acute injury and distress" due to the lack of a gluten-

5  free (Dkt. No. 89-16 at 11).  Dr. Hujoel's opinion on physical injuries resulting from gluten

6  exposure is a medical opinion, which Dr. Hujoel is plainly qualified to offer.  The Court

7  accordingly rejects NaphCare's contention that Dr. Hujoel is unqualified to opine on "acute

8  injury and distress" due to her lack of expertise in economics or accounting.

9          The Court also rejects NaphCare's argument that the same "acute injury and distress"

10  opinion should be excluded because "Dr. Hujoel has no experience in emergency department

11  care or in a correctional setting."  (Dkt. No. 88 at 11.)   NaphCare offers no authority or

12  explanation as to why Dr. Hujoel would need experience in an emergency room or correctional

13  setting to render an opinion that a patient suffered "acute injury and distress" as a result of

14  gluten-exposure.  In fact, Dr. Hujoel does not even base her "acute injury and distress" opinion

15  on Plaintiff's emergency room visit (*see* Dkt. No. 89-16 at 11–12), and there is nothing to

16  suggest that injuries relating to celiac disease would differ for a patient in a correctional setting

17  as compared to a patient outside of that setting.  Moreover, NaphCare's argument that Dr. Hujoel

18  would need experience in emergency room or correctional settings undercuts its suggestion that

19  only an accountant or economist could render the same opinion.

20          NaphCare's motion is DENIED insofar as it seeks to exclude Dr. Hujoel's opinions on

21  the basis of her qualifications.

22

23

24

ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY (DKT. NOS. 88, 91, 93, 94, 95) - 4

b.   *Methodology*

NaphCare argues Dr. Hujoel did not adhere to any scientific methodology in (1) "opining that Picciano has celiac disease" (Dkt. No. 88 at 12) and (2) "concluding that Picciano suffered 'acute injury and distress'" (*id.* at 11).

(1)   Celiac Disease

NaphCare argues Dr. Hujoel "should not be allowed to opine that Picciano had celiac disease" (Dkt. No. 88 at 13) because she failed to "administer[] *any* tests to validate that conclusion" (*id.* at 5) (emphasis in original).  In particular, NaphCare contends Dr. Hujoel "fail[ed] to follow the methodologies outlined in her own report that are required to confirm celiac disease—specifically, taking a blood test for celiac disease markers, taking small-bowel biopsies, and administering a gluten challenge prior to an upper endoscopy."  (*Id.* at 12.)  In NaphCare's view, Dr. Hujoel's reliance on a Zoom interview with Plaintiff (*id.*), and her "reflexive[]" adoption of "the conclusions of Picciano and his medical providers," conflict with "Dr. Hujoel's own opinion that a celiac-disease diagnosis 'can be challenging and cannot be done on history and physical exam alone'" (Dkt. No. 112 at 6).

NaphCare further argues Dr. Hujoel "errs by ignoring evidence suggesting a contrary diagnosis."  (Dkt. No. 88 at 12.)  As NaphCare contends, Plaintiff's "blood tests showed no markers for celiac disease," but, "[r]ather than engaging with this issue, Dr. Hujoel simply claims that Picciano suffers from an exceedingly rare condition called seronegative celiac disease" and "fails to consider myriad alternative diagnoses."  (*Id.* at 12–13.)  NaphCare asserts Dr. Hujoel should have "take[n] many more steps . . . to confirm that type of diagnosis."  (Dkt. No. 112 at 6.)

Plaintiff responds that Dr. Hujoel did not need to "personally conduct medical testing . . . because the appropriate testing had already been conclusively performed and Hujoel reviewed

1   the records from these tests." (Dkt. No. 106 at 8.)  Plaintiff also contends Dr. Hujoel's opinion

2   that Plaintiff has seronegative celiac disease is properly supported by her application of "the

3   diagnostic criteria in this case"—*i.e.*, "negative serology, a positive small bowel biopsy, and

4   resolution of symptoms once on a gluten-free diet." (*Id.* at 9, 11.)

5       NaphCare's arguments do not justify excluding Dr. Hujoel's opinion that Plaintiff has

6   celiac disease.  NaphCare's motion does not dispute that certain factors cited by Dr. Hujoel may

7   support a celiac disease diagnosis.  Rather, NaphCare takes issue with the fact that Dr. Hujoel

8   did not test those factors herself, and instead relied in part on results already contained in

9   Plaintiff's medical records.  In effect, NaphCare attempts to highlight inconsistencies between

10  the protocol for celiac diagnosis as outlined by Dr. Hujoel (*i.e.*, personally conducting certain

11  testing) and the manner in which Dr. Hujoel applied that protocol to the instant case (*i.e.*, relying

12  at least partly on testing conducted by other physicians).  But the Ninth Circuit has rejected

13  arguments for exclusion that relate to an expert's adherence to protocol rather than a flaw in the

14  protocol itself.  *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014)

15  ("adherence to protocol . . . typically is an issue for the jury" given the "strong emphasis on the

16  role of the fact finder in assessing and weighing the evidence").

17      Moreover, NaphCare has cited no authority that would require an expert to administer

18  diagnostic tests themselves rather than rely on results already recorded, or to conduct

19  confirmatory testing when presented with a "rare" diagnosis.  Courts have reached the opposite

20  conclusion, finding there is "no legal necessity [for a medical expert] to have personally

21  examined [a patient] before testifying." *Schroeder v. County of San Bernardino*, 2019 WL

22  3037923, at *4 (C.D. Cal. May 7, 2019).  NaphCare's arguments that Dr. Hujoel should have

23  conducted her own testing and run confirmatory tests bear on the weight a jury may give her

24

1   opinion, but not the opinion's admissibility.  *See Primiano*, 598 F.3d at 567 (arguments that an

2   expert could have taken additional steps to support their medical opinion "might be useful to the

3   jury as impeachment," but did not "furnish[] an adequate basis for exclu[sion]"); *Elosu v.*

4   *Middlefork Ranch Inc.*, 26 F.4th 1017, 1025 (9th Cir. 2022) (Rule 702 "requires foundation, not

5   corroboration").

6                              (2)      "Acute Injury and Distress"

7           NaphCare asserts "Dr. Hujoel followed no scientific methodology in concluding that

8   Picciano suffered 'acute injury and distress'" for two reasons:  First, because Dr. Hujoel did not

9   offer "methodological recitations or literature" in support of the opinion; and second, because of

10  "inconsistencies in her opinion."  (Dkt. No. 88 at 11.)  Among the "inconsistencies" to which

11  NaphCare points include that Dr. Hujoel admitted Plaintiff's vital signs, laboratory results, and

12  electrolyte readings were normal following Plaintiff's fall while simultaneously relying on that

13  fall "as evidence of 'acute injury and distress.'"  (*Id.*)  NaphCare further contends Dr. Hujoel's

14  "acute injury and distress" opinion is inconsistent with her statements that Plaintiff's "four-

15  pound weight loss 'would not necessarily trigger fire alarms'" and that she did not see evidence

16  of long-term harm to Plaintiff.  (*Id.*)

17          The Court finds unpersuasive NaphCare's one-sentence argument that Dr. Hujoel failed

18  to provide "methodological recitations or literature" in concluding Plaintiff suffered "acute

19  injury and distress."  (*Id.*)  Dr. Hujoel did cite studies to support her opinion.  (Dkt. No. 89-16 at

20  11.)  And in any event, a lack of citations to medical literature does not require exclusion of a

21  physician's opinion.  *See Primiano*, 598 F.3d at 566–67.

22          The Court likewise rejects NaphCare's argument that Dr. Hujoel's opinion on Plaintiff's

23  injuries must be excluded on the basis of inconsistency.  (Dkt. No. 88 at 11.)  Statements to

24  which NaphCare points do not reflect inconsistencies that would rise to the level of rendering her

1   opinion unduly confusing or unhelpful to the jury.  *See Alaska Rent-A-Car, Inc. v. Avis Budget*

2   *Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("the judge is supposed to screen the jury from

3   unreliable nonsense opinions, but not exclude opinions merely because they are impeachable").

4   For instance, Dr. Hujoel's statement that certain emergency department testing results were

5   "normal" (Dkt. No. 89-16 at 7) fails to conclusively undermine her opinion that Plaintiff suffered

6   "acute injury and distress while detained" (*id.* at 11).  Dr. Hujoel explains that "[n]one of the[]

7   tests" conducted in the emergency department "would identify gluten-exposure in someone with

8   celiac disease."  (*Id.* at 7.)  She does not even base her "acute injury and distress" opinion on

9   those test results—instead basing her opinion on Plaintiff's symptoms and studies on the

10  inflammatory impact of gluten exposure.  (*Id.* at 11–12.)

11          To the extent statements cited by NaphCare reveal inconsistency across Dr. Hujoel's

12  report and deposition testimony, those inconsistencies are more appropriate for impeachment.  *In*

13  *re Viagra Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. Jan. 13, 2020) ("apparent

14  inconsistencies" in expert opinion did "not rise to a level that would warrant excluding the

15  experts as unreliable" and were matters more "properly explored through cross-examination");

16  *Buck v. City of Sandpoint*, 2008 WL 4498806, at *20 (D. Idaho Oct. 1, 2008) ("an expert's

17  internally inconsistent statements are not necessarily grounds for exclusion, but rather fertile

18  content for cross-examination").

19          NaphCare's motion is DENIED insofar as it seeks exclusion of Dr. Hujoel's opinions on

20  the basis of methodology.

21          2.      Dr. Holliday's Opinions

22          Wellpath and NaphCare both move to exclude Dr. Holliday's "standard of care" opinion

23  on the ground that Dr. Holliday is unqualified.  (Dkt. Nos. 88 at 13–14; 91 at 5.)  NaphCare

24

1   moves to exclude Dr. Holliday's opinions on the additional grounds that the opinions are

2   unreliable (Dkt. No. 88 at 15) and unhelpful (*id.* at 16).

