UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GAVEN PICCIANO,

     Plaintiff,

  v.

CLARK COUNTY, CLARK COUNTY
JAIL, WELLPATH, LLC, and
NAPHCARE, INC.,

     Defendants.

CASE NO. 3:20-cv-06106-DGE

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT (DKT.
NOS. 141, 143, 146)

## I  INTRODUCTION

Before the Court are motions for summary judgment brought by Defendants NaphCare (Dkt. No. 141) and Wellpath (Dkt. No. 146), and a motion for partial summary judgment brought by Defendant Clark County (Dkt. No. 143). For the reasons set forth below, the Court finds and ORDERS that NaphCare's motion for summary judgment (Dkt. No. 141) is GRANTED in part and DENIED in part; Wellpath's motion for summary judgment (Dkt. No. 146) is GRANTED in part and DENIED in part; and Clark County's partial motion for summary judgment (Dkt. No. 143) is DENIED.

## II       BACKGROUND

Plaintiff Gaven Picciano brings claims against Clark County, NaphCare and Wellpath for failures to order or provide him gluten free meals while he was a detainee at the Clark County Jail.

Plaintiff was booked at the Clark County Jail on January 30, 2020.  (Dkt. No. 155-26 at 2.)  At that time, Wellpath served as the Jail's medical provider.  (Dkt. Nos. 43 at 1; 141 at 10; 146 at 3.)  At intake, Plaintiff reported he had celiac disease, and Wellpath provided Plaintiff various forms to sign.  (Dkt. No. 155-2 at 5.)  According to his testimony, "the guards" told Picciano he was "getting out the next day."  (Dkt. No. 155-1 at 24.)  Because of this, he executed a refusal of treatment form refusing to release his medical records because he was "getting out tomorrow."  (Dkt. No. 155-29 at 2.)  Both NaphCare and Wellpath do not place diet orders for individuals with celiac disease absent confirmation of the diagnosis from an outside provider.  (Dkt. Nos. 142-6 at 2; 147-8 at 3.)  Picciano testified he was not informed that he could not obtain a gluten-free diet until it was confirmed by his medical records that he in fact had celiac disease.  (Dkt. No. 155-1 at 27.)  His intake nurse, Tarah Ward, did not recall whether she told him the medical records release was required for him to obtain a gluten-free diet.  (Dkt. No. 155-17 at 18.)  The "Refusal of Treatment" form was filled out to state: "Medical records – getting out tomorrow" it did not identify any "treatment" Plaintiff refused.  (Dkt. No. 155-29 at 2.)

The next day, January 31, 2020, was Wellpath's final day serving as the Jail's medical provider, as well as the first day Plaintiff received any meal at the Clark County Jail.  (Dkt. No. 43 at 3.)  Plaintiff submitted his first grievance requesting gluten free meals.  (Dkt. No. 155-32 at 2.)

NaphCare replaced Wellpath as the Jail's medical provider on February 1, 2020, and

continued to serve as the Jail's medical provider until Plaintiff was released on February 20, 2024.  (Dkt. Nos. 43 at 1; 141 at 10; 146 at 3; 155-48 at 2.)  Plaintiff submitted additional grievances on February 1 and numerous times thereafter, notifying NaphCare of his celiac disease, describing symptoms, and requesting a gluten free diet.  (*See* Dkt. No. 155-32.)

Plaintiff was not seen by NaphCare until February 3, at which point he was given a release of records form to sign.  (Dkt. No. 142-13 at 2–4.)  NaphCare requested his records on February 5, and received them the next morning.  (Dkt. No. 142-5 at 7.)  NaphCare thereafter placed a diet order prescription for plaintiff on February 8. (Dkt. No. 142-16 at 2.)

After the diet order was placed, Plaintiff continued to file grievances that he was not receiving gluten free food.  (*See* Dkt. No. 155-32.)  Clark County admits it provides individuals with a "wheat free" diet instead of "gluten free" diet, unless told to do otherwise by its medical provider.  (Dkt. No. 144 at 2.)  Plaintiff's expert, Dr. Isabel Hujoel, M.D., explains: "while wheat is one of the sources of gluten in foods, it is not the only source. 'Zero-wheat' is not equivalent to gluten-free." (Dkt. No. 155-3 at 10.)  Clark County does not modify an inmate's diet absent a diet order placed by its medical provider.  (Dkt. No. 144 at 19.)

On February 10, after having gone twelve days without being served a gluten free meal, Plaintiff was found unresponsive to verbal and painful stimuli.  (Dkt. No. 155-40 at 3.)  He was taken to the emergency room, where he displayed symptoms of lightheadedness, dizziness, abdominal cramping, nausea, vomiting, fatigue, and dry mouth.  (Dkt. No. 155-42 at 5.)  He had only 3 bowel movements in the previous 12 days.  (*Id.*)  It was determined he experienced an orthostatic event due to decreased food intake and was recommended to continue a gluten free diet.  (*Id.* at 8.)  Upon return to the jail, he continued to receive foods containing gluten, and continued to feel sick, nauseous, and weak both from not having meals and from having to eat

1   meals that contained gluten.  (Dkt. No. 155-2 at 8.)  On February 20, Plaintiff was released from

2   custody.  (Dkt. No. 155-48 at 2.)  Plaintiff filed suit against NaphCare, Wellpath, and the

3   County, alleging various claims based on the Americans with Disabilities Act ("ADA"),

4   42 U.S.C. § 12131 *et seq*., the Rehabilitation Act, the Washington Law Against Discrimination,

5   42 U.S.C. § 1983, and various theories under Washington tort law.  (Dkt. No. 43 at 1–2.)

### III   LEGAL STANDARD

7   Summary judgment is appropriate when "there is no genuine dispute as to any material

8   fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[C]ourts

9   are required to view the facts and draw reasonable inferences in the light most favorable to the

10   party opposing the summary judgment motion," *Scott v. Harris*, 550 U.S. 372, 378 (2007)

11   (internal quotation and citation omitted) (cleaned up), but are not to "weigh the evidence or

12   determine the truth of the matter," *Metal Jeans, Inc. v. Metal Sport, Inc.*, 987 F.3d 1242, 1244

13   (9th Cir. 2021) (internal quotation and citation omitted).

14   A dispute of material fact is genuine and will defeat a summary judgment motion when

15   "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

16   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, "[a] motion for summary

17   judgment may not be defeated . . . by evidence that is merely colorable or [] not significantly

18   probative."  *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480

19   (9th Cir. 2000) (internal quotation and citation omitted).

20   A party moving for summary judgment who does not carry "the ultimate burden of

21   persuasion at trial"—usually, the defendant—has an "initial burden of production" which

22   requires "either produc[ing] evidence negating an essential element of the nonmoving party's

23   claim . . . or show[ing] that the nonmoving party does not have enough evidence of an essential

24

1  element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd.*

2  *v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If [the] moving party fails to

3  carry its initial burden of production, the nonmoving party has no obligation to produce anything,

4  even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Id.* at 1102–

5  1103.  In other words, "[a] moving party may not require the nonmoving party to produce

6  evidence supporting its claim or defense simply by *saying* that the nonmoving party has no such

7  evidence."  *Id.* at 1105 (emphasis added).

8                                    **IV       DISCUSSION**

9  **A.       NaphCare's Motion for Summary Judgment**

10        NaphCare moves for summary judgment on all of Plaintiff's claims.  (Dkt. No. 141 at 9.)

11  As Plaintiff voluntarily dismisses his claim for negligent infliction of emotional distress (Dkt.

12  No. 157 at 7 n.1), the Court addresses NaphCare's motion insofar as it seeks summary judgment

13  on Plaintiff's Rehabilitation Act, *Monell*, negligence, and outrage claims.

14        1.       Rehabilitation Act Claim

15        Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a

16  disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

17  be denied the benefits of, or be subjected to discrimination under any program or activity

18  receiving Federal financial assistance."  29 U.S.C. § 794.  A plaintiff bringing suit under § 504

19  must show (1) he is an individual with a disability; (2) he is otherwise qualified to receive the

20  benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4)

21  the program receives federal financial assistance.  *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135

22  (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001).

23        NaphCare argues it does not receive federal financial assistance as contemplated by

24

§ 504, and thus Plaintiff's Rehabilitation Act claim fails as a matter of law.  (Dkt. No. 141 at 26–28.)  Plaintiff points to public records showing NaphCare receives considerable federal grant funding.  (Dkt. No. 157 at 23.)  Plaintiff argues NaphCare's website states NaphCare works with correctional facilities "to obtain more then $1.5 million in grant funding and in-kind contributions" for the provision of medication-assisted treatment ("MAT") for inmates with opioid use disorder.  (*Id*.)  He also identifies a partnership between Lewis County on a MAT grant from the Medicaid Transformation Project/Delivery System Reform Incentive Payment program, in which NaphCare receives funds directly from the grant.  (*Id*.)  Plaintiff points to an email in which a NaphCare representative explained the proposed system: "[m]y vision of the funding would be for NaphCare to issue a bill separate from the main contract billing for those hours in the form of a monthly statement.  Lewis [County] would then pay from the pool of money the grant provides."  (*Id*.) (citing Dkt. No. 155-56 at 2).  Lewis County accepted this proposal and adopted a resolution authorizing it to direct the grant funds to NaphCare; the county then entered into a contract with NaphCare specifically identifying the grant as the source of funding for the MAT, which was distributed over a period of time inclusive of Picciano's detention.  (*Id.* at 23–24.)