3             a.   *Qualifications*

4                 (1)   Wellpath's Arguments

5       Wellpath seeks exclusion of Dr. Holliday's "standard of care" opinion only insofar as the

6   opinion relates to Plaintiff's negligence claims.  (Dkt. No. 91 at 6–7.)  Wellpath's argument is

7   twofold.

8       First, Wellpath argues Plaintiff's negligence claims must be analyzed under Chapter 7.70

9   of the Washington Revised Code (*id.* at 2), which "modifie[s] the substantive aspects of all

10  causes of action" for damages "claimed due to 'injury occurring as a result of health care'" (*id.* at

11  7).  Relevant to the instant motion, Wellpath asserts Chapter 7.70 modifies the standard of care

12  to be the level expected of "'a reasonably prudent health care provider at that time in the

13  profession or class to which he or she belongs, in the state of Washington, acting in the same or

14  similar circumstances.'"  (*Id.* at 9) (quoting Wash. Rev. Code § 7.70.040(1)(a)).

15      Second, and assuming the applicability of Chapter 7.70 to Plaintiff's negligence claims,

16  Wellpath argues Plaintiff was required to provide an expert qualified to opine on the degree of

17  care expected of a nurse in Washington state, because "[i]t was a Wellpath-employed nurse" who

18  saw Plaintiff.  (*Id.*)  To that end, Wellpath asserts Dr. Holliday is not qualified because he is a

19  dietitian nutritionist, and not a nurse, and because he conceded to having no knowledge as to the

20  standard of care of a nurse in Washington state.  (*Id*. at 5.)

21      Plaintiff's response asserts, *inter alia*, that the Court already rejected Wellpath's

22  argument regarding the applicability of Chapter 7.70 when ruling on Wellpath's motion to

23  dismiss.  (Dkt. No. 104 at 4.)  Plaintiff urges that the Court's prior ruling be afforded respect

24  pursuant to the law of the case doctrine.  (*Id.*)

1     The law of the case doctrine generally precludes a court "from reconsidering an issue that

2     has already been decided by the same court."  *United States v. Alexander*, 106 F.3d 874, 876 (9th

3     Cir. 1997) (internal quotation and citation omitted).  A court should adhere to law of the case

4     absent clear error in the earlier decision, an intervening change of law, prospective manifest

5     injustice, or changed circumstances.  *Id.*

6     The Court does not find Wellpath's motion to raise any of the above conditions as

7     justification for deviating from the Court's conclusion that Plaintiff's negligence claim is not

8     governed by Chapter 7.70.  (Dkt. No. 60 at 12.)  That Wellpath is a medical provider does not

9     require the conclusion that any negligence claim against Wellpath is a claim "for damages for

10    injury occurring as a result of health care" under Washington Revised Code § 7.70.010.  Indeed,

11    the Court finds instructive an analysis of similar circumstances in *Gonzalez v. Dammeier*, 2022

12    WL 1155744 (Wash. Ct. App. Apr. 19, 2022).

13    *Gonzalez* found Chapter 7.70 inapplicable to a negligence claim stemming from the

14    decision of a county's medical contractor to house the plaintiff on a jail's second floor despite

15    the plaintiff informing the contractor's nurse at booking of his multiple sclerosis diagnosis,

16    which made it difficult to walk.  *Id.* at *1, 6.  As *Gonzalez* explained, "[the medical contractor]

17    was acting as the County's agent in discharging *the County's* nondelegable duty to ensure [the

18    plaintiff's] safety."  *Id.* at *6 (emphasis in original).  "[T]he County's standard of conduct" was

19    therefore "measured against the professional standard of conduct for jailers, not for health care

20    providers."  *Id.*  The nurse's act of "merely not[ing]" the plaintiff's multiple sclerosis and

21    "ma[king] a placement decision" did not constitute examining, diagnosing, treating, or caring for

22    the plaintiff.  *Id.*  As such, the nurse was not providing "health care," so Chapter 7.70 did not

23    apply.  *Id.*

24

1   The circumstances here are similar.  As Plaintiff alleges, "[a]t the time he was booked

2   into Clark County Jail," he noted he had celiac disease requiring a "strictly gluten-free diet."

3   (Dkt. No. 43 at 6–7.)  Nonetheless, "Wellpath did not prescribe or otherwise take the steps

4   necessary to ensure that he had" that diet.  (*Id.* at 7.)  As in *Gonzalez*, the Court does not find the

5   conduct of noting Plaintiff's medical condition and assigning (or failing to assign) a dietary

6   placement to constitute the provision of "health care."  Accordingly, Chapter 7.70 does not

7   modify Plaintiff's negligence claims against Wellpath.

8   As the Court declines to reverse its prior ruling on the applicability of Chapter 7.70, the

9   Court's analysis of Wellpath's motion does not proceed further.  Wellpath's motion is DENIED.

10   (2)     NaphCare's Arguments

11   NaphCare argues "Dr. Holliday is not qualified to opine that NaphCare violated the

12   standard of care" in "failing to immediately prescribe Picciano a gluten-free diet" because he

13   "has no . . . qualifications that would allow him to criticize a jail medical service provider's diet

14   prescription."  (Dkt. No. 88 at 13–14.)  As NaphCare highlights, "Dr. Holliday is not a medical

15   doctor, nurse, or provider" and "is not qualified to render a medical prescription."  (*Id.* at 14.)

16   Further, NaphCare maintains Dr. Holliday "has no certifications or other qualifications that

17   would allow him to interpret" the National Commission of Correctional Health Care (NCCHC)

18   and American Correctional Association (ACA) standards on which Dr. Holliday's opinion is

19   based.  (*Id.*)

20   In response, Plaintiff contends Dr. Holliday's experience—including as Chief Dietitian

21   and Chief of Nutrition for the Federal Bureau of Prisons, and Chief Dietitian for the United

22   States Public Health Service—qualifies him to opine on correctional health standards governing

23   nutrition management and diet orders.  (Dkt. No. 106 at 4, 11–12.)  Among other qualifications,

24   Plaintiff notes Dr. Holliday has "authorized BOP guidelines for diet orders" (*id*. at 13) and "is

1    responsible for the creation of diet order policies in place at more than 110 correctional facilities

2    in the United States" (*id*. at 15).

3            Dr. Holliday's "standard of care" opinion concludes that "Defendants did not meet

4    standards of care in the treatment of Mr. Picciano's celiac disease" by failing to "provid[e] a

5    therapeutic diet order to receive a gluten-free diet for eight days . . . until an outside provider

6    diagnosis was received," and failing to ensure the diet "was provided as prescribed."  (Dkt. No.

7    89-18 at 11.)  In sum, Dr. Holliday's opinion concerns the standard for placement and provision

8    of special diet orders in a correctional setting.

9            The Court does not find that only a physician would be qualified to offer this opinion.  As

10   the Chief Dietician for the Bureau of Prisons and author of Bureau of Prisons guidelines

11   concerning medical diets, Dr. Holliday has considerable experience with diet orders in

12   correctional settings.  (*Id.* at 4, 16, 22.)  That the Clark County Jail tasked its medical contractors

13   with placing diet orders does not require the conclusion that only a physician could have

14   expertise on the conditions under which those orders should be placed.  In fact, correctional

15   standards quoted verbatim by Dr. Holliday (*id.* at 6) and referenced by NaphCare's own expert

16   (Dkt. No. 94-4 at 10) reflect that registered dietician nutritionists (RDNs) are tasked with

17   reviewing "medical diets," thereby underscoring that Dr. Holliday's experience as an RDN

18   allows him to credibly opine on diet order placement in this case.

19           NaphCare's remaining arguments that Dr. Holliday is not certified on NCCHC or ACA

20   standards and has "never audited a jail medical services provider" for compliance with those

21   standards (Dkt. No. 88 at 14) are better reserved for cross-examination.  *See United States v.*

22   *Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993).  For the purposes of admissibility, the Court finds

23

24

adequate Dr. Holliday's knowledge and experience with respect to these standards.  (*See* Dkt. Nos. 105-15 at 4–6; 107-19 at 5–6, 10.)

The Court DENIES NaphCare's motion to the extent it seeks exclusion of Dr. Holliday's standard of care opinion based on qualifications.

        b.   *Reliability*

NaphCare challenges Dr. Holliday's opinion that Defendants should have ordered Plaintiff a gluten free diet prior to confirming his diagnosis, arguing the opinion is unreliable because it contradicts guidance Dr. Holliday authored for the BOP that prohibits special diets prior to confirmation of food allergies.  (Dkt. No. 88 at 5–6.)

Plaintiff responds that NaphCare mischaracterized the BOP guidelines and "selectively quoted from an inapplicable section which deals specifically with situations where inmates have the option to select" food from the "BOP National Menu."  (Dkt. No. 106 at 14.)  Plaintiff further notes the guidelines are "specific to food allergies" and were simply "cited in a footnote as an example of BOP policies requiring interim diet orders."  (*Id.* at 13.)

The BOP guidance in question concerns the conditions under which a special diet should be ordered for allergic avoidance.  (Dkt. No. 89-19 at 9.)  It provides, for example, that special diets for certain food allergies should not be considered *unless* an "individual has a confirmed diagnosis" of the allergy.  (*Id.*)  Elsewhere, the guidance indicates that the suspected allergen should be "immediate[ly] remov[ed]" from the food tray of a person with "suspected food-induced anaphylaxis."  (*Id.* at 18.)

The guidance at least raises questions as to Dr. Holliday's opinion that a gluten free diet was required prior to confirming Plaintiff's celiac disease diagnosis.  But the guidance does not wholly contradict Dr. Holliday's opinion, as the guidance pertains only to food allergies, and not celiac disease (Dkt. No. 89-17 at 36, 43); and was tailored to the specific food offerings at the

Federal Bureau of Prisons (*id.* at 36, 41).  Dr. Holliday's opinion did not assert the guidance

directly applied to Clark County; instead, Dr. Holliday explained it was relevant because it

"established [] the need for removal of [unsafe] foods from" an individual's tray in certain

circumstances.  (Dkt. No. 107-19 at 19.)