The parties discuss *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597 (1986), in which individuals with disabilities brought an action challenging the conclusion of the Civil Aeronautics Board that its regulatory authority under § 504 was limited to those few airlines that receive subsidies under the Federal Aviation Act, as opposed to air carriers.  To determine the "recipient" of the federal assistance for purposes of § 504, the Supreme Court looked to the terms of the underlying grant statute.  *Id.* at 604.  The Court reviewed the Airport and Airway Development Act of 1970 and the Airport Improvement Program, finding airport

operators submit project grant applications for "airport development or airport planning[,]" and funds are disbursed for a variety of airport construction projects including land acquisition, paving, buildings, sidewalks, and parking: in short, only projects that concern airports.  *Id.* at 604–605.   The Supreme Court concluded: "Congress has made it explicitly clear that these funds are to go to airport operators.  Not a single penny of the money is given to the airlines.  Thus, the recipient for purposes of § 504 is the *operator* of the airport and not its users." *Id.* at 605.

Likewise, the Court thus begins with the terms of the underlying grant statute.  Here, Plaintiff points to the Medicaid Transformation Project/Delivery System Reform Incentive Payment program.  (Dkt. No. 157 at 23); 42 U.S.C. § 1315.  Typically, under the Social Security Act, states establish plans for providing medical services to those who are unable to pay the cost themselves.  If the plan meets an extensive list of requirements, the state can receive partial federal funding.  *See* 42 U.S.C. § 1396a; *California Welfare Rts. Org. v. Richardson*, 348 F. Supp. 491, 493 (N.D. Cal. 1972).  Section 1115 creates an exception to the rule.  The section gives broad power to the Secretary to authorize "demonstration projects" which do not fit within the normal guidelines as long as the project is one which "in the judgment of the Secretary is likely to assist in promoting the objectives of" certain subchapters of the Social Security Act. 42 U.S.C. § 1315.  Section 1115 thus waives certain requirements that would otherwise be applicable to state plans and allow "costs regarded as State plan expenditures" based on that state's demonstrated need.  *See* § 1315(a).  It is the *state* who carries out the project under the statute: "the Secretary may waive compliance with any of the requirements . . . to the extent and for the period he finds necessary to enable *such State or States to carry out such project*." § 1315(a)(1) (emphasis added).  Likewise, the "costs of such project" are to "be regarded as expenditures under the State plan . . . ." § 1315(a)(2)(A).  Based on a reading of the underlying

grant statute, Congress intended states to receive this federal assistance.

Plaintiff argues Section 504 defines "recipient" of federal financial assistance to include any "private entity" to which "Federal financial assistance is extended directly or through another recipient[.]"  (Dkt. No. 157 at 24) (citing 28 C.F.R. § 42.540(e)).  Plaintiff argues *Paralyzed Veterans* is distinguishable because "[n]ot a single penny of the money is given to the airlines" who benefitted only from their use of the improvements to the airports.  By contrast, Plaintiff argues NaphCare, a "private entity" to which federal financial assistance is extended "through another recipient," indirectly receives the funds funneled through Lewis County by the grant.  (Dkt. No. 157 at 25 n.43.)

Congress limited the scope of § 504 to those who actually "receive" federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds.  *Paralyzed Veterans*, 477 U.S. at 605. "Congress apparently determined that it would require contractors and grantees to bear the costs of providing employment for the handicapped as a *quid pro quo* for the receipt of federal funds." *Id.* (citing *Consolidated Rail Corporation v. Darrone,* 465 U.S. 624, 633, n.13 (1984)).

NaphCare also relies heavily on *Abraham v. Corizon Health, Inc.*, No. 3:16-CV-01877-PK, 2017 WL 11718378 (D. Or. Nov. 14, 2017), *report and recommendation adopted*, No. 3:16-CV-01877-PK, 2017 WL 6063066 (D. Or. Dec. 7, 2017), *aff'd*, 775 F. App'x 301 (9th Cir. 2019) (unpublished opinion).  In *Abraham*, deaf persons brought a class action suit against Corizon Health, Inc., which provides health services at the Clackamas County Jail, for denying equal access to medical treatment by failing to provide American Sign Language interpreters or other accommodations.  *Id.* at *1.  The court found Clackamas County, not Corizon Health, to be the designated recipient of federal grant money because, like *Paralyzed Veterans*, Corizon could not

1   choose whether it would accept or reject the funds; only Clackamas County could make that

2   choice.  *Id.* at \*3.

3       Plaintiff argues *Abraham* stands only for the proposition that when a jail receives federal

4   funds and deposits such funds into a general fund, the mere fact that payments were then made

5   from that general fund does not render payees recipients of federal financial assistance.  (Dkt.

6   No. 157 at 25.)  This was not the variable the *Abraham* decision hinged on.  The main

7   consideration was whether Corizon Health could choose whether it would accept or reject the

8   grant money; the court emphasized the *quid pro quo* system of accepting federal funds in

9   exchange for agreeing to comply with the Rehabilitation Act.[1]  *Abraham*, 2017 WL 11718378, at

10  \*3.

11      Review of Plaintiff's cited evidence, which includes emails regarding the demonstration

12  project, the contractual terms between Lewis County and NaphCare, and billing records,

13  confirms this conclusion.  (Dkt. Nos. 155-54, 155-55, 155-56, 155-57, 155-58).  The

14  arrangement between Lewis County and NaphCare constitutes a procurement contract for which

15  NaphCare was the beneficiary of any federal grants.  Lewis County received federal financial

16  assistance via a § 1115 demonstration project, and Lewis County used the financial aid to pay

17  NaphCare under their contract.  This Court has previously reviewed whether procurement

18  contracts constitute federal financial assistance under the Rehabilitation Act.  (Dkt. No. 165 at 5.)

19  Procurement contracts are those "in which goods or services are sold or purchased by the

20  government at a fair market value."  *Jacobson v. Delta Airlines*, 742 F.2d 1202, 1209 (citing 42

21

22  [1] The court also agreed that "because Clackamas County pays it as compensation for medical
    services, the Rehabilitation Act does not apply here because it 'covers only the recipients of
23  federal assistance and not the recipients of compensatory payments for services.'"  *Abraham*,
    2017 WL 11718378 at \*3.  § 504 thus covers only the recipient of federal assistance—Lewis
24  County—and not the recipient of compensatory payments for its medical services—NaphCare.

1    C.F.R. Sec. 84.3(h)).  "Entities that received federal funding via government procurement

2    contracts are generally not considered recipients of federal financial assistance under the

3    Rehabilitation Act." *Kimiko P. v. Alta California Regional Center*, 2019 WL 3004149, at *2

4    (E.D. Cal. July 10, 2019).  Thus, the procurement contract between NaphCare and Lewis County

5    is compensatory for services rendered and not a subsidy providing financial assistance.

6         Because NaphCare does not receive federal financial assistance as contemplated by

7    § 504, and instead receives compensation for providing medical services, Plaintiff's

8    Rehabilitation Act claim against NaphCare fails as a matter of law, and NaphCare's motion for

9    summary judgment is GRANTED.

10              2.    *Monell* Claim

11        The Ninth Circuit recognizes two paths to liability under *Monell*: direct and indirect.

12   *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1144 (9th Cir. 2012).  The direct path involves

13   policies "that result in the [municipal actor] itself violating someone's constitutional rights or

14   instructing its employees to do so."  *Id.* at 1143.  The indirect path involves policies that cause a

15   constitutional violation through a municipal actor's "inaction or omission," and "may be based

16   on failure to implement procedural safeguards to prevent constitutional violations."  *Id*.  A

17   plaintiff pursuing the indirect theory of liability must prove the policy in question "amounts to

18   deliberate indifference to the plaintiff's constitutional right."  *Id*. (internal quotation and citation

19   omitted).

20        Because Plaintiff appears to concede that he must establish deliberate indifference (Dkt.

21   No. 157 at 11–15), and because the gravamen of Plaintiff's *Monell* claim is NaphCare's failure

22   to immediately place an appropriate diet order (*id.* at 10–11), the Court analyzes Plaintiff's claim

23

24

under the indirect framework.[2]  To prevail on an indirect *Monell* claim, a plaintiff must prove "(1) [the plaintiff] had a constitutional right of which he was deprived; (2) the municipal[] [actor] had a policy; (3) the policy amounts to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy [wa]s the moving force behind the constitutional violation."  *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (internal citation and quotation omitted).

NaphCare argues Plaintiff's *Monell* claim cannot withstand summary judgment for three reasons.  First, NaphCare argues Plaintiff did not suffer any constitutional deprivation.  (Dkt. No. 141 at 20–21.)  Second, NaphCare argues Plaintiff's "records-review policy" was not deliberately indifferent to Plaintiff's constitutional rights.  (*Id.* at 22–25.)  Third, NaphCare argues its "records-review policy" was not "the moving force behind any injury."  (*Id.* at 25–26.)