While not airtight, Dr. Holliday's opinion is sufficiently reliable.  It is supported by

principles drawn from organizational standards; Dr. Holliday's experience in correctional

settings and as a dietician; and principles reflected in BOP guidance created for similar, but not

identical, situations (Dkt. No. 89-18 at 10).  The Court DENIES NaphCare's motion to the extent

it requests exclusion of Dr. Holliday's opinion that Defendants should have placed Plaintiff on a

gluten free diet prior to receipt of medical records.

c.     *Helpfulness*

NaphCare argues Dr. Holliday offers no opinion that would assist the trier of fact because

Dr. Holliday (1) was unable to "say what parts of his report constitute 'opinions' to a reasonable

degree of certainty, versus what parts merely regurgitate assumptions" (Dkt. No. 88 at 16); (2)

"declined to distinguish among defendants" in concluding that Defendants collectively breached

the standard of care "without explaining what standard of care applies to each defendant" (*id.* at

16–17); and (3) "refused to clarify what sources serve [as] the basis for his amorphous standard

of care" opinion, including by not explaining "how [NCCHC and ACA accreditation] standards

inform the standard of care for jail medical providers" (*id.* at 17.)

The Court does not find these bases require exclusion of Dr. Holliday's opinions, let

alone exclusion of his entire report.  First, Dr. Holliday *did* explain that he viewed two sections

of his report as containing opinion.  (*See* Dkt. No. 89-17 at 52.)  He merely noted that, "[n]ot

being a lawyer," he was uncertain as to "how the Court would view" a section he understood as

containing both "facts and opinions."  (*Id.*)

Second, NaphCare identified no rule requiring an expert to distinguish among defendants in rendering a standard of care opinion.  To the contrary, the Court is aware of caselaw rejecting similar arguments.  *See Krizek v. Queen's Med. Ctr.*, 2020 WL 5633848, at *7 (D. Haw. Sept. 21, 2020) (an expert is not required "to tether a violation of a standard of care to a particular physician").

Third, Dr. Holliday's purported "refus[al] to clarify" the sources serving as the basis for his standard of care opinion goes to the weight of Dr. Holliday's opinion.  (Dkt. No. 88 at 17.)  For purposes of admissibility, the Court finds sufficient Dr. Holliday's answers during his deposition as to the manner in which national correctional standards inform the standard of care.  (Dkt. No. 105-15 at 8–14.)

NaphCare's motion is DENIED to the extent it seeks to exclude Dr. Holliday's opinions on the basis of unhelpfulness.

**B.      Plaintiff's Motion to Exclude Testimony of NaphCare's Experts (Dkt. No. 94)**

Plaintiff moves to exclude testimony of NaphCare experts Alfred Joshua ("Dr. Joshua"), Kathryn Wild ("Ms. Wild"), Andrew Ross ("Dr. Ross"), and Eric Knowles ("Mr. Knowles").  (Dkt. No. 94 at 4–5.)

1.      <u>Dr. Joshua's Opinions</u>

a.      *Qualifications*

Plaintiff argues Dr. Joshua is not qualified to opine on whether Plaintiff (1) has celiac disease (*id.* at 6) and (2) was exposed to gluten at the Clark County Jail (*id.* at 8).

(1)      Celiac Disease

Plaintiff contends Dr. Joshua is unqualified to opine on Plaintiff's celiac disease diagnosis because he is an emergency room physician with "no training or experience as a gastroenterologist."  (*Id.* at 7.)  In particular, Plaintiff takes issue with Dr. Joshua's opinion,

1  offered to "a reasonable degree of medical probability," that "Mr. Picciano's symptoms were

2  related to gastroesophageal reflux disease and non-celiac gluten sensitivity" (Dkt. No. 94-1 at 5–

3  6); as well as Dr. Joshua's critique of Dr. Hujoel's conclusion that Plaintiff has celiac disease

4  (Dkt. No. 94-2 at 2).  As Plaintiff maintains, Dr. Joshua "has never diagnosed anyone with celiac

5  disease," instead referring patients to a gastroenterologist; as such, he does not have the requisite

6  expertise to opine on Plaintiff's celiac disease diagnosis.  (Dkt. No. 94 at 7.)

7  NaphCare responds that Dr. Joshua's "experience in both medicine *and* correctional

8  healthcare" qualifies him "to opine that . . . Picciano's medical records do not support a celiac-

9  disease diagnosis."  (Dkt. No. 100 at 6–7) (emphasis in original).  NaphCare further argues that

10  "[b]ecause NaphCare does not bear the burden of proving Picciano's alleged celiac disease

11  diagnosis, Dr. Joshua does not and need not affirmatively diagnose Picciano," and therefore

12  "need not demonstrate expertise in gastroenterology."  (*Id.* at 7–8).  NaphCare contends Dr.

13  Joshua's opinions do not concern an affirmative diagnosis of celiac disease, but concern

14  "something else," which NaphCare describes as "the *process* of diagnosing a patient with a

15  medical condition (that happens to be celiac disease)."  (*Id.* at 8) (emphasis in original).

16  NaphCare's arguments rely heavily on semantics in describing the nature of Dr. Joshua's

17  opinion as not concerning an "affirmative diagnosis" of celiac disease but rather the "process" of

18  diagnosing celiac disease.  Either way, Dr. Joshua's opinion concerns the diagnosis of celiac

19  disease.  For that reason, the Court cannot agree with NaphCare's suggestion that Dr. Joshua's

20  qualifications may be any less or different than those expected of an expert opining on an

21  "affirmative diagnosis."

22  NaphCare also relies on a novel but unsupported argument that the level of qualifications

23  required of an expert turns on whether the proponent of the expert testimony carries the burden

24

of proof on a certain issue.  (*Id.* at 7–8.)  In effect, NaphCare asks that Dr. Joshua be held to a

less demanding standard with respect to his qualifications simply because NaphCare does not

have the burden of proving Plaintiff has a medical condition.  (*Id.*)  But NaphCare fails to

provide any authority demonstrating that the burden of proof dictates the qualifications required

of an expert.  The Court rejects this reasoning.

Dr. Joshua lacks expertise to opine on the diagnosis of celiac disease.  While

"[o]rdinarily, courts impose no requirement that an expert be a specialist in a given field," an

expert must nonetheless be "knowledgeable about the issues their testimony concern[s]."  *Doe v.*

*Cutter Biological, Inc.*, 971 F.2d 375, 385–86 (9th Cir. 1992); *see also Avila v. Willits Env't*

*Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011) (an expert's testimony must "stay[] within

the reasonable confines of his subject area").  "[B]eing a physician in one specialty does not by

itself qualify that physician as an expert in another."  *Krizek*, 2020 WL 5633848, at *5.

Although Dr. Joshua has expertise as an emergency room physician, NaphCare has not

shown how Dr. Joshua has expertise in the diagnosis of celiac disease.  Indeed, when asked by

Plaintiff's counsel whether he ever diagnosed a patient with celiac disease, Dr. Joshua stated he

"refer[s] [patients] to a gastroenterology specialist."  (Dkt. No. 101-1 at 9.)  And when asked

what should occur "at a confirmatory diagnosis of celiac disease," Dr. Joshua responded that he

was "not a gastroenterologist" but "there should be some level of follow-up."  (Dkt. No. 94-3 at

23.)  While NaphCare cites testimony in which Dr. Joshua says he "has seen celiac disease

patients" as an emergency room physician and "consults with gastroenterology on a regular

basis" (Dkt. No. 101-1 at 8), this testimony is insufficient for the Court to conclude that Dr.

Joshua is an *expert* on the diagnosis of celiac disease.  *See Krizek*, 2020 WL 5633848, at *6

("[t]he mere fact that" an individual has "worked alongside" a certain type of physician "is

1   insufficient for him to" testify as an expert in that area); *Laux v. Mentor Worldwide, LLC*, 295 F.

2   Supp. 3d 1094, 1101 (C.D. Cal. Nov. 8, 2017) (a doctor is not qualified to opine on an issue of

3   microbiology simply because "he has worked alongside microbiologists in the past"); *Montera v.*

4   *Premier Nutrition Corp.*, 2022 WL 1225031, at *9 (N.D. Cal. April 26, 2022) ("[a]wareness of

5   and appreciation for an area of knowledge[] . . . is insufficient to render someone an expert").

6        The Court GRANTS Plaintiff's motion insofar as it requests exclusion of Dr. Joshua's

7   opinion on the diagnosis of celiac disease.

8                    (2)    Exposure to Gluten

9        Plaintiff next argues Dr. Joshua is unqualified to opine on whether and how Plaintiff was

10  exposed to gluten at the Clark County Jail.  (Dkt. No. 94 at 8.)  Specifically, Plaintiff challenges

11  Dr. Joshua's opinions that "Mr. Picciano purchase[d] items [from the Clark County Jail

12  commissary] that may have cross contamination with gluten" (Dkt. No. 94-1 at 5) and "Mr.

13  Picciano start[ed] receiving a gluten free diet on February 9th" (*id.* at 6).  As Plaintiff maintains,

14  Dr. Joshua "is not a dietitian or nutritionist" (Dkt. No. 94 at 8), and his statements during his

15  deposition disclaim special knowledge as to whether foods purchased by or provided to Plaintiff

16  contained gluten or were cross-contaminated (*id.* at 8–9).

17       NaphCare responds that Plaintiff "misuses his *Daubert* motion to dispute the factual

18  record rather than challenge the admissibility of any opinion."  (Dkt. No. 100 at 9.)  NaphCare

19  argues "[b]oth conclusions at issue are statements of fact, not potentially excludable 'opinions,'"

20  and that "a person need not have" specialized knowledge "to confirm that a particular food may

21  be cross contaminated with gluten" or "that a food does not obviously contain gluten."  (*Id.*)

22  Accordingly, NaphCare asserts Dr. Joshua can "rely on both facts without specific training in the

23  fields of dietetics or nutrition."  (*Id.*)

24

"An expert may, in appropriate circumstances, rely on [factual] assumptions when formulating opinions," and an opposing party's disagreement with those assumptions "does not, in general, provide a basis for excluding the expert's testimony." *Unknown Party v. Arizona Bd. of Regents*, 641 F. Supp. 3d 702, 727 (D. Ariz. Nov. 18, 2022). At the same time, expert testimony "may not include unsupported speculation," *Greenawalt v. Sun City W. Fire Dist.*, 23 Fed. Appx. 650, 652 (9th Cir. 2001), and may not be presented "for the purpose of reinforcing [a party's] factual narrative or providing a synopsis of [its] evidence for the jury," *Snead v. Wright*, 2022 WL 4329390, at *4 (D. Ala. Sept. 19, 2022).