Each argument is premised on NaphCare's contention that Plaintiff may only base his *Monell* claim on NaphCare's "records-review policy"—pursuant to which NaphCare waited to place medical diet orders until receipt and review of an inmate's medical records (*id.* at 9)—but may not base his *Monell* claim on a "custom or practice."  (*Id.* at 20.)  Because a *Monell* claim based on the records-review policy survives summary judgment, the Court does not address theories based on custom or practice.

a.   *Constitutional Deprivation*

NaphCare argues Plaintiff cannot show he suffered a constitutional deprivation because (1) "modest delays in providing medical diets 'do not rise to the level of a constitutional violation' as a matter of law" and (2) Plaintiff was not "completely" deprived of food since he

---

[2] The Court therefore does not address NaphCare's argument that the records-review policy is not "facially unconstitutional," as this argument appears to represent an attempt by NaphCare to challenge a direct *Monell* claim (Dkt. Nos. 141 at 21–22; 160 at 11–12).  *See Tsao*, 698 F.3d at 1143.

1  "had something to eat every meal of every day, including gluten-free options[] . . . he declined to

2  consume." (Dkt. No. 141 at 20–21.)  The Court rejects both arguments.

3      First, the three district court cases cited by NaphCare (*id.* at 20–21) do not demonstrate

4  that "modest delays" in the provision of medical diets cannot amount to constitutional violations.

5  For instance, NaphCare cites *Smith v. Tom Green Cnty. Jail*, which found that allegations of

6  delay did not suffice to plead a *Monell* claim when the delay did not cause harm, reflect

7  deliberate indifference, or "seem[] attributable" to the defendant, 2018 WL 3873665, at *12

8  (N.D. Tex. Aug. 15, 2018).  *Smith* did not advance a more sweeping rule that "modest delays,"

9  regardless of the circumstances, cannot constitute constitutional deprivations.  *See id.*  And even

10  assuming such a rule, NaphCare fails to establish that the delay in this case may only be viewed

11  by a jury as "modest."  (*See generally* Dkt. No. 141 at 20.)

12      Second, NaphCare does not show that Plaintiff's daily consumption of food and

13  declination to eat hard-boiled eggs preclude him from proving a constitutional deprivation.  As

14  Plaintiff correctly argues (Dkt. No. 157 at 9), NaphCare does not offer facts demonstrating the

15  meals Plaintiff received were safe for Plaintiff or that eating the gluten free foods that were

16  available would have rendered Plaintiff's meals nutritionally adequate.  *See Foster v. Runnels*,

17  554 F.3d 807, 813 n.2 (9th Cir. 2009).

18      NaphCare also offers no authority to support its suggestion that only complete

19  deprivations of food engender constitutional violations.  Instead, NaphCare cites *Foster* as a

20  "useful comparator," maintaining that *Foster* is so distinguishable as to foreclose Plaintiff's

21  *Monell* claim entirely.  (Dkt. No. 160 at 9; *see also* Dkt. No. 141 at 21.)  But *Foster*, which held

22  that the denial of sixteen meals over twenty-three days *could* amount to a constitutional

23  deprivation, would appear to support Plaintiff's claim.  *Foster*, 554 F.3d at 812–813.  *Foster* did

24

not establish that a jail's provision of some food negates any constitutional violation, nor a bright-line rule pursuant to which anything less than a deprivation of sixteen meals over twenty-three days fails to qualify as a constitutional deprivation.

Whether the denial of appropriate meals in this case rises to the level of a constitutional deprivation is best resolved by the jury.

### b. *Deliberate Indifference*

Deliberate indifference requires showing a municipal actor was "on actual or constructive notice" that its policy was "substantially certain to result in the violation of [] constitutional rights." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1248–1249 (9th Cir. 2016) (internal quotation and citation omitted).  A plaintiff may satisfy this standard by showing "a pattern of prior, similar violations of federally protected rights, of which the relevant [municipal actor] had actual or constructive notice." *Hyun Ju Park v. City and Cnty. of Honolulu*, 952 F.3d 1136, 1141–1142 (9th Cir. 2020).  Alternatively, a plaintiff may establish deliberate indifference when "the need for better policies" is "'obvious[ly] . . . likely to result in the violation of constitutional rights.'" *Germaine-McIver v. County of Orange*, 2018 WL 6258896, at *5 (C.D. Cal. Oct. 31, 2018) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  Where the risk of a policy's deficiencies is obvious, "a plaintiff need point only to the policy itself to establish that the [municipal[] actor] w[as] on notice that the plaintiff's federally protected rights would likely be violated if they failed to act." *Hyun Ju Park*, 952 F.3d at 1141–1142.

NaphCare first argues Plaintiff cannot show its records-review policy amounted to deliberate indifference because the delay in ordering a diet for Plaintiff was "short." (Dkt. Nos. 141 at 22; 160 at 12–13.)  NaphCare cites *Toussaint v. McCarty*, 801 F.2d 1080, 1112 (9th Cir. 1986), which found that "neither precedent nor common sense suggests that delay in providing a special diet arises to the level of deliberate indifference." (Dkt. No. 141 at 22.)

1    Plaintiff responds that NaphCare's reliance on *Toussaint* is misplaced because "deliberate

2 indifference is a fact-intensive question," and *Toussaint*'s holding was premised on different

3 circumstances. (Dkt. No. 157 at 13–14.) Plaintiff also disputes NaphCare's characterization of

4 its delay in placing a diet order as "short," arguing that NaphCare "did not order gluten-free

5 meals for a week," which "guarantee[d]" his "suffer[ing] for an extended period of time." (*Id.* at

6 13.)

7    The Court is not convinced by NaphCare's suggestion that *Toussaint* precludes deliberate

8 indifference in any case involving a delay in the provision of a medical diet. While the

9 circumstances in *Toussaint* may have been such that it was "common sense" to conclude the

10 delay did not rise "to the level of deliberate indifference," it is difficult to see why "common

11 sense" requires that conclusion here. A reasonable jury could conclude the opposite: that it is

12 common sense that patients with specific medical conditions—such as celiac disease or food

13 allergies—would be substantially likely to face serious harm if forced to wait for the release and

14 review of their medical records before receiving a meal they can safely consume. To that end, it

15 matters what the medical condition is, why a medical diet is required, and what type of harm

16 could result from failure to order the medical diet. *See Lolli v. County of Orange*, 351 F.3d 410,

17 419–420 (9th Cir. 2003) ("Leaving a diabetic . . . without proper food or insulin when it is

18 needed creates an 'objectively, sufficiently serious'" risk of harm, as diabetes "can produce

19 harmful consequences if left untreated for even a relatively short period of time."). The Court

20 therefore finds inappropriate a blanket rule for deliberate indifference that disregards these types

21 of facts. The Court also declines to substitute its judgment for that of the jury by deciding for

22

23

24

1   itself whether delays inherent in NaphCare's records-review policy are "short."[3]  *See Torres v.*

2   *City of Madera*, 648 F.3d 1119, 1125 (9th Cir. 2011).

3       NaphCare next argues that Plaintiff cannot demonstrate deliberate indifference because

4   delay in the provision of medically necessary meals is not an "'obvious' risk of its record-review

5   policy."[4]  (Dkt. No. 141 at 25.)  NaphCare asserts that in cases finding deliberate indifference

6   based on obviousness, the policy in question led to "fatal injuries"; whereas in the instant case,

7   the "risk" arising from the records-review policy is merely that "some inmates" may "have to

8   wait for a medical diet and eat foods they might not 'really like.'"  (*Id.* at 24.)

9       The Court rejects this argument, as Plaintiff provides facts indicating that NaphCare

10   downplays the severity of the risk.  For example, Plaintiff presents evidence that a single

11   exposure to gluten can lead to "acute distress" in individuals with celiac disease, and that

12   symptoms of gluten exposure experienced by individuals with celiac disease include stomach

13   pain, vomiting, and fatigue.  (Dkt. No. 155-3 at 11.)

14       Moreover, the Court is unaware of any rule that a finding of obviousness is limited to

15

16   [3] In addition to arguing the delay in the instant case was "short," NaphCare maintains that in some
17   instances, its policy will not lead to any delay because certain other medical conditions "can be
     confirmed on-site."  (Dkt. No. 141 at 24–25.)  But NaphCare does not demonstrate that on-site
18   confirmation of a diagnosis may occur for individuals with celiac disease.  That individuals with
     *other* conditions are excepted from the records-review policy does not erase the risk posed to
19   individuals, like Plaintiff, who *are* subject to the policy.  For this reason, the Court rejects
     NaphCare's reliance on *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021), which
20   NaphCare describes as having concluded a policy was not obviously risky because it provided
     exceptions for "urgent or emergent situations."  (Dkt. No. 141 at 25.)  NaphCare does not offer
21   evidence of any exceptions to its records-review policy that would apply to individuals with celiac
     disease.

22   [4] Because deliberate indifference may be based on either a prior pattern of violations or
     obviousness, *see Hyun Ju Park*, 952 F.3d at 1141–42, and because Plaintiff appears to base his
23   *Monell* claim only on the latter (Dkt. No. 157 at 11–15), the Court does not address NaphCare's
     argument that Plaintiff fails to show a "prior pattern" of constitutional violations (Dkt. No. 141 at
24   23).

1    cases involving fatalities.  The cases NaphCare cites (Dkt. No. 141 at 24) do not demonstrate this

2    proposition.  And regardless, it is not outside the realm of possibility that a policy of waiting to

3    order medical diets pending outside confirmation of celiac disease diagnosis or food allergies

4    could prove fatal.