Dr. Joshua's statement that Plaintiff's commissary purchases may have been cross-contaminated appears within the "Opinions" section of his report, and within the following paragraph:

> NaphCare provided the standard of care with noting Mr. Picciano's gluten sensitivity (without cooperation from Mr. Picciano for signing the initial release of information) and having the Clark County Jail provide him meals that avoid gluten. **It is clear from the records that Mr. Picciano purchases items that may have cross contamination with gluten.** While he may be sensitive to gluten, his symptoms may also be contributed from gastroesophageal reflux disease and not celiac disease. (As noted, when he sees Dr. Wong after he is released from Clark County Jail.). (Dkt. No. 94-1 at 5) (emphasis added).

While NaphCare asserts the statement concerning Plaintiff's purchases is nothing more than a statement of fact on which Dr. Joshua's expert opinion is based, the Court cannot agree. Dr. Joshua proposes that "[i]t is *clear*" Plaintiff's purchases "*may have*" been cross-contaminated with gluten—suggesting Dr. Joshua is rendering an opinion on the *possibility* of cross-contamination, rather than simply reciting a factual assumption on which his expert testimony is based. (*Id.*) (emphasis added). Moreover, the Court cannot find Dr. Joshua's opinions on the standard of care or gastroesophageal reflux are actually *based on* the assumed fact that Plaintiff's commissary purchases may have been cross-contaminated with gluten. Accordingly, the Court

1   excludes Dr. Joshua's opinion on the possibility of cross-contamination, as NaphCare has neither

2   shown how Dr. Joshua has special knowledge on this matter nor demonstrated that possible

3   cross-contamination forms a basis for Dr. Joshua's other opinions.

4   In contrast, the Court does not find Dr. Joshua's statement that Plaintiff began receiving a

5   gluten free diet on February 9th to have been conveyed as an opinion.  Instead, it serves as a

6   factual ground upon which Dr. Joshua's opinion—concerning adherence to the "typical[]"

7   timeline for "recei[pt] [of] medical records, review, and clinically appropriate implementation"

8   of a medical diet—is based.  (Dkt. No. 94-1 at 6.)  It will be up to Plaintiff to challenge the

9   veracity of this factual basis at trial.  *See Vanguard Logistics Services (USA) Inc. v. Groupage*

10  *Services of New England, LLC*, 2022 WL 17369626, at *5 (C.D. Cal. Oct. 4, 2022).

11  Plaintiff's motion is GRANTED in part and DENIED in part with respect to Dr. Joshua's

12  statements concerning gluten exposure.  Dr. Joshua may not opine on the likelihood Plaintiff's

13  commissary purchases were cross-contaminated, as NaphCare has not shown expertise on that

14  subject or how his opinions are actually predicated on an assumption of cross-contamination.

15  Dr. Joshua may, however, state as a factual predicate for his opinion on timeliness that Plaintiff

16  began receiving gluten free meals on February 9th.

17                  b.      *False Statement*

18  Plaintiff argues Dr. Joshua's statement that his "opinions have never been disqualified in

19  court" is false and should be stricken in light of *Ryan v. Corizon Health Inc.*, 2021 WL 3375674

20  (D. Wyo. July 22, 2021).  (Dkt. Nos. 94 at 6.)  In response, NaphCare asserts Plaintiff

21  "misleadingly claims that Dr. Joshua was disqualified as an expert" in *Ryan*, and that to the

22  contrary, Dr. Joshua's testimony was merely "limited."  (Dkt. No. 100 at 7.)

23  Dr. Joshua's statement that his "*opinions* have never been disqualified" (Dkt. Nos. 94-1

24  at 6; 94-2 at 4) (emphasis added) is false in light of *Ryan*, which concluded that "Dr. Joshua

[wa]s not qualified to opine on whether a spinal surgeon would have recommended different care." *Ryan*, 2021 WL 3375674, at *6.  Though *Ryan* did not exclude the entirety of Dr. Joshua's testimony, at least one opinion was excluded on the basis of his qualifications. *Id.*

The Court GRANTS Plaintiff's motion insofar as Plaintiff seeks to strike this statement. Dr. Joshua will not be permitted to represent at trial that his opinions have never been disqualified.

### 2.   Ms. Wild's Opinions

Plaintiff moves to exclude Ms. Wild's opinions on celiac disease, diet and nutrition, and meal preparation, on the basis that she lacks expertise to opine on these topics and applied no reliable methodology in reaching her conclusions.  (Dkt. No. 94 at 10–12.)  Plaintiff also moves to exclude portions of Ms. Wild's rebuttal report as outside the scope of rebuttal.  (*Id.* at 12–14.)

#### a.   *Qualifications*

Plaintiff first argues that because Ms. Wild "has no expertise in celiac disease, diets, nutrition, or meal preparation . . . her opinions on these topics should be excluded."  (Dkt. No. 94 at 11.)  Specifically, Plaintiff takes issue with Ms. Wild's statements that Plaintiff was able to eat something every day (Dkt. Nos. 94-4 at 11–12; 94-5 at 2), Plaintiff's commissary purchases "may have been cross-contaminated with gluten" (Dkt. No. 94-4 at 13), and Plaintiff could have avoided foods containing gluten absent a special diet order (Dkt. No. 94-5 at 2).  Plaintiff cites portions of Ms. Wild's deposition testimony that "disclaimed expertise on whether the food Picciano was provided while detained met his 'nutritional or dietary needs.'"  (Dkt. No. 94 at 11.)

NaphCare responds that Plaintiff merely "contests select facts underlying Nurse Wild's opinion" that "NaphCare's employees' treatment of Picciano was within the standard of care," which NaphCare contends is "misuse[]" of a motion challenging expert testimony.  (Dkt. No.

100 at 10–11.)  NaphCare also argues Ms. Wild "need not be 'an expert on celiac disease,' gluten free diets, dietetics, or nutrition to draw conclusions, based on available evidence, regarding foods available to Picciano during his detention."  (*Id.* at 11.)  In NaphCare's view, "[t]hose facts are observable by the average person, whether expert or not."  (*Id.*)

While NaphCare emphasizes, "[t]o be clear, Nurse Wild has not provided an opinion to a reasonable degree of medical probability regarding the foods available to Picciano" (*id.* at 10), the Court does not find this representation entirely accurate.  Ms. Wild's list of "Opinions"— which Ms. Wild herself represents as "expressed within a reasonable degree of nursing certainty"—states "Mr. Picciano testified that he was able to eat something every day and ate things from the tray that he could eat, and he received 3 meals daily."  (Dkt. No. 94-4 at 12–13.) While the Court agrees with NaphCare that this is a statement of fact, it nonetheless is presented in Ms. Wild's report as an independently enumerated opinion.  (*Id.* at 12.)

Assuming the statement was merely intended as factual grounds upon which Ms. Wild's standard of care opinion is based, Ms. Wild's report is devoid of explanation as to how the fact that Plaintiff ate something every day supports the conclusion that NaphCare complied with the standard of care, particularly when Ms. Wild's report suggests the standard of care does not require NaphCare to prepare special meals (*id.*) or "monitor" dietary contents (*id.* at 11). Accepting as true Ms. Wild's assertion that NaphCare was not responsible for ensuring gluten free food was actually provided to Plaintiff, it is unclear why the fact Plaintiff *was* provided food he could eat supports her conclusion that *NaphCare* complied with the standard of care.  As Ms. Wild's standard of care opinion does not actually rely on her assertion that Plaintiff was able to eat every day, Ms. Wild will not be permitted to offer this assertion at trial.

Ms. Wild's report also presents as an opinion that "Mr. Picciano supplemented his meals with items from commissary that *may* have been cross contaminated with gluten." (*Id.* at 13) (emphasis added). As the Court already held with respect to Dr. Joshua, Ms. Wild will not be permitted to opine on the likelihood Plaintiff's purchases were cross-contaminated. NaphCare has not shown how Ms. Wild has expertise on the possibility of cross-contamination, and has not shown this assertion forms the basis for any expert opinion.

Finally, Ms. Wild incorporates within her rebuttal report a quote concerning avoidance of unsafe foods from the report of Wellpath expert Dr. Fowlkes:

> "As pointed out in Dr. Thomas Fowlkes' report, 'any patient with a serious medical condition which has specific dietary restrictions should be knowledgeable enough to avoid eating foods which might contain the offending substance for at least several days even if a special diet is not being prepared." (Dkt. No. 94-5 at 2.)

To the extent Ms. Wild's rebuttal report attempts to adopt the opinion of Dr. Fowlkes, NaphCare has not shown how Ms. Wild is qualified to offer such an opinion, which, as far as the Court can tell, appears based on no more than speculation. *See Greenawalt*, 23 Fed. Appx. at 652. Moreover, "[e]xpert opinions ordinarily cannot be based upon the opinion of others." *Cleaver v. Transnation Title & Escrow, Inc.*, 2024 WL 326848, at *5 (D. Idaho Jan. 29, 2024) (internal quotation and citation omitted).

The Court GRANTS Plaintiff's motion to the extent Plaintiff seeks to exclude Ms. Wild's testimony concerning the foods Plaintiff was able to eat in Jail; Plaintiff's commissary purchases; and the ability of "patients," including Plaintiff, to avoid foods containing an "offending substance" absent a special diet order.[2]

---

[2] The Court need not address Plaintiff's argument that the same opinions must be excluded on the basis that Wild employed no reliable methodology in offering them. (Dkt. No. 94 at 11.)