5         NaphCare's final argument is that Plaintiff cannot show an obvious risk stemming from

6    its records-review policy since he has "no evidence that NaphCare *actually appreciated* the risk

7    of harm from the records-review policy."  (Dkt. No. 141 at 24) (emphasis in original).  This

8    argument appears to represent an attempt to insert a requirement of "actual notice" into the

9    "obviousness" theory of deliberate indifference.  The Court declines to do so, as "actual notice"

10   and "obviousness" are different.  *See Hyun Ju Park*, 952 F.3d at 1141 (deliberate indifference

11   requires showing "a municipal actor disregarded a known *or* obvious consequence of [its]

12   action") (emphasis added) (internal citation and quotation omitted).  While a plaintiff may

13   demonstrate deliberate indifference by showing a defendant had actual notice of a risk, deliberate

14   indifference may alternatively be premised on a risk's obviousness.  *Id.* at 1141–1142.  And

15   where deliberate indifference is premised on the latter, the plaintiff "need point only to the policy

16   itself to establish" notice of the policy's deficiencies.  *Id.*

17        In sum, NaphCare's arguments do not show that Plaintiff cannot establish deliberate

18   indifference.  Whether NaphCare's records-review policy amounted to deliberate indifference is

19   a question to be resolved by the jury.

20             c.    *Causation*

21        NaphCare offers three reasons why Plaintiff cannot show its records-review policy was

22   the moving force behind a constitutional deprivation.  (Dkt. No. 141 at 25–26.)  Each reason

23   seeks to establish that actions of Plaintiff and Clark County—and not NaphCare's records-review

24   policy—caused Plaintiff's injuries.  The Court finds each unavailing.

First, NaphCare argues Plaintiff's injuries were caused by Plaintiff's own refusal of treatment and refusal to release his medical records.  (*Id.* at 17.)  NaphCare relies on a "Refusal of Treatment" form signed by Plaintiff during his initial screening on January 30 as evidence of both refusals (Dkt. No. 142-12 at 6); as well as an authorization Plaintiff signed on February 3, permitting the release of his medical records (Dkt. No. 142-13).  (Dkt. No. 141 at 10, 17.)

The "Refusal of Treatment" form does not require the conclusion that Plaintiff refused to release his medical records pertaining to celiac disease or refused treatment for celiac disease. Most critically, the form is too vague to require NaphCare's desired conclusion.  It identifies no medical condition or type of record Plaintiff refused to release.  (Dkt. No. 142-12 at 6.)  Indeed, Plaintiff offers evidence indicating he was not informed that signing the release would deprive him of a gluten free diet.  (Dkt. Nos. 155-2 at 5; 155-17 at 18.)

To the extent NaphCare seeks to argue that Plaintiff caused delay by subsequently waiting until February 3 to authorize the release of his medical records, NaphCare offers no evidence that it provided Plaintiff an earlier opportunity to sign an authorization form.  Viewing the record in the light most favorable to Plaintiff, NaphCare has not shown that Plaintiff refused a gluten free diet or delayed in releasing his medical records.  *See Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1106 (9th Cir. 2000) (denial of defendant's motion for summary judgment is appropriate where the evidence produced by the defendant "purport[ed] to negate an essential element of plaintiffs' claim" but "d[id] not actually do so").

Second, NaphCare asks the Court to conclude that Plaintiff caused his injuries because he "declined to eat certain gluten-free items" due to personal preference.  (Dkt. No. 141 at 17–18.) But NaphCare only speculates that Plaintiff could have avoided injury by eating these items. Absent evidence showing Plaintiff's injuries would have been avoided by eating specific foods

1    provided to Plaintiff, this argument fails.

2          Third, NaphCare argues Plaintiff cannot establish causation because "NaphCare does not

3    control food or the kitchen" and instead merely "prescribe[s]" diets.  (*Id.* at 18.)  To that end,

4    NaphCare maintains that even the immediate placement of a gluten free diet order would not

5    have led Plaintiff to receive gluten free meals because "the Jail does not provide 100% gluten-

6    free diets."  (*Id.*)

7          The Court rejects this argument in light of evidence undermining NaphCare's position

8    that the County could not provide gluten free diets.  For instance, in the same deposition

9    NaphCare cites for the proposition that the "kitchen is 'not a hundred percent gluten-free" (Dkt.

10   No. 141 at 12), the County's 30(b)(6) witness represents that the kitchen *can* "cook . . . a gluten-

11   free meal at any time" (Dkt. No. 142-8 at 7).  There is also evidence suggesting that a directive

12   from NaphCare to the County to provide *strictly* gluten free meals would lead to the provision of

13   those meals.  (Dkt. No. 144 at 2) ("The Jail's Kitchen provides a 'wheat free' diet for persons

14   prescribed a 'gluten free' diet by medical *unless told to do otherwise by medical*.") (emphasis

15   added).[5]  As the record does not definitively demonstrate Clark County's inability to provide

16   strictly gluten free diets when directed, the Court finds unavailing NaphCare's argument

17   attacking causation based on this purported inability.

18          Relatedly, the Court observes that even assuming improper meals were provided to

19   Plaintiff following the placement of the diet order, Plaintiff may still be able to establish that

20

21   _____

22   [5] Plaintiff does not cite this evidence in its opposition to NaphCare's motion.  However, the Court
     "may consider other materials in the record," even if not cited by the parties, when ruling on a
     motion for summary judgment.  Fed. R. Civ. P. 56(c)(3); *see also Smith v. Balaam*, 2024 WL

23   1160695, at *1 n.1 (D. Nev. March 15, 2024) ("the modern-day version of Rule 56 encourages the
     Court to review the record thoroughly and be proactive in gathering facts and discerning whether

24   material disputes lie for purposes of judicial efficiency").

NaphCare's records-review policy was the moving force behind at least some of Plaintiff's injuries.  In particular, a jury could find that evidence of injuries incurred prior to or immediately after the placement of the diet order—including injuries reflected in Plaintiff's grievances (Dkt. No. 155-32)—were attributable to NaphCare's delay in placing the diet order.  That injuries may have been compounded by a subsequent failure to place the *correct* diet order, or by Clark County's failure to adhere to NaphCare's orders, does not change the fact that Plaintiff was not receiving appropriate food while waiting for NaphCare to place the diet order and suffered injuries during that time.

Finding each of NaphCare's arguments unsuccessful, NaphCare's motion for summary judgment on Plaintiff's *Monell* claim is DENIED.

### 3.   Negligence

NaphCare moves for summary judgment on Plaintiff's negligence claim, arguing Plaintiff cannot show that NaphCare breached any applicable standard of care or caused Plaintiff harm.  (Dkt. No. 141 at 14–15.)  The Court first, however, must address a preliminary argument by NaphCare regarding whether Plaintiff's claim is one of medical negligence under Chapter 7.70 of the Washington Revised Code, or common law negligence.  (*Id.* at 15 n.5.)

#### a.   *Chapter 7.70*

NaphCare argues in a footnote that Plaintiff's claim should be assessed pursuant to standards that apply to claims of medical negligence under Chapter 7.70 of the Washington Revised Code, because the conduct challenged by Plaintiff amounts to the provision of "health care" (*id.*).  *See* Wash. Rev. Code § 7.70.010 (modifying tort claims "for injury occurring as a result of health care").  If the claim is one of medical negligence, Plaintiff would need to prove NaphCare "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider . . . in the state of Washington, acting in the same or similar

1   circumstances." Wash. Rev. Code. § 7.70.040(1)(a).  Ordinarily, this requires expert testimony.

2   *Seybold v. Neu*, 19 P.3d 1068, 1074 (Wash Ct. App. 2001).

3          NaphCare acknowledges the Court previously declined to find Plaintiff's negligence

4   claim against Wellpath governed by Chapter 7.70 (Dkt. Nos. 60 at 12; 132 at 10), but proposes

5   that the "allegations regarding NaphCare are different in kind."  (Dkt. No. 141 at 15 n.5.)

6   NaphCare cites *Watson v. Washington Dept. of Corr.*, 2018 WL 7150488, at *9 (W.D. Wash.

7   Nov. 15, 2018), for the proposition that Chapter 7.70 should apply to a negligence claim

8   involving an analysis of "whether 'the standard of care required a gluten-free diet' from jail

9   doctors."  (*Id.*)

10         NaphCare's argument does not demonstrate that Plaintiff's claim is for medical

11  negligence.  Critically, NaphCare does not identify any way in which Plaintiff's claim against

12  NaphCare is "different in kind" than the claim against Wellpath, or explain why any difference is

13  so meaningful as to dictate a different result.

14         NaphCare also does not explain why *Watson* compels the conclusion that Chapter 7.70

15  applies in this case.  The plaintiff in *Watson* challenged a decision to decline to renew the

16  plaintiff's gluten free diet following review of medical testing indicating the plaintiff did not

17  have celiac disease.  *Watson*, 2018 WL 7150488, at *1.  The Court can understand that decision

18  to constitute the provision of "health care," and therefore warrant application of Chapter 7.70.