1

      b.   *Rebuttal Report*

2

     Plaintiff argues that because the majority of Ms. Wild's rebuttal report does not actually

3

constitute rebuttal opinion, those portions of her report must be excluded.  (Dkt. No. 94 at 12–

4

13.)  NaphCare responds that Ms. Wild's report rebuts the report of Dr. Holliday and therefore

5

was properly disclosed on the deadline for rebuttal reports.  (Dkt. No. 100 at 11–12.)

6

     Rebuttal reports are "intended solely to contradict or rebut evidence on the same subject

7

matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  Courts strike portions of

8

rebuttal reports that do not qualify as rebuttal testimony unless the inclusion of non-rebuttal

9

testimony was substantially justified or harmless.  *See, e.g.*, *Theoharis v. Rongen*, 2014 WL

10

3563386, at *7–8 (W.D. Wash. July 18, 2014).

11

     Plaintiff identifies five paragraphs as exceeding the scope of rebuttal: "The three

12

paragraphs of the first page preceding discussion of Holliday's report" and "[t]he last two

13

paragraphs of the second page."  (Dkt. No. 117 at 6.)

14

     With respect to the three paragraphs preceding Ms. Wild's discussion of Dr. Holliday's

15

report, the Court agrees these paragraphs must be excluded.  These paragraphs principally

16

incorporate opinion from Wellpath expert Dr. Fowlkes (which the Court has already excluded,

17

above) and Clark County expert Penny Bartley, and further paraphrase Plaintiff's testimony

18

regarding items Plaintiff ate each day.  (Dkt. No. 94-5 at 2.)  They do not purport to rebut any

19

opinion of Dr. Holliday.  (*See id.*)  Moreover, NaphCare has made no attempt at explaining how

20

inclusion of these paragraphs was substantially justified or harmless.

21

     The last two paragraphs of the second page of Ms. Wild's rebuttal report need not be

22

excluded.  The first of these paragraphs simply quotes an ACA standard that "therapeutic diets

23

should . . . conform as closely as possible to the foods served other offenders."  (Dkt. No. 94-5 at

24

3.)  The report of Plaintiff's expert, Dr. Holliday, recites the same standard.  (Dkt. No. 89-18 at

6.)  Even if inclusion of the standard does not directly rebut any portion of Dr. Holliday's report (as it at instead reflects agreement on the standard's relevance), its inclusion is harmless.

The last of these paragraphs contains discussion of facts in an apparent attempt to demonstrate the ACA standard was satisfied to some degree.  (Dkt. No. 94-5 at 3.)  It thereby rebuts Dr. Holliday's opinion on the same issue.  (Dkt. No. 89-18 at 9.)  This paragraph is admissible.

The Court GRANTS Plaintiff's motion insofar as he requests exclusion of the three paragraphs of Ms. Wild's report preceding discussion of Dr. Holliday's report, and DENIES the motion insofar as it requests exclusion of the last two paragraphs on the second page of Ms. Wild's rebuttal report.

### 3.   Dr. Ross' Opinions

Plaintiff moves to exclude Dr. Ross' opinions on the grounds that (1) Dr. Ross improperly opines on the division of responsibility in jails and NaphCare "standard protocols" (Dkt. No. 94 at 14–15), (2) Dr. Ross' rebuttal report is untimely (*id.* at 15), (3) Dr. Ross' opinion that Plaintiff faked his syncope is speculative (*id.* at 16), and (4) Dr. Ross' statement concerning requests for medical records is unsupported (*id.* at 17).

#### a.   *Division of Responsibility and Standard Protocols*

Plaintiff first argues for exclusion of Dr. Ross' opinions that preparation of gluten free meals "was beyond the scope of responsibility of NaphCare personnel" (Dkt. No. 94-7 at 2; *see also* Dkt. No. 94-8 at 2) and "NaphCare followed their standard protocols" once Plaintiff "signed a release of medical information" (Dkt. No. 94-8 at 2).  Plaintiff asserts this information was not found in any materials Dr. Ross listed as having reviewed and is a matter Dr. Ross "would not know about except through NaphCare's lawyers."  (Dkt. No. 94 at 14–15.)  Plaintiff further argues Dr. Ross "can point to no expertise or methodology in opining on the division of

responsibility in jails for ensuring meals were gluten-free," such that the statements "should be excluded as speculative." (*Id.* at 15.)

NaphCare responds that Plaintiff "simply disagrees with the underlying facts," and that Dr. Ross is "entitled to base his opinions" on "well-established" facts. (Dkt. No. 100 at 14.)

Dr. Ross' first report lists three "Conclusions" offered "[i]n light of [his] review of the medical records," with the second conclusion being:

> Assuming the Plaintiff did indeed have celiac disease, the standard of care required that Plaintiff be placed on a gluten free diet and Plaintiff's refusal to sign an ROI delayed the process of assessing and determining whether he indeed required a special diet. **After he was assigned a gluten-free diet, the Clark County kitchen was responsible for ensuring that his meals were gluten free.** (Dkt. No. 94-7 at 3) (emphasis added).

Dr. Ross' second report makes the same assertion, though phrased differently: "The provision of th[e] [gluten free] diet and its contents was the sole responsibility of the Clark County Jail." (Dkt. No. 94-8 at 2.)

The Court excludes Dr. Ross' representations regarding the responsibility for providing gluten free meals. While ordinarily, challenges to the factual basis of an expert's report are suitable for cross-examination, *Vanguard*, 2022 WL 17369626, at *5, the Court cannot find the statements in question actually serve as foundation for any of Dr. Ross' expert opinions. Instead, the statements appear tacked onto Dr. Ross' report without explanation as to why or how they support any of Dr. Ross' conclusions.

NaphCare may introduce evidence at trial reflecting the division of responsibility in serving meals at the Clark County Jail; NaphCare should not need to rely on expert testimony to reinforce its factual narratives. *See In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 11696720, at *3 (D. Ariz. Dec. 22, 2017). Holding otherwise would risk the jury perceiving Dr. Ross' tangential testimony on division of responsibility as authoritative, despite Dr. Ross having

no expertise on the subject and having not even reviewed the relevant records.  *See Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1431 (9th Cir. 1991) ("Jurors may well assume that an expert . . . will offer an authoritative view on the issues addressed; if what an expert has to say is instead tangential to the real issues, the jury may follow the 'expert' down the garden path and thus focus unduly on the expert's issues to the detriment of issues that are in fact controlling.").

The same result obtains with respect to Dr. Ross' statement that "NaphCare followed their standard protocols" upon receiving Plaintiff's signed release of medical information.  (Dkt. No. 94-8 at 2.)  The Court can discern no expert opinion that relies on this assertion, and NaphCare has identified none.

The Court GRANTS Plaintiff's motion to the extent it requests exclusion of testimony concerning the division of responsibility at the Clark County Jail and standard protocols.

b.       *Rebuttal Report*

Plaintiff argues the entirety of Dr. Ross' rebuttal report must be excluded because it "does not seek to 'contradict or rebut' any statement made in any other expert report, and therefore does not qualify as a rebuttal report."  (Dkt. No. 94 at 15.)  Plaintiff maintains Dr. Ross instead "offered new opinions not in his first report, including an assertion that Picciano's syncope episode and subsequent lack of responsiveness to painful stimuli or narcotic reversal agents while detained were 'fictitious in nature.'"  (*Id.*)

In response, NaphCare argues Dr. Ross' explanation that "Picciano's controlled fall was not due to gluten exposure" given the "lack[] [of] evidence of any consistent symptoms" directly rebuts Dr. Hujoel's opinion, as paraphrased by NaphCare, that "Picciano's controlled fall at the Jail and symptoms at the emergency room were consistent with gluten exposure."  (Dkt. No. 100 at 13.)

1   Dr. Ross' opinion on Plaintiff's orthostatic syncope (Dkt. No. 94-8 at 2) rebuts Dr.

2   Hujoel's conclusion that the syncope resulted from lack of nutrition due to gluten exposure (Dkt.

3   No. 94-12 at 12).  Both opinions concern "the same subject matter"; Dr. Ross simply presents a

4   differing view of Plaintiff's syncope episode, which is proper rebuttal.  *See* Fed. R. Civ. P.

5   26(a)(2)(D)(ii).

6   Plaintiff's motion is DENIED insofar as it seeks to exclude the entirety of Dr. Ross'

7   rebuttal report on the basis that the discussion of syncope does not qualify as rebuttal.

8   c.   *Speculation*

9   Plaintiff next challenges Dr. Ross' opinion that Plaintiff's syncope was "fictitious" on the

10  basis that the opinion is "speculation unsupported by any reliable methodology."  (Dkt. No. 94 at

11  16–17.)  NaphCare responds "there is ample record evidence supporting [Dr. Ross'] conclusion"

12  on syncope, including that "(1) after his controlled fall, Picciano resisted NaphCare nurses'

13  attempts to open his eyes . . . (2) Picciano did not suffer from symptoms typically present in

14  celiac disease gluten exposure, such as diarrhea, (3) Picciano's vital signs, laboratory results, and

15  blood work were all normal, and (4) the emergency department doctor concluded that Picciano's

16  controlled fall was due to sudden blood pressure changes from him changing positions."  (Dkt.

17  No. 100 at 14.)

18  In his reply, Plaintiff argues "lab workup results and the lack of diarrhea . . . have nothing

19  to do with whether [he] experienced unconsciousness," and further argues NaphCare's attorneys

20  are "invent[ing] *post hoc* rationales for Ross," because Dr. Ross' opinion "did not mention or

21  rely on" Plaintiff resisting opening his eyelids.  (Dkt. No. 117 at 7.)

22  The Court finds unsupported Dr. Ross' opinion that Plaintiff's "controlled syncope and

23  lack of responsiveness to painful stimuli or narcotic reversal agents, in the setting of normal

24  laboratories and physician examination[,] was fictitious in nature."  (Dkt. No. 94-8 at 2.)  The

1  sole factual basis Dr. Ross advances for this opinion is Plaintiff's "normal laboratories and

2  physical examination." (*Id.*)  But Dr. Ross fails to offer any explanation as to how normal

3  laboratory and physical examination results support a conclusion that Plaintiff's syncope and

4  lack of responsiveness to stimuli were "fictitious."  *See Joiner*, 522 U.S. at 146 ("nothing . . .