19  But the actions challenged here are different.  They involve no decision following medical

20  testing, and instead concern an initial failure to place a diet order followed by inaction.  *See*

21  *Beggs v. State*, 247 P.3d 421, 426 (Wash. 2011) ("everything within a doctor-patient relationship

22  is not necessarily health care").  The Court accordingly assesses Plaintiff's claim as one of

23  common law negligence.

24

1

       b.       *Common Law Negligence*

2       The substantive elements of a negligence claim are "(1) the existence of a duty, (2)

3   breach of that duty, (3) resulting injury, and (4) proximate cause."  *Ranger Ins. Co. v. Pierce*

4   *County*, 192 P.3d 886, 889 (Wash. 2008) (internal citation and quotation omitted).  NaphCare

5   argues Plaintiff's claim cannot survive summary judgment because Plaintiff fails to identify the

6   existence of an applicable duty breached by NaphCare.  (Dkt. No. 141 at 15–17.)  The Court

7   agrees.

8       Plaintiff argues the applicable duty flows from NaphCare's contractual relationship with

9   Clark County.  (Dkt. No. 157 at 32.)  Specifically, Plaintiff asserts that by contracting with the

10   County to provide diet orders, NaphCare "assumed" the Jail's affirmative duty owed to inmates

11   to "ensure [their] health, welfare, and safety."  (Dkt. No. 157 at 32) (citing *Gregoire v. City of*

12   *Oak Harbor*, 244 P.3d 924, 927 (Wash. 2010).  But Plaintiff does not explain what contractual

13   provisions reflect NaphCare's assumption of these duties.  (*Id.*)  And even assuming NaphCare

14   expressly accepted these duties through its contract with the County, Plaintiff does not provide

15   authority demonstrating that NaphCare's contractual obligations—which would be owed to the

16   County—may serve as the source of a common law duty owed to Plaintiff.  Absent authority

17   demonstrating that NaphCare's contractual obligations owed to the County translate into a

18   common law duty owed to Plaintiff, Plaintiff's negligence claim cannot succeed.[6]

19       The Court acknowledges that Plaintiff cites to *Gonzalez v. Dammeier*, 2022 WL 1155744

20

21   [6] Plaintiff also suggests that "*apart* from [its] contractually imposed duties," NaphCare had a duty
22   to comply with "the standard of care in correctional settings [] to order interim diets pending
     confirmation of diagnoses."  (Dkt. No. 157 at 33) (emphasis added).  But the Court is not aware
23   of any independent duty of a medical provider to adhere to "the standard of care in correctional
     settings" that would stem from anything other than the medical provider's contractual relationship
24   with the jail.  Accordingly, the Court does not find that a duty to comply with "the standard of care
     in correctional settings" exists "apart" from NaphCare's contractual arrangement with the County.

(Wash. Ct. App. April 19, 2022), for the proposition that medical contractors may be found "liable for breaching a jailer's nondelegable duties." (Dkt. No. 157 at 32.) However, *Gonzalez* does not support that proposition, as *Gonzalez* concerned a "jailer's" liability—not the liability of the jailer's medical contractor. 2022 WL 1155744, at *5. In particular, *Gonzalez* held that a jailer would still be liable for a breach of its duty to ensure inmates' health, welfare, and safety, even if it arranged for a medical contractor to take on some of those duties, because ultimately, those duties are nondelegable. 2022 WL 1155744, at *6–7. *Gonzalez* does not show that a claim for negligence against a medical contractor for the breach of the jailer's duties is cognizable.

Finally, the Court acknowledges that its earlier order on Wellpath's motion to dismiss found that Plaintiff had pled the existence of a duty in part due to allegations that Wellpath had a contractual relationship with Clark County. (Dkt. No. 60 at 12–13.) But upon a fuller review of the arguments on summary judgment, the Court cannot find sufficient authority to allow the conclusion that a contractual obligation owed by a medical provider to a county may form the basis of a common law duty to a detainee.

The Court GRANTS NaphCare's motion for summary judgment on Plaintiff's negligence claim.

4.   Outrage

NaphCare argues Plaintiff cannot satisfy any element of his outrage claim. (Dkt. No. 141 at 18.) However, NaphCare's motion only substantively challenges two elements: (1) extreme and outrageous conduct and (2) intent or recklessness. (*See id.* at 18–19.) In particular, NaphCare argues that "[t]he mere fact of delay" in placing a diet order neither constitutes "outrageous and extreme conduct" nor "prove[s] that a NaphCare employee acted 'intentionally or recklessly'" (*id.* at 18–19); and that Washington law calls into question whether "'the conduct

of a health care provider might ever be considered outrageous'" (*id.* at 18) (citing *Christian v. Tohmeh*, 366 P.3d 16, 31 (Wash Ct. App. 2015)).

The two cases relied upon by NaphCare to demonstrate that "delay" neither constitutes "outrageous and extreme" conduct nor gives rise to a finding of recklessness or intent (*id.* at 18–19) involve delay relating to financial and property matters.  *Neyens v. American Family Mut. Ins. Co.*, 2012 WL 5499870, at *4 (W.D. Wash. Nov. 13, 2012) (rejecting claim of outrage that was based on an allegation that the plaintiff's insurance company "did not pay [the plaintiff] fast enough and forced her to arbitrate"); *Wells v. Chase Home Fin., LLC*, 2010 WL 4858252, at *8 (W.D. Wash. Nov. 19, 2010) (rejecting claim of outrage based on a "communication delay" and failure of the defendant "to stop the foreclosure process" against plaintiff homeowners).  They do not stand for a broader proposition that delay in any context will not support an outrage claim, and NaphCare does not provide a compelling reason for the Court to so extrapolate.  The cases appear particularly inapposite here, where Plaintiff's outrage claim is centered on Plaintiff's safety and ability to eat while in detention.  (Dkt. No. 157 at 30.)

The Court also finds unavailing NaphCare's reliance on *Christian v. Tohmeh*, 366 P.3d 16, 31 (Wash Ct. App. 2015), for the proposition that NaphCare's status as a health care provider effectively immunizes it from an outrage claim.  (Dkt. No. 141 at 18.)  While *Christian* reflects the difficulty a plaintiff may face in prevailing on an outrage claim against a medical provider, Plaintiff properly notes that medical cases are not entirely analogous to the instant case, which involves more fundamental obligations relating to the adequacy and safety of inmate meals.  (Dkt. No. 157 at 30.)

Further, as Plaintiff argues (Dkt. No. 157 at 29–30), Washington caselaw on outrage claims requires consideration of factors beyond a defendant's status as a health care provider.  In

1   particular, power dynamics between the parties may be "a significant factor in determining

2   whether liability [for outrage] should be imposed." *See Robel v. Roundup Corp.*, 59 P.3d 611,

3   620 (Wash. 2002) (internal citation and quotation omitted).  The power imbalance in this case is

4   pronounced—and certainly more pronounced than in a typical provider-patient relationship—as

5   Plaintiff's confinement deprived him of the ability to seek relief from any provider but

6   NaphCare.  The Court accordingly does not find that NaphCare's status as a medical provider

7   automatically protects it from a claim of outrage.

8         Finally, the Court observes that Plaintiff offers facts further indicating the resolution of

9   his outrage claim is more appropriately reserved for the jury (Dkt. No. 157 at 31) (citing Dkt.

10  No. 154 at 21–22), including evidence reflecting that NaphCare was routinely made aware of

11  Plaintiff's suffering through Plaintiff's grievances (Dkt. No. 155-32) but chose to disregard them

12  (155-38 at 2) (stating "no additional diet changes will be made").  These facts are relevant to

13  both elements NaphCare challenges—*i.e.*, "extreme and outrageous conduct" and intent or

14  recklessness.[7]  The Court declines to substitute its judgment for that of the jury on these

15  elements.  *See Snyder v. Medical Service Corp. of Eastern Wash.*, 35 P.3d 1158, 1163 (Wash.

16  2001) ("the determination of whether conduct is sufficiently outrageous to warrant recovery is

17  generally a question of fact for the jury").

18        The Court DENIES NaphCare's motion insofar as it seeks summary judgment on

19  Plaintiff's outrage claim.

20

21

22  _____

23  [7] NaphCare's opening motion failed to substantively challenge other elements of an outrage claim, including emotional distress.  (*See* Dkt. No. 141 at 18–19.)  Accordingly, the Court does not consider arguments in NaphCare's reply seeking to raise these challenges for the first time.  (*See* Dkt. No. 160 at 8.)

24

**B.     Wellpath's Motion for Summary Judgment**

Wellpath moves for summary judgment on all of Plaintiff's claims.  (Dkt. No. 146 at 1.)  As Plaintiff voluntarily dismisses his negligent infliction of emotional distress claim (Dkt. No. 156 at 7 n.1), the Court only assesses Wellpath's arguments insofar as they concern Plaintiff's Rehabilitation Act claim, *Monell* claim, negligence claim, and outrage claim.