5  requires a district court to admit opinion evidence that is connected to existing data only by the

6  *ipse dixit* of the expert.").  "[E]xpert opinion must stay within the bounds of what can be

7  concluded from a reliable application of the expert's basis and methodology."  Fed. R. Evid. 702

8  Advisory Committee's Note to 2023 Amendments.  As the Court cannot find a sufficient factual

9  or methodological basis for Dr. Ross' opinion, Plaintiff's motion is GRANTED insofar as it

10  seeks exclusion of Dr. Ross' opinion on "fictitious" symptoms.[3]

11              d.     *Requests for Medical Records*

12        Finally, Plaintiff seeks exclusion of Dr. Ross' statement that "[d]espite numerous

13  requests, we were unable to obtain an independent review of the pathology slides used to make

14  the patient's original diagnosis of celiac disease in 2018." (Dkt. No. 94 at 17.)  Plaintiff argues

15  Dr. Ross "does not explain who the 'we' of this sentence refers to" and "the reference to

16  'numerous requests'" incorrectly "suggests Picciano was refusing to turn over medical records."

17  (*Id.*)

18        NaphCare responds that the statement "is relevant to the validity of Picciano's alleged

19  celiac-disease diagnosis," because "[w]ithout the ability to independently review the pathology

20  slides, no provider or expert can conclusively opine that Picciano has celiac disease." (Dkt. No.

21  100 at 15.)

22

23  [3] The Court does not exclude Dr. Ross' opinion that Plaintiff's symptoms "present[ed] to the
emergency department . . . [were] not consistent with exposure to gluten," which the Court finds

24  sufficiently reliable.  (Dkt. No. 94-8 at 2.)

1    The Court does not find the statement requires exclusion.  It does not affirmatively

2  represent that Plaintiff failed to respond to discovery requests.  To the extent Plaintiff finds the

3  statement misleading, Plaintiff may cross-examine Dr. Ross to elicit context.  The Court

4  DENIES Plaintiff's motion to the extent it seeks to strike Dr. Ross' statement regarding

5  "numerous requests" for pathology slides.

6        4.    Mr. Knowles' Opinions

7        Plaintiff argues Mr. Knowles' rebuttal report should be excluded as untimely because it is

8  not a true rebuttal report and therefore "should have been filed by the deadline for initial expert

9  disclosures."  (Dkt. No. 94 at 18.)  As Plaintiff explains, Mr. Knowles' rebuttal report opines on

10  economic damages, despite the fact that none of Plaintiff's experts offered opinions on economic

11  damages.  (*Id.*)

12        NaphCare responds that Mr. Knowles' report did not need to be disclosed earlier because

13  it "properly serves to rebut the baseless opinions of Dr. Hujoel regarding the 'acute injury and

14  distress' she claims Picciano suffered at Clark County Jail."  (Dkt. No. 100 at 16.)

15        The Court excludes Dr. Knowles' rebuttal report.  A rebuttal report is "intended *solely* to

16  contradict or rebut evidence on the *same subject matter* identified by another party."   Fed. R.

17  Civ. P. 26(a)(2)(D)(ii) (emphasis added).  Mr. Knowles' report opines on economic damages.

18  (Dkt. No. 94-11.)  It cannot reasonably be described as concerning "the same subject matter" as

19  Dr. Hujoel's report, which opines on physical injuries.  While NaphCare attempts to characterize

20  both reports as concerning the broader subject of "damages," the Court cannot reasonably adopt

21  such a broad conception.  *Vu v. McNeil-PPC, Inc.*, 2010 WL 2179882, at *3 (C.D. Cal. May 7,

22  2010) ("If the phrase 'same subject matter' is read broadly to encompass *any* possible topic that

23  *relates* to the subject matter at issue, it will blur the distinction between 'affirmative expert' and

24

1    'rebuttal expert.'").  Plaintiff's motion is GRANTED to the extent it seeks exclusion of Mr.

2    Knowles' rebuttal report.

3    **C.**    **Plaintiff's Motion to Exclude Testimony of Wellpath's Experts (Dkt. No. 93)**

4         Plaintiff moves to exclude testimony of Wellpath's expert, Thomas Fowlkes ("Dr.

5    Fowlkes"); and expert testimony of certain non-retained experts, including a Wellpath employee

6    and medical providers of Plaintiff.  (Dkt. No. 93 at 4.)

7         1.    <u>Dr. Fowlkes' Opinions</u>

8         Plaintiff requests exclusion of Dr. Fowlkes' opinions on celiac disease and the avoidance

9    of gluten, as well as Dr. Fowlkes' supplemental report.  (*Id.*)

10        a.    *Celiac Disease and Avoidance of Gluten*

11        Plaintiff argues Dr. Fowlkes should be precluded from testifying on celiac disease and

12   avoidance of gluten because Dr. Fowlkes lacks expertise in gastroenterology and nutrition and

13   does not apply reliable methodology to reach his conclusions.  (*Id.* at 4, 7–8; Dkt. No. 116 at 3.)

14   In particular, Plaintiff challenges Dr. Fowlkes' opinions that "most patients with celiac disease,"

15   including Plaintiff, "would have likely been well familiar with how to" avoid gluten even "in an

16   environment where a special diet was not being prepared" (Dkt. No. 93-1 at 9; *see also id.* at 11);

17   and that foods presented in a list within Dr. Fowlkes' report were "always gluten-free" (*id.* at 9–

18   10).  Plaintiff highlights portions of Dr. Fowlkes' deposition testimony in which Dr. Fowlkes

19   seemingly disclaims these opinions (Dkt. No. 93 at 7–9), despite declaring in his report that his

20   opinions were "limited" to those he could "offer to a reasonable degree of medical certainty"

21   (Dkt. No. 93-1 at 2).

22        Wellpath's response does not dispute that Dr. Fowlkes is unqualified to testify as an

23   expert on celiac disease or gluten avoidance.  Instead, Wellpath represents that it does "not

24   intend to offer Dr. Fowlkes as an expert in Celiac's Disease or gastroenterology" (Dkt. No. 102

at 1) and that Dr. Fowlkes "explained to Plaintiff's Counsel that he would not be offering an opinion as to Celiac's Disease, the diagnosis thereof, or the diet/nutrition management of someone who has a confirmed diagnosis of Celiac's Disease" (*id.* at 5).  Wellpath also provides deposition testimony in which counsel represented "[Dr. Fowlkes is] not going to be expressing any opinions about celiac disease" (Dkt. No. 103-1 at 17) and in which Dr. Fowlkes himself stated "I am not" offering "opinions in this case about the diagnosis or GI management of celiac disease."  (*Id.* at 33.)  Nonetheless, Wellpath maintains Dr. Fowlkes is "qualified to give an opinion as to the care provided by Wellpath's medical and healthcare providers" and that "Plaintiff's concerns as to the qualifications of Dr. Fowlkes are better suited for cross-examination."  (Dkt. No. 102 at 7.)

The Court takes Dr. Fowlkes and Wellpath at their word, and GRANTS Plaintiff's motion insofar as it seeks to exclude Dr. Fowlkes' opinions on celiac disease and avoidance of gluten.  The Court specifically excludes opinions 5 and 8 of Dr. Fowlkes' report, which opine that (1) most patients, including Plaintiff, would have been able to avoid foods containing gluten even absent a special diet and (2) certain foods are always gluten free (Dkt. No. 93-1 at 9–11).  *See In re Pacific Steel Casting Co. LLC*, 2022 WL 3330422, at *3 (N.D. Cal. Aug. 10, 2022) ("An expert may not testify on topics that the expert and his counsel concede are beyond his expertise").  Though other of Dr. Fowlkes' opinions may, but do not necessarily, implicate the management of celiac disease, the Court does not find Plaintiff's motion to have raised the admissibility of those remaining opinions and therefore offers no ruling on their admissibility at this time.

     b.   *Supplemental Report*

Plaintiff argues Dr. Fowlkes' supplemental report should be excluded because it was provided to Plaintiff after the deadline for expert rebuttal reports.  (Dkt. No. 93 at 9.)  Wellpath

1    responds that the delay in issuing Dr. Fowlkes' supplemental report was "substantially justified"

2    as the report "was provided to Plaintiff upon the receipt of new discovery – specifically, the

3    depositions of Plaintiff's proffered expert witnesses" Dr. Hujoel and Dr. Holliday.  (Dkt. No. 102

4    at 2.)  As Wellpath argues, "[d]ue to the recency of the[se] depositions, Dr. Fowlkes could not

5    have had an opportunity to review the deposition transcripts . . . and then supplement his report

6    before the June 9, 2023, deadline."  (*Id.* at 10.)  Wellpath maintains no prejudice could have

7    resulted from the delay because the report "was based on testimony and evidence that Plaintiff

8    was familiar with."  (*Id.*)

9            As rebuttal (*id.*), Dr. Fowlkes' supplemental report was due on June 9, 2023 (Dkt. No. 81

10   at 2).  Wellpath did not disclose the report until June 19, 2023.  (Dkt. Nos. 93-2 at 4; 93-3 at 2.)

11   Accordingly, the report was untimely and "may not be used unless the failure to timely disclose

12   was substantially justified or harmless."  *Meyer v. Mittal*, 2024 WL 378743, at *2 (D. Or. Feb. 1,

13   2024).

14           Wellpath's failure to timely disclose was not substantially justified, as Wellpath's

15   justification—*i.e.*, that Dr. Fowlkes could not have met the deadline for rebuttal reports given the

16   timing of the depositions of Plaintiff's experts—is belied by the fact that those depositions

17   occurred on May 12 and May 26, 2023.  (Dkt. Nos. 89-15 at 2; 89-17 at 2.)  Dr. Fowlkes had

18   sufficient time to prepare his report prior to the June 9, 2023 deadline.