1.     Rehabilitation Act Claim

The same arguments made regarding Plaintiff's Rehabilitation Act claim against NaphCare are applicable to his claim against Wellpath.  *See* section A.1., *supra.*  Plaintiff argues the Maine Department of Health and Human Services (DHHS) entered into a contract with Wellpath in which Wellpath would receive 100% of the funding for the contract under the grant.  (Dkt. Nos. 156 at 18; 155-51, 155-52, 155-53 at 1, 12.)  Despite the contracts being labeled "sub-awards," Wellpath correctly asserts there is a lack of evidence demonstrating anything more than a contractual relationship between Maine DHHS and Wellpath.  (Dkt. No. 146 at 13–14.)  For the same reasons NaphCare is not a recipient of federal funding based solely on its contractual relationship with Lewis County, Wellpath does not appear to receive federal funding as contemplated by § 504 based on its contract with Maine DHHS.

Plaintiff points out the first page of the contract requires Wellpath "agree[] that it will comply" with a list of federal laws including section 504, implicating the *quid-pro-quo* arrangement that binds recipients of federal funding.  (Dkt. Nos. 156 at 18 n.21; 155-53 at 1, 50–51.)  This exact argument was considered and rejected in *Abraham*:

> Plaintiff also notes that the contract between Clackamas County and Defendant requires that Defendant comply with all laws, specifically the Rehabilitation Act. Defendant argues that Plaintiff, who is not a party to the contract, has no legal standing to contend that Defendant has breached the contract. I agree with Defendant that the remedy for Plaintiff would be to bring a Rehabilitation Act claim against Clackamas County.

2017 WL 11718378, at *4.  This Court concurs; the contractual nature of the relationship between Wellpath and the Maine DHHS provides only for traditional breach-of-contract remedies.  As a result, Wellpath or Main DHHS—not Plaintiff—are the appropriate parties to enforce any such breach.[8]

Because Wellpath does not receive federal financial assistance as contemplated by § 504, and instead receives compensation for providing medical services, the Court GRANTS Wellpath's motion for summary judgment with regard to Plaintiff's Rehabilitation Act claim.

    2.    *Monell* Claim

Plaintiff bases his *Monell* claim on Wellpath's policy of not ordering medical diets until receipt of an individual's medical records.[9]  (Dkt. No. 156 at 7–9.)  Although Wellpath frames its challenges to Plaintiff's *Monell* claim as pertaining to the elements of causation and deliberate indifference, its arguments with respect to both elements focus on causation.  (Dkt. No. 146 at 10–12.)

Wellpath's principal contention is that Plaintiff is unable to demonstrate that its diet order policy was the moving force behind his injuries.  (*Id.*)  For instance, Wellpath maintains that Plaintiff has no evidence that he suffered any injury in the 35 hours during which Wellpath served as the Jail's medical contractor.  (*Id.* at 11–12.)  To this end, Wellpath points to the

---

[8] Wellpath points out Plaintiff cites no authority for the proposition that a recipient of federal financial assistance for a program or activity in one state (in this case, Maine) has Rehabilitation Act liability for a completely unrelated program or activity in another state (Washington).  (Dkt. No. 161 at 8.)  In either event, the Maine arrangement still does not constitute the acceptance of federal funds upon which a Rehabilitation Act claim could be brought.

[9] Although Wellpath argues it did not have a policy of waiting for confirmation of a diagnosis prior to placing an order for a medical diet (Dkt. No. 146 at 4, 12), the Court finds Wellpath's 30(b)(6) deposition testimony raises a dispute of fact as to the existence of such a policy.  (Dkt. No. 155-10 at 12.)

deposition testimony of Plaintiff's expert, Dr. Hujoel, in which Dr. Hujoel stated that she did not

know whether Plaintiff experienced symptoms from consuming gluten during Wellpath's time as

the Jail's medical contractor (Dkt. No. 147-3 at 11–12); as well as deposition testimony in which

Plaintiff did not recall whether he vomited or lost weight during the same period (Dkt. No. 147-9

at 25–26).  Wellpath further argues Plaintiff cannot establish causation because he has no

evidence demonstrating he was exposed to gluten while Wellpath was operating at the Jail.  (Dkt.

Nos. 146 at 7; 161 at 6.)  As support, Wellpath points to testimony in which Plaintiff said he did

not recall the food he consumed during this time.  (Dkt. No. 147-9 at 25–26.)

Plaintiff fails to offer facts refuting Wellpath's evidence or arguments.  Instead, Plaintiff

cursorily asserts that he was "immediately confronted with the choice between starvation and

eating unsafe food" and "experienced hunger and uncertainty" (Dkt. No. 156 at 10), while citing

three pages of his statement of facts (Dkt. No. 154 at 16–17, 25).  *See Unicorn Energy AG v.*

*Tesla, Inc.*, 2024 WL 3463356, at *29 (N.D. Cal. July 17, 2024) ("Broad citations to evidence

without explanation is alone grounds to grant summary judgment.").  But the pages Plaintiff cites

largely discuss events that occurred *after* Wellpath ceased operations at the Clark County Jail.

For instance, they reference various grievances filed by Plaintiff (*see* Dkt. No. 154 at 16–17,

n.66–67, 70, 75–76, 78–80); with only one of those grievances having been filed while Wellpath

was still in operation (Dkt. No. 155-32 at 2).  And although that single grievance contains a

request for a gluten-free diet, it does not identify any injury.  (*Id.*)

The cited portions of Plaintiff's statement of facts also briefly paraphrase conclusions of

Plaintiff's expert, Dr. Hujoel.  (Dkt. No. 154 at 25.)  Relevant here, Plaintiff maintains that Dr.

Hujoel "opined that Picciano's symptoms during detention and its aftermath were consistent with

gluten exposure" (*id.*), in turn citing four pages of Dr. Hujoel's expert report (Dkt. No. 155-3 at

3, 9–11, 13).[10]  Those four pages do not contain any opinion indicating that Plaintiff's injuries were caused by *Wellpath's* failure to immediately order a gluten free diet.  (*See id.*)

      As the evidence of injuries cited by Plaintiff is not tied to the timeframe in which Wellpath served as the Jail's medical contractor, it is unclear the basis on which those injuries can be attributed to Wellpath's diet order policy.  And to the extent Plaintiff seeks to argue that Wellpath's diet order policy was the moving force behind injuries incurred *after* Wellpath ended operations at the Jail, Plaintiff presents no factual basis to support this proposition.  Instead, Plaintiff merely speculates that a "reasonable juror could draw the inference" that he "became sick as a result of hunger and gluten exposure that began as a result of Wellpath's failure to promptly place a diet order" (Dkt. No. 156 at 10).  But "[a]rguments based on conjecture or speculation are insufficient" to survive summary judgment.  *McIndoe v. Huntington Ingalls, Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (internal citation and quotation omitted); *Coomes v. Edmonds School Dist. No. 15*, 816 F.3d 1255, 1261–1262 (9th Cir. 2016) ("conclusory statements . . . and [] lone citation to the factual record were insufficient to meet [the plaintiff's] burden" of showing a genuine dispute of fact).

      As Plaintiff fails to provide facts from which a jury could find Wellpath's diet order policy operated as the moving force behind Plaintiff's injuries, the Court GRANTS Wellpath's

---

[10] Plaintiff's citations to the record have created considerable difficulty for the Court.  Rather than cite evidence directly, Plaintiff supports his factual assertions, if at all, with citations to various pages of his statement of facts contained within his opposition to Clark County's motion for summary judgment.  Accordingly, for every fact asserted in Plaintiff's response, the Court has been sent on somewhat of a scavenger hunt: first, locating the relevant pages of Plaintiff's opposition to Clark County's motion for summary judgment; then, reviewing those pages to determine whether they contain an assertion truly aligned with the assertion advanced in the instant response; and only then, learning of the *actual* location of the evidence that Plaintiff contends supports the assertion in question.  *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) ("judges are not like pigs, hunting for truffles buried in briefs") (internal citation and quotation omitted).

motion for summary judgment on Plaintiff's *Monell* claim.

3.    <u>Negligence</u>

Like NaphCare, Wellpath argues Plaintiff's negligence claim fails as a matter of law. (Dkt. No. 146 at 20.)  Wellpath acknowledges this Court previously declined to find Plaintiff's negligence claim against Wellpath governed by Chapter 7.70, but maintains Plaintiff's lack of expert testimony, which is necessary to establish a duty—the standard of care—is fatal to his negligence claim.  As explained in Section A.3., *supra,* and in previous orders, the Court treats Plaintiff's claim as one of common law negligence.  (Dkt. Nos. 60 at 12; 132 at 9–11.)  Expert testimony is not required to establish common-law negligence, so Wellpath's argument is not well-taken.

Nonetheless, Wellpath is similarly situated to Naphcare.  The Court sees no reason why the same reasoning for dismissing Plaintiff's negligence claim against Naphcare should not apply to Plaintiff's negligence claim against Wellpath.  As with Naphcare, the Court is unaware of any common-law duty Wellpath owed to Plaintiff.  Any contractual duties Wellpath owed to the County did not create a common-law duty owed to Plaintiff.  In the absence of a common-law duty, Wellpath's negligence claims fails and the Court need not address any other arguments Wellpath raises.

The Court GRANTS Wellpath's motion for summary judgment with regard to Plaintiff's negligence claim.