19           Wellpath's untimely disclosure was not harmless.  Plaintiff received the report just three

20   minutes before the deposition of Dr. Fowlkes (Dkt. No. 93-2 at 4) and did not have time to

21   become familiar with or develop questions related to the opinions therein.  The statement by

22   Wellpath's counsel during Dr. Fowlkes' deposition that "[i]f you need more time you're entitled

23   to more time but it's basically rebuttal" is insufficient to obviate this harm.  (*Id.* at 3.)  The Court

24

also finds unpersuasive Wellpath's suggestion that because the report "was based on testimony and evidence that Plaintiff was familiar with," Plaintiff was not harmed by the late disclosure. (Dkt. No. 102 at 9–10.)

The Court GRANTS Wellpath's motion to insofar as it seeks exclusion of Dr. Fowlkes' supplemental report.

2.     Non-Retained Experts

Plaintiff next argues Wellpath's "non-retained" experts should not be allowed to provide expert testimony because Wellpath did not provide written summaries of their anticipated opinions pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).  (Dkt. No. 93 at 4, 10.)

a.     *Dr. Shah*

Plaintiff first asks that Wellpath be precluded from offering expert testimony of Wellpath employee, Dr. Vivek Shah.  (*Id.* at 11.)  As Plaintiff summarizes, Wellpath's initial disclosures stated that Dr. Shah "may express standard of care opinions" and that a "decision will soon be made whether Dr. Shah will be an expert called at the time of trial."  (*Id.*)  Wellpath's disclosures also stated that "[i]f it is decided that [Dr. Shah] will be called," Wellpath "will provide a written summary of his opinion.'"  (Dkt. No. 93-4 at 3.)  Because "[d]iscovery has since ended and Wellpath has still not provided any 'summary of facts and opinions' to which Shah would testify," Plaintiff asks that Dr. Shah be disallowed from providing expert opinion.  (Dkt. No. 93 at 11.)

Wellpath does not respond to Plaintiff's argument.  (*See generally* Dkt. No. 102.)  The Court construes Wellpath's non-response as conceding Plaintiff's argument has merit.  *See Hunt v. Colvin*, 954 F. Supp. 2d 1181, 1196 (W.D. Wash. 2013).  The Court GRANTS Plaintiff's motion with respect to Dr. Shah, who may not testify as an expert at trial.

1

    b.    *Plaintiff's Health Care Providers*

2    In addition to Dr. Vivek Shah, Wellpath's initial disclosures list as witnesses "Plaintiff's

3    pre and post occurrence health care providers, including Dr. Banny Wong, McKenzie Tracshel,

4    RN, Dr. Daniel Stein, Dr. Bhavesh Shah, and emergency physicians that examined Plaintiff at

5    the January 9, 2020 Providence emergency department."  (Dkt. No. 93-4 at 3.)  The disclosures

6    state that although "[t]hese health care providers are primarily factual witnesses," they "may

7    provide expert opinions because of their medical expertise in the course of [their] testimony."

8    (*Id.*)

9    Plaintiff argues Wellpath should be precluded from offering expert opinion of these

10    medical providers because Wellpath's initial disclosures failed to summarize the facts and

11    opinions the providers were expected to discuss, as is required by Federal Rule of Civil

12    Procedure 26(a)(2)(C).  (Dkt. Nos. 93 at 12; 116 at 7.)

13    Wellpath vaguely responds it "has no intention to use *most* of these witnesses as experts,"

14    while failing to identify which experts it does intend to use.  (Dkt. No. 102 at 2) (emphasis

15    added).  Wellpath does not address Plaintiff's argument that Wellpath did not comply with Rule

16    26(a)(2)(C), and instead argues that a different subsection, Rule 26(a)(2)(B), does not require

17    Wellpath to provide expert reports of the providers because "they are not 'specially employed' to

18    provide expert testimony" and "are primarily factual witnesses by nature."  (*Id.* at 11–12.)

19    Assuming the providers would only offer opinion they "formed during the course of

20    treatment" of Plaintiff, Wellpath is correct the providers did not need to issue written reports

21    under Rule 26(a)(2)(B).  *See Goodman v. Staples the Off. Superstore, LLC*, 644 F.3d 817, 826

22    (9th Cir. 2011).  But Wellpath ignores that it still must comply with the less demanding

23    requirements of Rule 26(a)(2)(C) by disclosing a summary of the facts and opinions the

24    providers were expected to testify.  *Lambert v. Liberty Mut. Fire Ins. Co.*, 2016 WL 3193252, at

1  *2 (D. Ariz. June 9, 2016); *Burreson v. BASF Corp.*, 2014 WL 4195588, at *3 (E.D. Cal. Aug.

2  22, 2014).  While the summary need not involve "undue detail," a statement "that the physician

3  will testify consistent with medical records" is insufficient.  *Lambert*, 2016 WL 3193252, at *2.

4  Failure to comply with Rule 26(a)(2)(C) warrants exclusion of expert testimony unless "the

5  failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Goodman*,

6  644 F.3d at 826.

7          Wellpath failed to comply with Rule 26(a)(2)(C).  Its initial disclosures only state that the

8  providers "may provide expert opinions because of their medical expertise" when testifying.

9  (Dkt. No. 93-4 at 3.)  Wellpath offers no summary of facts or opinions.  (*Id.*)  Further, Wellpath

10  has not shown how this failure was substantially justified or harmless.  The closest Wellpath

11  comes to offering a justification for its failure is a cursory statement that "there appears to be

12  medical records yet undisclosed.  Therefore, any prejudice would not be to Plaintiff, but to

13  Wellpath."  (*Id.* at 2.)  But Wellpath has not provided any detail as to the nature of any

14  "undisclosed" medical records, how these records could implicate the anticipated testimony of

15  each provider, and how the undisclosed records justify its failure to comply with Rule 26.

16          Moreover, Wellpath's continued refusal to specify which of the providers it seeks to rely

17  on underscores that its failure is not harmless.  (Dkt. No. 102 at 2.)  Were the Court to allow the

18  providers to offer expert testimony at this stage, Plaintiff would still have no notice as to whose

19  testimony Plaintiff would need to anticipate.  *See Alfaro v. D. Las Vegas, Inc.*, 2016 WL

20  4473421, at *14 (D. Nev. Aug. 24, 2016) (the purpose of Rule 26(a)(2)(C) is "to prevent unfair

21  surprise and to conserve resources").

22          The Court GRANTS Plaintiff's motion insofar as it seeks to preclude Wellpath from

23  introducing expert testimony of Plaintiff's medical providers.

24

1      **D.      Plaintiff's Motion to Exclude Testimony of Clark County's Experts (Dkt. No. 95)**

2              Plaintiff moves to exclude Clark County's expert witness Penny Bartley ("Ms. Bartley")

3      and various employees listed in the County's initial disclosures as non-retained experts.  (Dkt.

4      No. 95 at 4–5.)

5              1.      Ms. Bartley's Opinions

6              Plaintiff requests exclusion of the entirety of Ms. Bartley's expert reports on three bases.

7      First, Plaintiff argues Ms. Bartley is unqualified to render the opinions in her report.  (*Id.* at 10.)

8      As Plaintiff maintains, Ms. Bartley's report opines on "celiac disease, disease management, food

9      preparation, whether Picciano was in fact served gluten-free meals, and whether the lack of

10     gluten-free meals harmed Picciano" (*id.* at 6); however, Ms. Bartley has no expertise to offer

11     these opinions because Ms. Bartley is a corrections administrator and "not a health care provider,

12     a nutritionist, or a dietician" (*id.* at 4).

13             Second, Plaintiff argues that because Ms. Bartley lacks relevant expertise, "she has not

14     and cannot use any specialized knowledge or technique to support her opinions which were

15     developed solely for this case," and therefore applied no reliable methodology to reach her

16     opinions.  (*Id.* at 11.)  Ms. Bartley's "reports amount to googling and then making conclusory

17     statements without any relevant expertise or facts."  (*Id.* at 12.)

18             Third, Plaintiff argues Ms. Bartley improperly provides legal opinions when she

19     "purports to apply 'applicable case law,'" "claims that 'brief or harmless delays or interruptions

20     in providing prescribed diets are not unconstitutional,'" and "asserts . . . that Picciano cannot rely

21     on 'a disagreement in care' to establish deliberate indifference."  (*Id.* at 10.)

22             Clark County responds that Plaintiff's arguments misconstrue Ms. Bartley's reports.

23     (Dkt. No. 98 at 4.)  The County maintains it does not seek to rely on Ms. Bartley as a "medical

24

expert or a dietician" and does not intend to ask Ms. Bartley "to instruct the jury on the applicable law." (*Id.*) Rather, the County asserts "Ms. Bartley is qualified to offer opinions on Jail administration, correctional facilities' standards of care related to medical diets, contract administration . . . and whether Clark County acted consistently with industry standards." (*Id.* at 5.) To these ends, the County states Ms. Bartley's reports properly concern "the standard of care applicable to a Jail's provision of medical diets to those in its custody" (*id.* at 3) and "the Jail's policies and procedures" with respect to the same (*id.* at 4).

        a.    *Qualifications*

Ms. Bartley's opinions on issues of medicine, diet and nutrition, celiac disease, and celiac disease management must be excluded, as they lie outside her expertise as a corrections administrator. *See Brown v. Google*, 2022 WL 17961497, at *11 (N.D. Cal. Dec. 12, 2022) (expert "opinion must be rooted in the expert's relevant expertise").

Related to medicine, Ms. Bartley's "Report Conclusion" opines that "[t]here is no indication that Mr. Picciano's orthostatic syncope was related to the alleged consumption of gluten or lack of nourishment." (Dkt. No. 95-1 at 25.) Elsewhere in her report, she opines that "[d]espite Mr. Picciano's grievance claim that he is losing significant weight, his weight seems stable." (*Id.* at 20.) And Ms. Bartley interprets medical records by opining that although "Mr. Picciano's complaint [] identifies that he was diagnosed with dehydration, electrolyte imbalance and arrhythmia at the emergency department . . . this is not supported by the medical records that say the exact opposite." (*Id.* at 24.)