4.    <u>Outrage</u>

Wellpath argues Plaintiff cannot demonstrate outrage, largely relying on the fact that it is "frequently dismissed by summary judgment" and is an "extremely difficult claim to establish." (Dkt. No. 146 at 15.)  True, the requirement of outrageousness is not an easy one to meet;

1    however, no case suggests that the standard to defeat a summary judgment motion is harsher for

2    plaintiffs asserting outrage claims than plaintiffs in other tort suits.  *Christian v. Tohmeh*, 366

3    P.3d 16, 30 (2015).

4         Courts may consider a number of factors in analyzing whether conduct is sufficient to

5    support an outrage claim, including (1) the position the defendant occupied, (2) whether the

6    plaintiff was particularly susceptible to emotional distress and the defendant was aware of the

7    susceptibility, (3) whether the defendant's conduct was privileged, (4) whether the degree of

8    emotional distress was severe as opposed to merely annoying, inconvenient or embarrassing, and

9    (5) whether the defendant was aware of a high probability that his or her conduct would cause

10   severe emotional distress, and consciously disregarded that probability.  *Sutton v. Tacoma Sch.*

11   *Dist. No. 10*, 324 P.3d 763, 768–769 (Wash. App. Ct. 2014).

12        Viewed in the light most favorable to plaintiff, and like NaphCare, the power imbalance

13   between Plaintiff and Wellpath is pronounced, which is a significant factor weighing against

14   summary judgment.  *Robel*, 59 P.3d at 620.  Plaintiff was emotionally distraught enough that the

15   police were called, leading to his arrest, and ultimately his first time in prison.  Plaintiff was in a

16   position making him particularly susceptible to emotional distress, something Wellpath knew or

17   should have known at intake.  (Dkt. No. 155-2 at 4.)  Plaintiff's emotional distress was severe; an

18   inability to safely eat while in jail is not merely annoying, inconvenient, or embarrassing.

19        Wellpath argues there was no evidence Plaintiff suffered severe emotional distress or

20   became ill during the 35-hour period Wellpath served as the medical contractor.  (Dkt. No. 146

21   at 17–18.)  By contrast, Plaintiff's declaration states: "[o]n January 31, 2020, I remember feeling

22   dawning horror and panic that I was trapped without food and that no one was responding to my

23   requests for help with safe food."  (Dkt. No. 155-2 at 5.)  This, on its own, is enough to create a

24

genuine dispute.  The Court notes there are also allegations not tied to a particular time period that could also create a genuine issue as to Plaintiff's severe emotional distress within the first 35-hour period.  (*See id.* at 7) ("I thought I was going to die because no one was helping me.  I cried a lot.").  There is at least a genuine issue as to whether Plaintiff suffered severe emotional stress in the first 35 hours of his time in the jail.

Wellpath argues Plaintiff's indication that he was to be released within 12 hours paired with his refusal of treatment demonstrated "no urgency to his condition," and "that fact alone demonstrates that Plaintiff cannot establish the outrage as to Wellpath."  (Dkt. No. 146 at 16.) Wellpath does not explain why a lack of urgency absolves it of liability under a theory of outrage.  Even still, as noted earlier, whether Plaintiff knew and understood what he was signing is an unresolved question of fact; Plaintiff testified he does not recall reading the form and signed it because he "was told to" by "the nurse." (Dkt. No. 155-1 at 21–22).  Tarah Ward, the intake nurse, testified she does not recall whether she informed Picciano that he could not receive a medical diet unless he signed the form.  (Dkt. No. 155-17 at 18).

Again, there is sufficient dispute here that the Court declines to substitute its judgment for that of the jury on these elements.  *Snyder*, 35 P.3d at 1163.  The Court DENIES Wellpath's motion for summary judgment with respect to Plaintiff's outrage claim.

## C.    Clark County's Partial Motion for Summary Judgment

Clark County moves for summary judgment on its claim under Title II of the Americans with Disabilities Act, Rehabilitation Act claim, *Monell* claim, and outrage claim.[11]  (Dkt. No.

---

[11] Clark County also moves for summary judgment on Plaintiff's claims for negligent infliction of emotional distress, battery, negligent misrepresentation, intentional misrepresentation, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.  (Dkt. No. 143 at 3–4.)  Plaintiff's response voluntarily dismisses

1    143 at 1 n.1, 3–4.)

2        Before discussing each claim independently, the Court addresses the County's

3    preliminary argument that Plaintiff's federal claims must be dismissed under the Prison

4    Litigation Reform Act, 42 U.S.C. § 1997e(a), because Plaintiff failed to "completely exhaust his

5    available administrative remedies" while at the Clark County Jail. (Dkt. No. 143 at 5–6.) The

6    Court disagrees. The PLRA precludes "*a prisoner confined in any jail*" from initiating a federal

7    action regarding "prison conditions . . . until [] administrative remedies . . . are exhausted." 42

8    U.S.C. § 1997e(a) (emphasis added). "The language of the statute is plain and unambiguous."

9    *Talamantes v. Leyva*, 575 F.3d 1021, 1023 (9th Cir. 2009). It "applies only to 'prisoners.'" *Id.*

10   "[A] person not 'incarcerated or detained' . . . at the time the action is filed is not a 'prisoner' for

11   purposes of the statute, and therefore, not subject to the exhaustion requirement." *Id.* As Clark

12   County does not dispute that Plaintiff was not detained when he initiated this action, the PLRA's

13   exhaustion requirement is inapplicable.

14       1.    Title II of the Americans with Disabilities Act & Rehabilitation Act Claim

15       The County challenges Plaintiff's ADA and Rehabilitation Act claim based on the lack of

16   evidence demonstrating the County acted with deliberate indifference. (Dkt. No. 143 at 7.) "To

17   recover monetary damages under Title II of the ADA or Rehabilitation Act, a plaintiff must

18   prove intentional discrimination on the part of the defendant."[12]  *Duvall*, 260 F.3d at 1138. In

19

20   these claims. (Dkt. No. 154 at 6 n.1.) Plaintiff further dismisses all claims against Clark County
     Jail. (*Id.*)

21   [12] Analysis of this feature is identical under both the Rehabilitation Act and the ADA, so the
     Court considers them together. The legislative history of the ADA indicates Congress intended
22   judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting
     the ADA. *Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 n.3 (9th Cir. 1995); *Zukle v.*
23   *Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) ("There is no
     significant difference in analysis of the rights and obligations created by the ADA and the

24

the Ninth Circuit, the appropriate standard for intentional discrimination is deliberate indifference.  *Id.*  Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood.  *Id.* at 1139.

When a plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test.  *Id.*  The County does not explicitly admit Picciano alerted the jail to his celiac disease and his need for a gluten free diet.  (Dkt. No. 143 at 7) ("In this case, the plaintiff alleges he notified the Jail at intake that he had celiac disease and was not provided a 'strict gluten free diet' throughout his custody.").  But the County makes no substantive argument refuting this fact, and the County's proffered evidence reveals the information was recorded on Picciano's intake form.  (Dkt. No. 144 at 6.)  Picciano also testified he told the nurse at intake he required a "strict gluten-free diet that's celiac friendly."  (Dkt. No. 155-1 at 19.)

It is unclear whether Plaintiff's notification to the County of his need for an accommodation is disputed.  The result remains the same, however, because if disputed, there is a genuine dispute of material fact as to what the County knew and when.  If undisputed, the Court moves to the second step below, which the Court also finds involves a genuine dispute.  In either event, summary judgment is inappropriate.

The County's duty on receiving a request for accommodation is well-settled by Ninth Circuit case law.  *Duvall*, 260 F.3d at 1139.  It was required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation.  *Id.*  The entity must

---

Rehabilitation Act . . . [t]hus, courts have applied the same analysis to claims brought under both statutes.").

1    gather sufficient information from the disabled individual and qualified experts as needed to

2    determine what accommodations are necessary.  *Id.*; *Wong v. Regents of Univ. of California*, 192

3    F.3d 807, 818 (9th Cir. 1999), *as amended* (Nov. 19, 1999).  The second element is satisfied if

4    the entity's "failure to act [is] a result of conduct that is more than negligent, and involves an

5    element of deliberateness."  *Id.*

6          The County argues it took appropriate action by following its policy and waiting for the

7    medical provider to order the diet, and Plaintiff cannot establish the County knew that having

8    such a policy was substantially likely to result in harm to a federally protected right.  (Dkt. No.

9    143 at 7.)  As a matter of course, the County states it "does not provide medically indicated diets

10   unless told to do so by its contracted medical provider."[13]  (*Id.* at 2.)

11         To be clear, violation of the ADA or the Rehabilitation Act is not categorically avoided

12   by the County abiding by its own policies or procedures, especially when those policies and

13   procedures themselves could violate the law.  What matters in determining whether the County

14   acted with deliberate indifference for purposes of the ADA and the Rehabilitation Act is the

15   adequacy of the investigation and the action the County took based on that investigation.

16         The County's 30(b)(6) witness, Kimberly Beltran, testified the County *could* approve

17   diets for somebody with food allergies without input from the medical contractor, but they

18   choose not to and instead wait for a medical provider to order the diet.  (Dkt. No. 155-11 at 8–9.)

19   The County requires an inmate provide medical records before they are approved for a medical

20   diet.  (*Id.* at 13.)  Beltran cited the costs and labor associated with providing specialized meals at

21

22   _____
     [13] This is not quite what the policy says. The exact language of the policy states: "[t]he Food
23   Service Supervisor, with approval from a Registered Dietician or the contract Physician, shall
     plan for therapeutic diets . . . The medical unit shall provide the kitchen staff with a daily
24   printout of therapeutic dietary restrictions."  (Dkt. No. 144 at 19.)