Ms. Bartley also discusses issues of diet and nutrition, celiac disease, and disease management. For instance, she states that "many of the items served seem consistent with [her] knowledge of a gluten free diet" and "the easiest way to protect Mr. Picciano's food from any potential cross contamination would be to provide him whole fruits and vegetables that would

1    not come into contact with any surfaces or utensils in the kitchen." (*Id.* at 19.)  She speculates

2    that "Mr. Picciano's daily caloric intake was probably less than what was served to other inmates

3    prior to being placed on a gluten free diet." (*Id.*)  And she discusses the nature of celiac disease

4    by noting that it "is not apparent by just looking at someone," and explaining that "[a]ccording to

5    internet websites, gluten can be found in non-food items." (Dkt. No. 95-2 at 7.)

6         The County has not met its burden of showing how Ms. Bartley's qualifications allow her

7    to testify on these topics.  *See In re Bard IVC Filters Prods. Liab. Litig.*, 2018 WL 11446831, at

8    *2 (D. Ariz. Jan. 22, 2018).  Rather, the County vaguely asserts "Ms. Bartley's CV is attached

9    showing that she is more than qualified . . . to offer opinions on the standard of care applicable to

10   a Jail's provision of medical diets to those in its custody." (Dkt. No. 98 at 3.)  But the County

11   fails to explain how any specific experience relates to the content of the opinions challenged by

12   Plaintiff.  And while the Court's own review finds Ms. Bartley's CV reflects experience in jail

13   management and law enforcement, the CV does not require or even support the conclusion that

14   she is qualified to offer expert opinion on medicine, diet and nutrition, celiac disease, and celiac

15   disease management.  (*See generally* Dkt. No. 95-1 at 27–31.)

16        Perhaps most tellingly, Ms. Bartley herself states she is not an expert on celiac disease

17   (Dkt. No. 95-3 at 4); is not an expert on "meal or food preparation" (*id.* at 6); has no "more

18   [experience] than the layperson" at evaluating medical records (*id.* at 20); and, with respect to

19   "medical or health care" provided to an inmate, can opine that a jail must "have a medical

20   provider" and that the "medical provider [must] have policies, but *cannot* "speak to the medical

21   efficiency or the impact of those direct policies or protocols," as "that would be a medical

22   provider's role" (*id.* at 3–4).

23

24

The Court GRANTS Plaintiff's motion for exclusion of Ms. Bartley's opinions insofar as they concern issues of medicine, diet and nutrition, celiac disease, and celiac disease management.  Ms. Bartley will not be permitted to opine on these issues at trial.

        b.    *Methodology*

The Court need not address Plaintiff's argument that Ms. Bartley used no reliable methodology in offering the opinions already excluded.  (Dkt. No. 95 at 11.)  However, Ms. Bartley's reports are filled with other opinions supported by no methodology, which amount to no more than discussion of "lay matters" on which an expert may not opine.  *See Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. May 20, 2020).

For example, Ms. Bartley's report speculates "[i]t is *possible* that the change in medical providers and multiple request and grievance systems caused some of" Plaintiff's requests for a gluten free diet "to be delayed in their delivery to the correct recipients."  (Dkt. No. 95-1 at 15) (emphasis added).  And she repeatedly weighs Plaintiff's allegations against evidence in the record—for instance, by opining that Plaintiff's complaint "identifies events that are not supported by available records," stating Plaintiff's complaint "mischaracterizes" the record, and referring to certain of Plaintiff's allegations as not supported by anything "other than his complaints."  (*Id.* at 24).

Ms. Bartley's factual "narration [is not] traceable to a reliable methodology" and must be excluded.[4]  *In re Packaged Seafood Prods. Antitrust Litig.*, 2023 WL 8719454, at *1 (S.D. Cal.

---

[4] Clark County asserts that Ms. Bartley's "comments . . . about the allegations of the case provide the context for her opinions, but are not the opinions she will be asked to offer at trial."  (Dkt. No. 98 at 4.)  While the County is correct in suggesting that recitation of allegations may in some cases provide a proper basis for expert opinion, it does not identify—and the Court cannot discern—how Ms. Bartley's discussion of Plaintiff's allegations actually provides necessary "context" for any expert opinion.  *See Mata v. Oregon Health Auth.*, 739 Fed. Appx. 370, 372 (9th Cir. 2018) (a district court may exclude an expert from testifying "on the grounds that his testimony would not

Dec. 18, 2023); *see also Taylor v. County of Pima*, 2023 WL 2652602, at *5 (D. Ariz. March 27, 2023) (excluding an expert's "factual narratives" that "impermissibly rel[ied] upon implicit credibility determinations" and "resolution of evidentiary conflicts").  The jury does not require expert testimony on the presence or absence of evidence in the record and may draw their own conclusions as to whether alleged events unfolded.

c.    *Legal Conclusions*

"Expert testimony is not proper for issues of law."  *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996); *see also M.H. v. County of Alameda*, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015).  The Court therefore agrees with Plaintiff that Ms. Bartley's legal opinions—including regarding when "courts have indicated that special diets must be provided" (Dkt. No. 95-2 at 3), whether delays in providing special diets are "unconstitutional" (*id.*), and whether "a disagreement in care" can "give rise to deliberate indifference" (*id.* at 9)—must be excluded.  Plaintiff's motion is GRANTED insofar as it seeks exclusion of these opinions.

d.    *Remaining Opinions*

Plaintiff asks that the entirety of Ms. Bartley's reports be excluded on the above grounds. (Dkt. No. 95 at 12–13.)  The County's opposition to Plaintiff's motion, which largely contains general characterizations of Ms. Bartley's reports and blanket statements of the types of topics on which Ms. Bartley is qualified to opine, ultimately only identifies two "opinions" from Ms. Bartley's reports to support its contention that Ms. Bartley should be permitted to provide expert testimony in this case.  (Dkt. No. 98 at 4.)  The first is Ms. Bartley's statement that "[i]n each of the three accreditation programs"—*i.e.*, the Washington Association of Sheriffs and Police Chiefs (WASPC), ACA, and NCCHC—"medical or therapeutic diets are ordered after

---

have been helpful to the trier of fact" because the expert's "report did little more than vouch for [the proponent's] version of events").

consultation with medical personnel and then communicated to the kitchen." (*Id.*)  The second is

Ms. Bartley's "descri[ption] [of] the obligations of the Jail's medical contractor for ordering

medical diets per its contract with Clark County." (*Id.*)  Plaintiff's reply calls these opinions

"superficial." (Dkt. No. 119 at 4–5.)

The Court concludes that the second "opinion" identified by the County requires

exclusion.  It does not appear to be an expert opinion as much as statements of fact that the

County's "Request for Proposals (RFP) #764 for Medical Services for Inmates . . . exclusively

requires the medical provider to authorize therapeutic diets for all inmates," and that NaphCare's

response to this RFP stated that its "physician will prescribe . . . medical diets when necessary."

(Dkt. No. 95-1 at 23.)  A jury does not require expert testimony to understand the express

language of the County's RFP and NaphCare's response.  *See Aya Healthcare Services, Inc.*, 613

F. Supp. 3d at 1322 (explaining an expert is not "better situated than lay persons . . . to observe

and draw conclusions" from certain documentation); *Orgain, Inc. v. Northern Innovations*

*Holding Corp.*, 2022 WL 2189648, at *9 (C.D. Cal. Jan. 28, 2022) (rejecting expert opinion that

described documents because "the jury can read" the documents "and make the relevant

deductions and inferences themselves").

However, Ms. Bartley's opinion that each of the three accreditation standards calls for

placement of diet orders "after consultation with medical personnel" is reliable and within the

realm of Ms. Bartley's expertise in correctional administration.  (Dkt. No. 95-1 at 23.)  As the

County points out, Ms. Bartley has experience reviewing "jails for compliance with accreditation

standards." (Dkt. No. 98 at 3.)  Ms. Bartley may therefore opine on the discrete issue of these

standards and their applicability to the facts of this case at trial.  But the County has failed to

carry its burden of showing how any other of Ms. Bartley's opinions are admissible, *see*

*Spearman Corp. Marysville Div. v. Boeing Co.*, 2022 WL 11823467, at *1 (W.D. Wash. Oct. 20, 2022), and the Court declines to undertake that task for the County.

The Court accordingly GRANTS in part and DENIES in part Plaintiff's motion to exclude Ms. Bartley's opinions. Ms. Bartley's reports are excluded in their entirety, with a narrow exception: Ms. Bartley may testify to accreditation standards insofar as they relate to the provision of medical diets, only to the extent these opinions are already contained in her reports.

       2.   <u>Clark County Employees</u>

Clark County represents that it will not be offering expert opinion of its own employees at trial. (Dkt. No. 98 at 1.) The Court therefore GRANTS as uncontested Plaintiff's motion to exclude expert testimony of Clark County employees.

## IV    CONCLUSION

Accordingly, and having considered the motions (Dkt. Nos. 88, 91, 93, 94, 95), briefing of the parties, and remainder of the record, the Court ORDERS that:

1. NaphCare's motion to exclude expert testimony of Plaintiff's experts (Dkt. No. 88) is DENIED;

2. Wellpath's motion to exclude expert testimony of Plaintiff's experts (Dkt. No. 91) is DENIED;

3. Plaintiff's motion to exclude expert testimony of NaphCare's experts (Dkt. No. 94) is GRANTED in part and DENIED in part;

4. Plaintiff's motion to exclude expert testimony of Wellpath's experts (Dkt. No. 93) is GRANTED; and

5. Plaintiff's motion to exclude expert testimony of Clark County's experts (Dkt. No. 95) is GRANTED in part and DENIED in part.

1      Testimony SHALL be excluded consistent with the specific rulings identified throughout

2   this order.

3      Dated this 11th day of March 2024.

4

5

6      David G. Estudillo
       United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24