1    intake without first verifying necessity with a medical provider.  (*Id.* at 14–16.)  Beltran admitted

2    this has resulted in allergic reactions occurring in inmates waiting for their medical diet to be

3    approved.  (*Id.* at 15.)  Beltran also admits, depending on the severity of the reaction, a person

4    could die due to the delay in ordering a medical diet.  (*Id.* at 18.)

5           This is sufficient to demonstrate a genuine dispute as to whether the County acted with

6    deliberate indifference toward Picciano's disability and request for reasonable accommodation.

7    The County's policy of requesting medical records certainly demonstrates some level of fact-

8    specific investigation to determine what constitutes a reasonable accommodation for each

9    incoming inmate.  A modest delay in providing a reasonable accommodation is not actionable

10   under the ADA, because "the mere delay during correction of the problem" is "too trifling of an

11   injury" to support a claim.  *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 840 (9th

12   Cir. 2007).  But this logic only applies when the delay of an accommodation is a mere

13   inconvenience.  *See id.* (holding that a delay in providing a disabled person a hotel room with a

14   roll-in shower and shower chair was not a denial of access); *Suarez v. Superior Court of*

15   *California*, 283 Fed.Appx. 470, 471 (9th Cir. 2008) (unpublished) (holding that an order to

16   postpone arraignment to the following day when an ASL interpreter would be available does not

17   amount to deliberate indifference); *O'Connor v. Scottsdale Healthcare Corp.*, 871 F.Supp.2d

18   900, 903 (D. Ariz. 2012) (holding that delaying a visitor from entering a hospital by demanding

19   she register her service dog did not constitute constructive denial of a public accommodation).

20          The County fails to make a preliminary showing that the delay of Picciano's

21   accommodation was a mere inconvenience.  The evidence shows the County was aware that

22   persons with medical conditions could experience medical problems consuming the normal diets

23   during the interim period while their records are obtained.  The County was also aware that those

24

1    medical problems could lead to death.  The record reflects the jail's kitchen was capable of

2    making and serving gluten free meals to Plaintiff pending the arrival of his medical records.

3    Instead of providing a gluten free meal after intake, the County followed its policy, and there is a

4    genuine dispute as to whether this action denied a reasonable accommodation.  A reasonable jury

5    could conclude the County acted with deliberate indifference in withholding this

6    accommodation.  The Court DENIES the County's motion for summary judgment on Plaintiff's

7    ADA and Rehabilitation Act claims.[14]

8            2.    *Monell* Claim

9            The County moves for summary judgment on Plaintiff's *Monell* claim.  (Dkt. No. 143 at

10   9–14.)  But the County does not provide sufficient reasons why Plaintiff's claim cannot succeed

11   as a matter of law, and therefore does not carry its initial burden of production on summary

12   judgment.  Instead, the County's arguments amount to little more than recitations of general rule

13   statements and quotations from other cases alongside the occasional cursory assertion that

14   Plaintiff cannot prove a *Monell* claim.[15]  (*See generally id.*)

15           At its most specific, the County suggests that its "medical diet policy" is not

16   "unconstitutional" because "no case has held that the Constitution requires . . . Jail staff [to]

17   provide [medical] diets . . . without first receiving an order from a medical provider."  (*Id.* at 13.)

18

19   _____

     [14] The County also argues there is no evidence Plaintiff was denied a gluten free diet *because of*
20   his disability.  (Dkt. No. 143 at 7.)  This is not the standard; nor are the cases the County cites
     applicable because this case is not about discrimination in connection with the provision of
     medical care, but rather the failure to accommodate Plaintiff's requests for a gluten free diet.

21
     [15] The County appears to believe that merely stating that Plaintiff lacks evidence to support its
22   claim satisfies its initial burden on summary judgment.  (*See* Dkt. No. 143 at 4–5.)  To the contrary,
     "[a] moving party may not require the nonmoving party to produce evidence supporting its claim
23   . . . simply by *saying* that the nonmoving party has no such evidence."  *Nissan Fire & Marine Ins.
     Co., Ltd*, 210 F.3d at 1105 (emphasis added).  Allowing otherwise would permit defendants to
24   "use [] summary judgment motion[s] as [] substitute[s] for discovery."  *Id.*

1   But the County does not show that Plaintiff's *Monell* claim depends on the existence of a case

2   holding exactly that.  Rather, the County simply quotes a portion of *Gordon v. County of*

3   *Orange*, 6 F.4th 961, 972 (9th Cir. 2021), which stated in the context of a qualified immunity

4   analysis that the court was "not aware of any precedent expressly recognizing" a particular

5   constitutional right.  (Dkt. No. 143 at 13.)  The County fails to explain why an observation made

6   in the context of a qualified immunity analysis precludes Plaintiff's *Monell* claim.

7           The only other remotely specific argument offered by the County is a conclusory

8   assertion that Plaintiff has not "presented evidence 'of other events involving similar conduct or

9   constitutional violations' at the Clark County Jail due to the [County's] policy." (*Id.* at 13–14.)

10  But critically, the County does not show why evidence of other constitutional violations is

11  necessary in *this* case, particularly as evidence of other constitutional violations is not required

12  when a *Monell* claim is based on an "express polic[y]" rather than a custom or practice.[16]

13  *Gordon*, 6 F.4th at 974.  And to the extent the County's argument may be understood as

14  attacking the element of deliberate indifference, the Court notes that deliberate indifference need

15  not be shown through evidence of prior constitutional violations.  *See Hyun Ju Park*, 952 F.3d at

16  1141–42.

17          As the County fails to satisfy its initial burden on summary judgment, the Court DENIES

18  the County's motion with respect to Plaintiff's *Monell* claim.

19          3.      Outrage

20          The County offers two arguments in support of its motion for summary judgment on

21  Plaintiff's outrage claim.  First, the County argues Plaintiff's outrage claim must be dismissed

22

23  _____

    [16] The County fails to provide any reason why Plaintiff's *Monell* claim cannot succeed on the basis

24  of an express policy.

because Plaintiff's negligence claim will proceed to trial, and recovery for outrage is "allowed only in the absence of other tort remedies." (Dkt. No. 143 at 15.)  Plaintiff fails to respond to this argument. (Dkt. No. 154 at 37–39.)

The Court declines to dismiss Plaintiff's outrage claim on this basis.  Although the Court agrees with the County that Plaintiff may ultimately only recover for the tort of outrage absent recovery on his negligence claim, *Rice v. Janovich*, 742 P.2d 1230, 1238 (Wash. 1987), dismissal of Plaintiff's outrage claim at this time would be premature.  While the Court acknowledges the negligence claim will likely be presented to a jury given that the County does not move for summary judgment on that claim, the Court cannot yet definitively reach this conclusion until all evidence is presented at trial.  Assuming the negligence claim survives at trial and is presented to the jury, the Court will not present the outrage claim to the jury and will otherwise dismiss it at that time.

Second, the County provides a single sentence contending that its decision to "wait[] for medical to order plaintiff's medical diet" cannot be considered "extreme or outrageous" conduct. (Dkt. No. 143 at 16.)  The County provides no argument or authority to support its conclusory contention.  (*Id.*)  Absent argument and authority explaining *why* the County's conduct cannot, as a matter of law, support a finding of "extreme or outrageous" conduct, the Court DENIES the County's motion for summary judgment with respect to Plaintiff's outrage claim.[17]

---

[17] The County cites caselaw for the proposition that courts undertake a screening role in determining whether a defendant's conduct may give rise to an outrage claim. (Dkt. No. 143 at 16.) But the County offers no showing that the Court is required to engage in a screening analysis in the face of a motion for summary judgment that fails to offer non-conclusory, substantive argument.

1

### V       CONCLUSION

2        Accordingly, the Court finds and ORDERS that NaphCare's motion for summary

3    judgment (Dkt. No. 141) is GRANTED in part and DENIED in part; Wellpath's motion for

4    summary judgment (Dkt. No. 146) is GRANTED in part and DENIED in part; and Clark

5    County's partial motion for summary judgment (Dkt. No. 143) is DENIED.

6        As to Naphcare, Plaintiff's Rehabilitation Act and negligence claims are DISMISSED on

7    summary judgment.  Plaintiff's claim for negligent infliction of emotional distress is also

8    dismissed pursuant to Plaintiff's voluntary dismissal.

9        As to Wellpath, Plaintiff's Rehabilitation Act, *Monell* and negligence claims are

10   DISMISSED on summary judgment.  Plaintiff's claim for negligent infliction of emotional

11   distress is also dismissed pursuant to Plaintiff's voluntary dismissal.

12       As to Clark County, Plaintiff's claims for negligent infliction of emotional distress,

13   battery, negligent misrepresentation, intentional misrepresentation, breach of express warranty,

14   breach of implied warranty of merchantability, and breach of implied warranty of fitness for a

15   particular purpose are dismissed pursuant to Plaintiff's voluntarily dismissal.  Pursuant to

16   Plaintiff's voluntary dismissal, the Court further dismisses all claims against Clark County Jail.

17       All other claims remain consistent with this Order.

18

19       Dated this 19th day of August 2024.

20

21

22       David G. Estudillo
         United States District Judge

23

24